**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| THE LAMBERT LAW FIRM P.C.<br>    A Florida professional corporation<br><br>GEORGE LAMBERT<br><br>    Plaintiffs,<br><br>    v.<br><br>NATIONAL UNION OF FIRE INSURANCE<br>COMPANY OF PITTSBURGH, PA,<br>    A foreign corporation for profit registered<br>    In the State of Florida<br><br>GAVIN CURLEY<br><br>    Defendants | ACTION No. 1:25cv20340-CMA<br><br>**AMENDED COMPLAINT**<br><br>1. BREACH OF CONTRACT;<br>2. BREACH OF GOOD FAITH<br>   AND FAIR DEALING<br>   COVENANT;<br>3. BREACH OF IMPLIED<br>   CONTRACT;<br>4. PROMISSORY ESTOPPEL;<br>5. QUANTUM MERUIT;<br>6. DECLARATORY RELIEF;<br>7. EQUITABLE ACCOUNTING;<br>8. FRAUDULENT<br>   MISREPRESENTATION<br><br>Demand for Jury Trial |

**PREAMBLE.**

This is an action brought by a law firm based in Miami-Dade County and its principal attorney against an insurance carrier registered in Florida as a foreign corporation for profit (with a domicile in Pennsylvania).  The insurance carrier is a part of a larger conglomerate of insurance companies, American International Group Inc. (AIG).  The insurance carrier was obligated to pay for the legal representation of the insureds (in criminal and civil actions).  Since August 1, 2024, it has failed to pay for the legal services provided by the plaintiffs in several jurisdictions and refund the costs.  The action states the causes of action based on Breach of Contract, Breach of Implied Contract, Promissory Estoppel, Quantum Meruit, Declaratory Relief, Accounting, and Fraudulent Misrepresentation.  The claims are also asserted against the insurance carrier's affiliate,

agent, and attorney, who were responsible for some, but not all, of the tortious conduct stated against the insurance carrier.

## A. PARTIES

1.     Plaintiff The Lambert Law Firm Professional Corp., aka The Lambert Law Firm P.C., aka The Lambert Law Firm (hereinafter also "LLPC"), is a professional corporation registered in the State of Florida at 421 Poinciana Dr., 1422, Sunny Isles Beach, FL 33160, Docket Number P23000084634, FEI/EIN 93-4814613.  Its office in Florida is at 323 Sunny Isles Blvd, 700, Sunny Isles Beach, FL, 33160. The professional corporation has affiliated law offices in the District of Columbia and the State of Massachusetts, where the firm's principal attorney is also admitted and practices law. Information about the law firm's practice can be found on its websites: www.law-miami-lambert.com, www.law-lambert.com, and www.law-boston-lambert.com.

2.     Plaintiff George Lambert ('Lambert') is an attorney admitted in the State of Florida, the District of Columbia, and the State of Massachusetts with offices at the respective addresses: 323 Sunny Isles Blvd 700, Sunny Isles Beach, FL 33160, 1025 Connecticut Ave, 1000 NW Washington, D.C. 20036, and 100 Cambridge St., 14th Fl, Boston, MA 02114.  Lambert is admitted to practice in six U.S. District Courts and eight U.S. Courts of Appeals.  LLPC and Lambert, who act jointly, will also be named hereinafter also as LLPC.

3.     Defendant National Union of Fire Insurance Co of Pittsburgh, Pennsylvania ("NUFIC") is a for-profit foreign corporation registered in Florida, Docket 803349, FEI/EIN Number 25-0687550. NUFIC was registered in 1928. NUFIC, a capital stock company, is a part of the conglomerate AIG.  NUFIC's registered agent in Florida is c/o Chief Financial Officer, 200 E. Gaines St., Tallahassee, FL 32399.  NUFIC's head address is 1271 Avenue of the Americas, 37th Floor, New York, NY 10020.  NUFIC is a first-tier insurance carrier operating nationwide.

4.      Defendant Gavin Curley ("Curley") is an attorney, NUFIC's outside counsel, acting before LLPC as its exclusive agent to handle the Insurance Policy at issue.  Curley is a partner and attorney at Manire Curley LLP, with offices at 450 Lexington Avenue, 4th Fl., New York, New York 10017, and elsewhere.  Curley is the defendant in the present action because, due to his acts or omissions to act, as required under the insurance policy and standards in the insurance industry, Curley caused damages to LLPC with a domicile in Florida.

## B.  JURISDICTION AND VENUE

5.      This Court has jurisdiction in this action and over the defendants under Title 28, §1332. The first defendant, NUFIC, a Pennsylvania corporation, is registered in Florida as a foreign for-profit corporation.  The second defendant, Curley, is a resident of the State of York and engaged in intentional conduct or omission to act that have caused damages to the plaintiffs in Miami-Dade County.

6.      The Lambert Law Firm P.C. is a Florida corporation, and Lambert is a Florida resident.  The claims stated herewith support jurisdiction over defendant Curley under St. Fla. Stat. §48.193 et al. ('long-arm jurisdiction) and other laws.  The unpaid outstanding invoices for legal fees and refund of costs represent the damages caused to the plaintiffs and satisfy the statutory minimum required for the jurisdiction of the U.S. District Court, exceeding $75,000.

7.      The venue is proper.  The plaintiffs have offices in Miami-Dade County.  That is the main location of the law offices from which the plaintiffs' legal services were provided under the contractual arrangement originated by an insurance carrier in 2020, which was taken over in 2022 by NUFIC.  The checks and payments from NUFIC, to the extent paid, for the legal services for the insured were directed to the office in Miami-Dade County.  Upon dishonoring its

obligations starting from August 1, 2024, NUFIC has caused damages to two parties with offices in Miami-Dade County.

### C.  UNDERLYING FACTS.

8.      Lambert is a practicing attorney, licensed in three jurisdictions: Florida, the District of Columbia, and Massachusetts.  Lambert's practice is currently organized as The Lambert Law Firm Professional Corp., incorporated in Florida.  Lambert is admitted in six U.S. District Courts and eight U.S. Courts of Appeal.

9.      In July 2020, Lambert was contacted by a prospective client whose identity will be disclosed herewith by his initials M.K.  Providing the initials is proper for the present pleading, considering the ongoing court proceedings regarding that person, who needs legal representation. M.K. also acted as the Chief Executive Officer of the corporation, which has been in a similar position of a defendant in active litigation and will be identified herewith as CCI.  At this time, initials are also used for several attorneys given the active stage of certain legal proceedings.

10.      In initial phone interviews that M.K. initiated in July 2020, Lambert learned that M.K. had been since May 2019 a defendant in a civil action brought by the U.S. Securities and Exchange Commission (SEC), case 19cv4355, pending in the U.S. District Court for the Southern District of New York.  As it subsequently turned out, M.K. was also a defendant in two federal criminal cases that were unsealed in October 2020, namely cases 20cr109 and 20cr083, in the U.S. District Courts of Nevada and Colorado, respectively.

11.      M.K., as CEO of CCI, was qualified to be covered by the insurance policy, known as the corporation's Director & Officer Policy (D&O).  The corporation had contracted the insurance coverage, identified herewith as CCI.  The corporation, CCI, and M.K. were the beneficiaries, entitled to cover legal fees for defenses, Policy No. NHS671155, claim number

7030110232-00.  M.K. was the supermajority owner of CCI's common stock (over 80%).  M.K. was the founder of that corporation in 2007 and has since been its president, CEO, and director at all relevant times.

12.     The liability under the Insurance Policy No. NHS671155 was divided into five layers, the last of which (for $5 million) was NUFIC's responsibility. The insurance carriers who participated in that insurance coverage contract succeeded each other but were interrelated under the terms of the same continuous corporate insurance policy package, which NUFIC and others underwrote.

13.     In July and August 2020, Lambert had several telephone consultations with M.K., who elected to use Lambert's legal representation.  The insurance carriers were to pay for it, subject to guidelines and regulations.  That included a regulated time for processing invoices.

14.     In July and August 2020, Lambert had several interviews with the insurance carrier's representatives and attorneys in New York.  Lambert submitted the litigation strategy presentation, with the immediate list of filings.  The insurance carrier considered Lambert's evaluation of the procedural juncture in the SEC's litigation, his plan for the forthcoming filings, and ongoing discovery.

15.     Among other factors, the reason that the insurance carrier selected Lambert Law Firm included its principal attorney's admissions to the bar in three jurisdictions: the District of Columbia, Massachusetts, and Florida.  The selection and proposals by the insurance carrier to Lambert Law firm included the principal's admissions to practice in eight U.S. Courts of Appeals, as follows: for the District of Columbia, First Circuit, Second Circuit, Third Circuit, Fifth Circuit, Ninth Circuit, Tenth Circuit, and Eleventh Circuit.  The insurance carrier also considered that the principal attorney was admitted to practice in five U.S. District Courts: the District of Columbia,

the District of Massachusetts, the Middle District of Florida, the Northern District of Florida, and the Southern District of Florida.

16.     The insurance carrier approved Lambert to work as the defendants' attorney under that policy, NHS671155, and offered, in writing, the rate of $500 per hour for the principal attorney, $400 per hour for an associate, and $200 per hour for a paralegal, plus costs. Subsequently, supplemental claim number 7030110232-00 also identified the insurance policy. See Exh. 7.

17.     Namely, the letter from the insurance carrier on August 3, 2020, concerning retaining the Lambert Law Firm stated in its pertinent part: "*As indicated in our July 29, 2020 letter, RSUI will approve the retention of The Lambert Firm to represent you and Veronica Kontilai at the rates you proposed (following rates: $500/hr Partner, $400/hr Associate, and $200/hr Paralegal). RSUI's approval of The Lambert Firm is subject to the firm's agreement to abide by the RSUI Billing Guidelines. Please ask George Lambert to confirm that agreement. RSUI will also agree to the retention of local counsel in New York, to be identified by Mr. Lambert, subject to RSUI's approval and that firm's agreement to abide by the RSUI Billing Guidelines. If Mr. Lambert wishes to involve other U.S.-based lawyers or associate with ICLG on certain tasks, he will need to request pre-approval for any lawyer/firm Mr. Lambert would like to retain pursuant to the RSUI Billing Guidelines and provide details of the work to be performed*." Ibid., Exh. 1.

18.     The contract resulted from a meticulous, detailed negotiation, creating correspondence on the terms of work and compensation, dated July 31-August 5, 2020. Exh. 2. It was accompanied by Lambert's Executive Memo dated August 3, 2020, describing the prospective plan of work, litigation strategy, and immediate legal issues to be urgently addressed in numerous filings. Exh. 3.

19.     Lambert was made aware that five participating insurance carriers covered the Insurance Policy NHS671155.  Exh. 7.

20.     The Lambert Law Firm and Lambert agreed to those terms and started implementing them since August 3, 2024.  The Lambert Law Firm and Lambert started to provide M.K. with legal advice, services, and representation.  In August 2020, Lambert entered his appearance on behalf of M.K. in the case of the U.S. Securities and Exchange Commission, 19cv4355.  Lambert also appeared on behalf of M.K.'s wife, who was joined by the SEC as a relief defendant.  Lambert was diligent, active, and responsible in providing M.K. with defenses.

21.     The docket in that case, including the injunction proceedings and the intervenors' claims, has exceeded 1,620 filing events, with six intermediate appeals counted to date.  The District Court proceedings are still active in the portion of the intervenors' claims.

22.     Lambert and his firm participated in discovery, which included over 2 million pages at the time (later reaching 3 million pages). Lambert also conducted numerous depositions and defended the clients in their depositions. That civil matter in the intervenors' claims portion is pending. Since April 2025, the defendants' three appeals have been initiated from a judgment in favor of the SEC in the preceding month.

23.     In parallel, in October 2020, the U.S. Department of Justice unsealed two M.K. indictments for a total of 24 Counts, one indictment in the District of Nevada and the other in the District of Colorado.  If the maximum allowed sentence under each count were stacked and counted, the total would amount to about 364 years of imprisonment.  In March 2021, Lambert obtained admission to practice in the U.S. District Court for the District of Colorado.

24.     At the time, M.K. was in Europe, where he went in August 2019 before he was indicted, and he was not a fugitive.  In April 2023, M.K. was arrested in Germany.  The extradition

proceedings against M.K. were commenced per the U.S. Department of Justice's application under the Extradition Treaty with Germany of 1978.

25.     Within two days after M.K.'s arrest, per the client's emergency request, transmitted by telephone, Lambert traveled to Germany.  The High Regional Court for Bavaria and German authorities approved Lambert's credentials.  The Court and the prosecution allowed Lambert to visit M.K.'s detention center in Germany daily, subject to being accompanied by a German attorney.

26.     Acting in an emergency, the Plaintiffs immediately retained a local German attorney, Oehmichen International, with an office in Berlin to represent M.K. in the extradition proceedings.  That representation was effective to the extent that an immediate extradition of M.K. was prevented.  Thereafter, the Plaintiffs, that immediately prepaid German legal representation, had to wait for months to be refunded by NUFIC.

27.     The work with German attorneys and Lambert was preparing defenses to M.K.'s extradition, negotiating the extradition arrangements, and seeking assurances from the U.S. authorities regarding M.K.'s medical care and placement.

28.     Since April 2023, Lambert had to be in Germany to secure the representation of M.K. before the German authorities, jointly with local counsel.  In Germany, criminal defense attorneys would not agree to await payments through an insurance carrier months after work was accomplished and required retainers in advance.

29.     Lambert informed NUFIC in several memoranda of the issues of representation by German attorneys of M.K.  The acute issue was that German attorneys would not undertake work without prepayment, which NUFIC typically did not provide.  Short of default of German

attorneys' representation to represent M.K., Lambert had to advance some of his own funds or make a written pledge or personal assurance.

30.     Lambert entered his appearance in two criminal cases, 20cr109 and 20cr083, in two U.S. District Courts, mentioned above, and was the person of contact for the defense with the U.S. Department of Justice (DOJ).

31.     Given NUFIC's failure in bad faith to provide immediate payments to German attorneys as retainers or on an expedited basis, given M.K.'s immediate extradition, the Lambert Law Firm was forced to make advance payments to German law firms and attorneys to secure M.K.'s representation in German courts.  Numerous submissions were filed in the German courts by the law enforcement agencies and the defense. On working days, Lambert had to visit the client and German attorneys at the prison JVA Stadelheimer Str., 12, Munich, Germany.

32.     Among other updates, Lambert provided Curley and NUFIC an Executive Memorandum on June 25, 2023. Exh. 4.  Lambert explained to NUFIC and Curley that German attorneys will not do work without prepayment or immediate payment, and that NUFIC's slow processing of invoices jeopardized M.K.'s defenses in the extradition.

33.     In addition to Oehmichen International in Berlin, which The Lambert Law Firm had to hire as an emergency and de facto forced to make advances to German attorneys, who would not have worked without money upfront.  Those other German law firms and attorneys in Munich included Kreuzer, Pfister, Girshausen & Poesl law firm, Erhard Rechtsanwälte, Fachanwälte law firm, and others.

34.     Because NUFIC negligently approached its obligations and caused systemic delays, LLPC had to wait months before getting the refunds.  NUFIC saved money on translators because Lambert reads in German and is sufficiently fluent in German.

35.     Lambert was in contact with the U.S. Department of Justice concerning all extradition issues, including towards obtaining assurances that M.K.'s health condition would be addressed correctly in accordance with the international standards.

36.     In November 2023, Lambert traveled from Germany to New York for a jury trial in the SEC case.  The jury trial resolved only the liability issue for SEC against the defendants, but not any amounts.

37.     In January 2024, Lambert returned to Germany to continue representing M.K. in extradition proceedings and resumed visits to M.K. on workdays in the detention centers and the prison hospitals where M.K. was held in Germany.

38.     On March 13, 2024, the German Court ordered M.K.'s extradition subject to the written assurances provided by the DOJ, particularly concerning the defendant's health care.  The German Court noted in its decision the critically important assurances provided by the DOJ,

39.     The assurances given to the defense on behalf of the U.S. federal agencies regarding M.K.'s health care and other assurances were an essential outcome of the legal services provided in Munich, Germany.

40.     On May 3, 2024, M.K. was extradited to the U.S. and placed in a detention center in Nevada. Per M.K.'s request, Lambert went to Nevada, attended his arraignment in the U.S. District Court in Las Vegas on May 8, 2024, and resumed daily visits to prepare M.K.'s defenses in his two criminal cases, working on the preparation for the criminal trial.

41.     The government's disclosure to the defense exceeded 552,000 pages.  Together with the documents generated through discovery in the parallel civil case, the documentation exceeded 3 million pages.  Additionally, the case materials involved over 500 video materials.

42.     Lambert visited M.K. in the detention center in Nevada, in the privileged meeting rooms, nearly every day for over five months, allowed to bring two laptops (one for work the other containing cases' databases), often starting at 8 AM and sometimes until 5 PM or later, to work on disclosure and discovery and overcome the handicap of little to no detainee access to his cases' materials.

43.     The initially scheduled criminal trial was postponed, by stipulated Order, to November 2024.

44.     In parallel with preparing for the criminal jury trial, anticipating over 40 witnesses to testify, Lambert proposed to the prosecution to reach a possible plea bargain with the U.S. Department of Justice.  Those negotiations entered a decisive phase in July-August 2024.

45.     In July 2024, Lambert entered an appearance on behalf of CCI in the pending civil action of the SEC in the Southern District of New York, case 19cv4355.  Lambert became an attorney for M.K., CCI, and M.K.'s wife as a relief defendant in that case, the informed conflict waivers duly executed.

46.     Through July 2024, NUFIC paid the plaintiffs' Invoices, albeit with delays, without any objections to any entries therein.  All Invoices indicated the following payer's information: Director of Claims, AIG Claims, Inc., AIG - National Union Fire Insurance Co of Pittsburgh, P.A., 1271 Ave of the Americas, 35th Fl. New York, NY 10020; Gavin J. Curley, Esq., Manire Galla Curley, 450 Lexington Ave, 4th Floor, New York, NY 10017.  See front pages in Exhs. 5-6.

47.     LLPC's Invoices are always exceedingly detailed and prepared in good faith.  On some days, the description of work done approaches 12 lines.  The costs are presented with precision up to cents, with payment documents in support of payment made. For example,

Lambert, conscious of the insurance coverage, always used modest accommodations (three-star hotels near the respective prisons).

48.     On September 11, 2024, Lambert submitted in person to the client, M.K., Invoice 128 for the work done on M.K.'s three cases, namely two criminal cases and one civil case. That included preparing for the jury trial in the first criminal case, internal memoranda, daily visits to the detention center seven days a week, support work of two paralegals, and costs associated with living outside of the home State, e.g., the Holiday Inn costs in Pahrump, Nevada, the Enterprise car rentals, and other indispensable expenses. That also included work for a new civil jury trial in the Southern District of New York (subsequently canceled).

49.     The invoice was for August 2024, when Lambert and two other attorneys negotiated a plea bargain agreement with the prosecution. Without the assumption that the agreement would be finalized (after more than a dozen textual changes), Lambert engaged in trial preparation, scheduled to commence on November 21, 2024. That preparation included a review of over 3 million pages produced by the government and the parties in the related civil case of the SEC.

50.     The billed work included Lambert's daily meetings with the client in the detention center, including Saturdays and Sundays. Lambert's visits to the detention center were entered in the prison visitation journal. Lambert's work time in August 2024 was 174.7 hours. The notation was made that up to 20% of the actual work time was not entered in the Invoice, as a gesture of goodwill.

51.     Additionally, the firm's invoice included bridge payments to two co-counsels (Peter Joseph, Esq. and Gregory Smith, Esq., for a total of $7,500), the work of two paralegals, the ongoing costs for the Holiday Inn stay in Pahrump, Nevada, and the Enterprise car rental costs. See Exh. 5.

52.     Upon thorough review, the client, M.K., approved the invoice, writing on September 11, 2024, on the front page "Approved" with signature, and again "Approved" with the signature on the page showing the total numbers of the hours and amounts for the costs.

53.     That Invoice, for $105,191 and 34 cents, was transmitted to the payer, NUFIC and Curley, on that same day at 10:13 PM.  Since that presentment date, Lambert has received no substantive objections from NUFIC, Curley, or the clients regarding any entry to the date of the present Complaint.  See Exh. 5 (redacted, recognizing the confidentiality, work product).

54.     In September, the plaintiffs' work continued and was marked by a highly successful result when the plea bargain was finalized and signed with the prosecution on September 7, 2024. The plea bargain agreement was an exceptional achievement for the defense, as 23 Counts against the client, from two indictments, pending in two U.S. District Courts, were to be dismissed by the government.  Only one Count was left, with a moderate portion of the sentence negotiated for the government's submission to the Court.

55.     The invoice was for September 2024, included when Lambert and two other attorneys brought a plea bargain agreement with the prosecution to an executed version after dozens of changes were made from both sides.  The billed work included Lambert's daily meetings with the client in the detention center, including Saturdays and Sundays.  Lambert's visits to the detention center were entered in the prison visitation journal.  Lambert's work time was 172.6 hours in that month.  At the same time, Lambert prepared for the civil trial on the intervenor's claims in New York (subsequently, the trial was canceled).

56.     The notation was made that at least 20% of the real work time was not entered in that Invoice as a gesture of goodwill, as this was a routine custom of the plaintiffs to reduce their Invoices as a matter of courtesy.

57.     On October 8, 2024, Lambert presented to the client, M.K., Invoice 129 for the work on M.K.'s cases in September 2024.  That included daily visits to the detention center, meeting with the client nearly seven days a week, the services of two paralegals, and costs that reflected the Holiday Inn costs in Nevada, the car rental costs, and other local expenses.

58.     The client, M.K., approved that invoice, writing on the front page "Approved" with his signature, and again "Approved" with the signature on the page showing the total numbers of the hours and amounts for the costs.  See Exh. 6.

59.     The Invoice for $94,325 and 98 cents was transmitted to the payer, NUFIC and Curley, at 10:50 PM on the same day, October 8, 2024.  Since that date, Lambert has received no substantive objections from NUFIC, Curley, or clients regarding the entries in that invoice.  See Exh. 6.

60.     Lambert's legal work representing M.K. was very effective.  As a result, as mentioned above, a plea bargain was finalized with the government, which left one Count, whereas 23 counts in two criminal cases were to be dismissed.  M.K. was to be sentenced to 51 months.

61.     On October 27, 2024, Lambert wrote to Curley: "*We have not received checks for August and September (Nos. 128, 129), therefore it is best to route those payments now via ACH. Thank you for your attention*."

62.     Per Curley's request on October 27, 2024, Lambert executed an ACH form for AIG, which allowed NUFIC, to expediently send wire transfer payments instead of checks. Lambert interpreted that as a goodwill gesture and facilitation, meaning the next payment was about to arrive in the account.

63.     Lambert did not know that Curley's asking him to open an ACH for the payments from NUFIC on AIG's form was, as it turned out, a ruse to prolong the time Lambert continued to

work without payment, in effect giving false hopes of resolving the payments amicably and thus delaying the filing of this case.

64.     On November 6, 2024, Lambert wrote to Curley: "*I would like to inquire about payment for… my law firm's Invoices Nos. 128-129.  My law firm's account does not show incoming AIG payments to date.  Kindly update if it has been sent out but has not reached the account or, alternatively, when it will be sent*."

65.     On the same day November 6, 2024, Curley, as discovered, wrote to a consultant in insurance law, D.F., declining to follow his recommendations: "*We respectfully reject the premise in your email that National Union needs "authority" from you or others to issue payment for signed retention agreements by Mr. Kontilai or invoices that are presented to National Union for payment by Mr. Kontilai's counsel. National Union's obligations to Mr. Kontilai are governed by the National Union Policy…*"

66.     On several other occasions in November 2024, Lambert wrote to Curley, inquiring about the status of the payments per the outstanding Invoices 128 and 129, receiving a vague response or no response.  However, given that some checks were late or misdirected in the past,

67.     On November 25, 2024, Curley wrote, as it turned out, deceiving Lambert and LLPC that Curley awaited to be "…alerted when Mr. Lambert's firm is uploaded to the [ACH] system. Once that process is completed, National Union can issue an ACH payment to Mr. Lambert in the amount of $105,191.34 as payment in full for his invoice number 128."

68.     Curley never disclosed to Lambert that, in the end, NUFIC played for time and planned to dishonor its obligations to pay per the plaintiffs' Invoices.  NUFIC misled the plaintiffs into continuing to do legal work payable under the Insurance Policy.

69.     On December 8, 2024, traveled from Nevada to New York for an oral hearing and argued an appeal on behalf of M.K. before the Second Circuit U.S. Court of Appeals.  That appeal was about the defense's contesting the validity and the scope of the Preliminary Injunction Order obtained by the SEC in the case 19cv4355, for $46.1 million.

70.     On December 12, 2024, Curley wrote back to Lambert's new reminder about payment that M.K. "…*has not yet approved your invoice number 128*."  That was false because the client approved it on September 11, 2024, which was demonstrated by his endorsements in handwriting.  Exh. 5.

71.     Regrettably, Curley made untruthful statements on behalf of NUFIC to create confusion and delay filing the claims.  Curley improperly relied on the opinions of an insurance consultant D.F., whose role is unclear and whom Curley disavowed as having no authority in his November 5, 2025, email, received in the discovery.

72.     Based on Lambert's being attorney for M.K., Lambert believes that D.F. does not have any power of attorney or its equivalent to act on behalf of M.K.  Lambert is certain that D.F. has no authority to act on behalf of CCI, the corporation that Lambert represents at this time.

73.     Curley improperly failed in his professional obligation as an insurance professional and as an attorney bound by the applicable Rules of Professional Conduct not to copy for Lambert emails with D.F., containing important information concerning payments to Lambert.

74.     As it turned out from undisclosed correspondence, admitted in discovery, Curley improperly relied on the same consultant in insurance law, D.F. to delay payments, even though more than a month earlier, on November 6, 2024, Curley wrote to D.F., as quoted above, that D.F.'s opinions did not matter, and NUFIC itself made decisions on payments.

75.     In another email, Curley wrote another untruthful statement to Lambert that M.K. "…*is still reviewing your invoice number 128*."  That was likewise false, as the review was completed on September 11, 2024, with regard to Invoice 128, and the LLPC maintains that and preceding invoices in hard copies with the client's original signatures.  Curley knew that the insured's handwritten approvals supersede anything else.

76.     Expressly, the misrepresentations by Curley were untrue because Invoice 128 was approved by M.K. on September 11, 2024, in writing with the original signatures under the resolution "approved," addressed to Curley and NUFIC and Curley knew that as it was sent to him on the same day, September 11, 2024, at 10:13 PM.  Curley and NUFIC also knew that the client, M.K., signed the page with the dollar amounts "Approved."  See Exh. 5.

77.     Likewise, Invoice 129 was approved in writing on October 8, 2024, in a similar process, with M.K.'s resolution "Approved" on the front page and the page with the summary numbers.  See Exh. 6.  In the correspondence with Curley, Lambert pointed out that he retained the original sets with M.K.'s authentic signature, which he had given to Lambert in the detention center.

78.     On December 12, 2024, Lambert followed up on Curley's delays and ultimately failure to honor the payment obligation by NUFIC in a letter that stated, in rebuttal to Curley: "*The plain and clear material fact is that the client approved Invoice No. 128 for August on September 11, 2024, in writing.  I have that document with the original signatures if needed*."

79.     Lambert's letter to Curley and NUFIC further stated: "*That concerns the work already accomplished...  On the front page, the Invoice was directed to AIG National Union and you, without your objection. You have no basis for overriding a written approval of the invoice*

with the client's original signatures 3 months later as being untimely, no matter what excuses after the fact.  In my view, my law firm has been extremely cooperative in every regard."

80.     Lambert's letter to Curley and NUFIC further stated: "*If you had advised me that you were considering, on whatever pretext, to dishonor the written approval of the invoice, signed by the insured client, I would have filed motions to withdraw from the cases in which I have been working under CCI's policy, to cut my losses including, particularly, ever accumulating costs and advances made per the client's requests*."

81.     Lambert's letter to Curley and NUFIC stated: "*Respectfully, your failure to honor the insured's written approval should be treated as bad faith under the case law.  While working for [the client] for over 4 years, since August 2020, I have dedicated an extraordinary amount of work, typically with numerous hours of work that I even donated, e.g., sometimes in reality working on the client's case for over 10 hours a day, yet billing for only say 6.5 hours, in a conscientious manner.*"

82.     Lambert's notification and demand letter to Curley on December 12, 2024, further demonstrated the importance of Lambert's work for the insureds: "*On Monday, 3 days ago, I made, as it seems, a successful argument, on the appeal in the SEC's civil case in New York, before three Judges of the 2nd Circuit (who, as it seems developed a genuine interest in my points on the case law and who extended the argument to 38 minutes as opposed to the scheduled 20 minutes for the case)…*"

83.     Lambert's letter to Curley and NUFIC further stated: "*I also respectfully disagree with your view that an insurer is immune from the claims based on bad faith, at least under the law of Florida if it applies, the State where my main law office is and where the damages, as it*

*seems, have been caused.  See Harvey v. GEICO General Insurance Co.*, Supr. Ct of Fl., 2018, 259 So.3d 1, and a line of cases on bad faith…"

84.     Acting in bad faith, neither Curley nor any representative of NUFIC responded, as of the date of the present filing, dishonoring their obligations to pay, thus making this action unavoidable.

85.     As a result, NUFIC and Curley abandoned the insureds, M.K. and CCI, in their duty to defend them both in the criminal proceedings and in the civil case of the SEC, 19cv4355, in the Southern District of New York.  In the Spring of 2025, Lambert remains the only active attorney representing the defendants in that action, apart from one local attorney sponsoring Lambert's pro hac vice appearance.

86.     Notably, Lambert, essentially representing the defense himself, faced the representation of the SEC through three trial attorneys and the agency's internal staff.  Lambert also had to deal with about four attorneys representing the intervenors, adverse to the defendants in that civil action.

87.     NUFIC and Curley's dishonoring to pay the plaintiffs to secure the representation of the insureds, CCI and M.K., in a major civil action brought by a federal agency represented an extraordinary manifestation of bad faith and failure to comply with their obligations to maintain the insureds' legal representation.

88.     As stated above, NUFIC and Curley's dishonoring the obligation to pay the legal fees and costs incurred by the plaintiffs in this case jeopardized M.K.'s criminal defense.

89.     Acting under the applicable Rules of Professional Conduct, Lambert did not abandon the client and continued working on the insureds' cases despite not being paid.  On January 3, 2025, a judgment was entered in M.K.'s criminal case in one District Court.

90.     Under the terms of the plea bargain agreement, reached upon Lambert's initial proposal, where Lambert was a critical component in the negotiations process on the defense's side, M.K.'s second criminal case, in the District of Colorado, was dismissed with prejudice. The Court issued a sentence of 51 months, which matched the plea bargain terms.

91.     M.K.'s imprisonment in Germany and pre-trial incarceration were to be deducted, leaving the client under two years to serve in a prison camp.  Lambert received numerous congratulations from other attorneys, stating that his defense work was excellent.

92.     Lambert's work was handicapped by NUFIC's not paying even costs.  For example, Lambert requested and received from a court reporter a proforma invoice of $748 for M.K.'s sentencing hearing on December 4, 2025, which was forwarded to Curley and NUFIC for immediate payment.  Curley promised to LLPC to process payment, stating that a wire transfer to LLPC's account was coming.  Then, according to Curley, that wire transfer did not go through, but, as an alternative suggestion, NUFIC's check has never arrived either.

93.     Curley's and NUFIC's persistent failures to pay indispensable fees and costs prompted the defendant's decision not to appeal in the U.S. Court of Appeals for the Ninth Circuit from the criminal judgment of January 3, 2025. That was despite the plea bargain agreement allowing M.K. to appeal the judgment, albeit within a narrow area of specified appellate issues.

94.     On March 14, 2025, the U.S. District Court for the Southern District of New York entered a judgment in case 19cv4355, in the SEC claims portion of the cases, against the defendants.  On April 9-11, 2025, Lambert filed three notices of intermediate appeal, on behalf of M.K., CCI, and M.K.'s wife, in the U.S. Court of Appeals for the Second Circuit.

95.     Curley and NUFIC received Lambert's emergency ad hoc invoice for two filing fees of the U.S. Court of Appeals, $605 each, for $1,210.  NUFIC failed to pay the appellate filing

fees of the two insureds, demonstrating their ultimate failure to fulfill their duty to defend under the insurance policy obligations.

96.     NUFIC's non-payment even of the appellate filing fees, $1,210, could entail jurisdictional consequences for the two insureds in the appeals to defend against a judgment exceeding $40 million, and represented an ultimate demonstration of bad faith in the insurance industry.

97.     Despite the bad faith of NUFIC and this case being filed, Lambert could not abandon the clients, under the Rules of Professional Conduct, remaining the only active attorney for both insureds.  The component of the civil case 19cv4355, represented by the Intervenors' claims, remains pending in the same case in the U.S. District Court for the Southern District of New York, where Lambert, by himself, faces about eight opposing attorneys on behalf of the SEC and the intervenors.

98.     NUFIC's and Curley's conduct in bad faith represented a complete disregard of the standards in the insurance industry, that is mainly left to the States to regulate, under the McCarran-Ferguson Act, 15 U.S.C. §1011 et seq.  The defendant failed to follow or implement specific State regulations of the insurance industry, particularly promulgated by the Office of Insurance Regulation, 200 East Gaines St., Tallahassee, FL 32399.

99.     NUFIC, registered in Florida, has been in violation, inter alia, of Fl. Stat. §626.9521. The statute prohibits unfair or deceptive acts or practices within the insurance industry and outlines the penalties for violating these regulations..  Specifically, it prohibits any trade practice defined as unfair or deceptive under the statutory law.

100.     The issues of NUFIC's and Curley's problematic conduct included but were not limited to: failure in the duty to defend the insureds, M.K. and CCI; failure to interview the

attorneys for the insureds; other than Lambert, paying other attorneys who made duplicative work or next to no good faith work, instead of paying LLPC; paying legal fees to certain attorneys without executed retainer agreements; on the occasions admitted by NUFIC, not having copies of retainer agreements and overpaying certain other attorneys, without the necessary evidence of work.

101.    NUFIC admitted that it had failed to interview any German attorneys representing the insured in M.K.'s extradition proceedings.  On an occasion known to LLPC, NUFIC prepaid in about January 2024 over $200,000 to an attorney, N.H., who graduated from a German law school only a year earlier, as well as her associates.  The German attorney lacked the experience and skills to represent a defendant in complex extradition proceedings; she was unable to prepare legal briefs for the Court.  As the evidence shows, N.H. failed to account for the amounts she received or explain what exactly her legal fees were for.  Under N.H.'s representation, M.K.'s extradition was ordered.

102.    In another example, NUFIC, failed to interview an attorney in Nevada, T.L., and prepaid him about $175,000, even though M.K. refused to sign a retainer agreement with him.  In the detention hearing at which said attorney took the floor, T.L. demonstrated that he was largely unfamiliar with M.K.'s case.  The government later quoted T.L. in its submission showing his lack of the necessary knowledge of the case and arguing incoherently.  Later, it turned out that the said attorney was subject to disciplinary proceedings in the Supreme Court of Nevada, docket No. 83245.  The said attorney was subject to a one-year suspension, which was postponed for five years, the postponement period is in force at this time.  NUFIC and Curley did not send any questions about his disciplinary status or interview him.

103.     Lambert approached a total of 5 years of being an attorney for M.K. and CCI for a part of that time, accumulating an extensive knowledge of facts and documents exceeding 3 million pages. Lambert's rate has been lower than most of the attorneys involved in the case.  A diligent insurance carrier should have considered Lambert and LLPC as valuable assets for implementing its duty to defend.

104.     Instead, NUFIC paid an extraordinary number of unnecessary or duplicative attorneys from different law firms without justification and failed even to undertake interviews with the attorneys to whom it was sending sizeable payments.  NUFIC's handling of attorneys was comparable to a "revolving door."  Sometimes, under NUFIC's mishandling of its obligations to provide efficient defense, attorneys were paid but only provided representation for a few months, never getting up to speed, and were dropped from the representation.

105.     NUFIC admitted in discovery that it had paid over 20 different firms.  Thereby, NUFIC never used the required diligence.  Some payments of the insurance funds by NUFIC were unwarranted, nearly useless, or extravagant.

106.     As another example, NUFIC paid one attorney in Las Vegas (notable for some disciplinary proceedings long ago, reaching the U.S. Supreme Court) $50,000 for traveling to Munich, with his consultant, and spending less than ten hours with M.K.  That attorney showed a lack of diligence, coming into the meetings, as Lambert observed, without being sufficiently familiar with M.K.'s indictments, reading those at the meetings.  That attorney, whose trip was useless, was subsequently never retained.  In another example, NUFIC paid a consultant doctor at the rate of $1,000/hr to visit M.K. in detention, without the right to touch or examine the detainee, but to have a conversational meeting towards a medical consultative opinion.  That rate, which NUFIC paid, was at the rate of about a triple of similar consultation services in Las Vegas.

107.     At no time did NUFIC send to Lambert or to any other attorney paid in that matter its Guidelines and Regulations for working under an Insurance Policy, which is typical for first-tier insurance carriers, to which NUFIC belongs.  In the discovery commenced in this case, it turned out that NUFIC does not have such a document, e.g., Guidelines and Regulations or its equivalent, for attorneys.

108.     That essentially represented NUFIC's waste of financial resources vested in the Insurance policy, as each attorney claimed time and dedication to get up to speed, only to drop off from the representation, often within a short period.  Curley often did not respond to emails for weeks. NUFIC's and Curley's handling of a D&O policy was extraordinarily inefficient.  Curley's correspondence with various attorneys could be best described as a documentary mess.  That occurred at the expense of the truly indispensable work provided by LLPC.

109.     NUFIC's course of business causing damages to LLPC is governed in Florida, where NUFIC is registered as a foreign for-profit organization. NUFIC is subject to regulation under Florida's statutes, Chapter 624, Title XXXVII Insurance, Fl. St. §624.01 et seq.

110.     Plaintiffs allege that NUFIC's conduct fell under the clause of Fl. Stat. 624.155, 'Civil remedy' "(8)… acts giving rise to the violation occur with such frequency as to indicate a general business practice and these acts are: (a) Willful, wanton, and malicious; (b) In reckless disregard for the rights of any insured..."

### COUNT I.
### BREACH OF CONTRACT.
### (stated against Defendant NUFIC)

111.     Plaintiffs incorporate by reference the allegations in Paragraphs 1 to 110 above and further allege as follows.

112.    The underlying contractual obligations to defend the insureds are stated in five sister insurance policies, operating in conjunction, divided among five insurance carriers, each responsible for a $5 million layer, totaling $25 million.  NUFIC was responsible for the last, fifth layer, covering the continuation of the legal defenses on behalf of CCI and its CEO, M.K. Plaintiffs refer to, and incorporate by reference, Exh. 7, which represents all five interrelated insurance policies, the last of which was NUFIC's responsibility.

113.    Prior to NUFIC, none of the preceding four insurance carriers showed the extraordinary problems that appeared after NUFIC took over payments in 2022.  NUFIC was the only one that showed bad faith and failed in its duty to defend.

114.    This case states a cause of action for breach of contract satisfying the required elements.  LLPC has shown breach of contract action since August 1, 2024 (commencing non-payment), where there was: (1) a valid existing contract; (2) the defendants committed a material breach of the contract; and (3) damages resulted.  *Deauville Hotel Management, LLC v. Ward*, 219 So.3d 949.

115.    As mentioned above, under the insurance policy, NHS671155, the work of The Lambert Law Firm and Lambert on representing the insured parties, CCI and M.K., goes back to July-August 2020.

116.    In July and August 2020, Lambert had several interviews with the insurance carrier's representatives and attorneys.  The insurance carrier considered Lambert's evaluation of the procedural juncture in the SEC's litigation, plan of filings, and discovery.  Details of the negotiations are in Exhs 1-2, incorporated by reference, showing a good-faith approach of the Lambert Law Firm.

117.    The contract-creating correspondence, dated July 31-August 5, 2020, was accompanied by Exh. 3, Lambert Law's Memorandum to the insurance carrier on the litigation strategy and plan of work, with legal issues to address, dated August 3, 3020 (subject to redacting out privileged information).

118.    Among other factors, the reason that the insurance carrier selected The Lambert Law Firm included its principal's admissions to the bar in three jurisdictions.  That includes admission to the bar in the District of Columbia, Massachusetts, and Florida.  Lambert is currently admitted in nine U.S. Court of Appeals, as follows: U.S. Court of Appeals for the District of Columbia; the First Circuit; the Second Circuit; the Third Circuit: the Fifth Circuit; the Ninth Circuit; the Tenth Circuit; the Eleventh Circuit, and the U.S. Court of Appeals for Federal Claims. The insurance carrier also considered that the principal attorney is admitted to practice in five U.S. District Courts, namely: District of Columbia; District of Massachusetts; Middle District of Florida; Northern District of Florida; Southern District of Florida, and since 2021 the U.S. District Court for the District of Colorado (admitted specifically for representing M.K. in that Court).

119.    The insurance carrier approved Lambert to work as an attorney and an associate. The insurance carrier offered, in writing, the rate of $500 per hour for the principal attorney, $400 per hour for an associate, and $200 per hour for a paralegal, plus costs.  See Exhs. 1-2.

120.    Namely, the letter from the insurance carrier on August 3, 2020, concerning retaining the Lambert Law Firm, stated in its pertinent part: "*As indicated in our July 29, 2020 letter, RSUI will approve retention of The Lambert Firm to represent you and Veronica Kontilai at the rates you proposed (following rates: $500/hr Partner, $400/hr Associate, and $200/hr Paralegal).  RSUI's approval of The Lambert Firm is subject to the firm's agreement to abide by the RSUI Billing Guidelines.  Please ask George Lambert to confirm that agreement. RSUI will*

26

*also agree to the retention of local counsel in New York, to be identified by Mr. Lambert, subject to RSUI's approval and that firm's agreement to abide by the RSUI Billing Guidelines.  If Mr. Lambert wishes to involve other U.S.-based lawyers or associate with ICLG on certain tasks, he will need to request pre-approval for any lawyer/firm Mr. Lambert would like to retain pursuant to the RSUI Billing Guidelines and provide details of the work to be performed*." See Exh. 1.

121.    The Lambert and the Lambert Law Firm confirmed the proposal, stating it agreed "enthusiastically," and it then engaged in effective legal representation.  See Exhs. 2-3.

122.    NUFIC was aware, as a successor payer in the final layer of insurance coverage, of the approval granted to the plaintiffs by a predecessor insurance carrier after all reviews, investigations, and decision-making processes, including Lambert's presentation of the plan of legal work, litigation strategy, including the proposed filings and discovery.

123.    NUFIC and Curley, who were required to review all prior arrangements with the attorneys working under that Insurance Policy, took over the policy's obligations for $5 million.

124.    The combination of the Insurance Policy package for CCI, by five insurance carriers, represented a continuous contract obligating the insurance carriers in their succession to defend CCI and M.K.  While NUFIC's Policy was the last, fifth, of the package of five, its reading relates to the other four policies and should be read together. Exh. 7.

125.    The insurance policies previewed the duty to defend as operating worldwide.  In the real situation, when legal fees of German attorneys were required, NUFIC was unwilling to change its after-the-fact payments.  That jeopardized the legal representation of M.K. in Germany, where attorneys would not do defense work without money up front, as is standard in Germany.

126.    Being guided by good faith, Lambert, the only American attorney working on the extradition matter, had to make advances or pledges to pay German attorneys.  A disclaimer is made that, ultimately, NUFIC later refunded those payments LLPC made to German attorneys.

127.    As mentioned above, NUFIC and Curley received Invoices 128 and 129, approved in writing by the client, M.K., on September 11 and October 8, 2024, respectively.  The approval was express and in writing, containing the client's original signatures on the front and last dollar amounts summary page, with exact numbers.  NUFIC was in communication with RSUI and was aware of those terms.

128.    At no time did NUFIC, Curley, or the client, who was given a courtesy of several days to review those, question any entry, or point to a single entry in those Invoices.

129.    Prior to the correspondence on December 12, 2024, Curley and NUFIC made it appear that the payment was being processed and about to be made, inviting Lambert to open an ACH account for expediency.

130.    On December 12, 2024, however, Curley, on behalf of NUFIC, made statements that operated to renege and dishonor their contractual obligation to pay on the work and costs undertaken by the plaintiffs as early since August 1.  That put LLPS in a difficult position after months of accumulating costs, that had to be paid from the attorney's pocket.

131.    If Curley and NUFIC had not acted deceptively and unfairly, as they did, Lambert would have started in September 2024 the process of withdrawing, responsibly and fairly, from the actions in which he represented M.K. and cut the practice's losses.

132.    Instead, Curley and NUFIC made it appear to the plaintiffs that payment was coming, asking to enroll in ACH, and impliedly encouraging Lambert to stay on and continue work, avoiding defaults.  That included the case where Lambert is currently the only attorney for

M.K. and CCI in a big civil case of the U.S. Securities and Exchange Commission, 19cv4355, pending in the U.S. District Court for the Southern District of New York.  That included preparing for an oral argument and undertaking it in the 2nd Circuit, U.S. Court of Appeals, on December 9, 2024.

133.    Knowing about Lambert's extensive and intense work while representing M.K. and CCI, Curley and NUFIC, acting in bad faith, misled Lambert and LLPC into continuing legal work, accumulating costs that, as it now appears, they never intended to repay.

134.    The plaintiffs' claim is consistent with *Harvey v. GEICO General Insurance Co., Supr. Ct of Fl.*, 2018, 259 So.3d 1, other case law, and the statutory framework for insurance carriers engaging in business in Florida.

135.    The plaintiffs seek relief, a judgment, and an order against NUFIC to pay LLPC, what they owe under Invoices 128 and 129, as well as subsequent work and costs undertaken by LLPC for representing the insureds.

## COUNT II
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### (stated only against Defendant NUFIC)

136.    Plaintiffs incorporate by reference the allegations in Paragraphs 1 to 110 above and further allege as follows.

137.    The implied good faith and fair dealing covenant exists in virtually all contractual relationships. *County of Brevard v. Miorelli Engineering, Inc.,* 703 So. 2d 1049, 1050–51.  The implied covenant of good faith is "to protect the reasonable expectations of the contracting parties." *Ins. Concepts & Design, Inc. v. Healthplan Services, Inc*., 785 So. 2d 1232, 1234–35; *Cox v. CSX Intermodal, Inc*., 732 So. 2d 1092, 1097.

138.     As shown above, the plaintiffs have been parties to the contract with the predecessor insurance carrier under the policy since August 3, 2020. When NUFIC substituted the previous insurance carrier, it inherited the rights and obligations of the insurance carrier under the same Insurance Policy package.  Exh. 7.

139.     As stated above, Lambert started to work on the legal representation subject to the insurance carrier's payments in August 2020.  The parties then established a protocol on which the plaintiffs relied, namely a written approval of an invoice by the client, subsequent processing, and payment by a check.   Until November 2024, Lambert could rely on the insurance carrier's obligations to secure the defense of M.K. in his cases.

140.     On September 11 and October 8, 2024, NUFIC and Curley received Invoices 128 and 129, approved in writing by the client, M.K.  The approval was in writing with the client's original signatures on the front and the last summary page of dollar amounts.

141.     Prior to the correspondence on December 12, 2024, exposing NUFIC's intent to dishonor the obligations to pay, Curley, acting as an agent for NUFIC and thus NUFIC, made it appear as though the payment was being processed and was about to be made in a day or two. Curley invited Lambert to open an ACH account to expedite payments and prolong the time.

142.     However, on December 12, 2024, Curley and NUFIC made statements that reneged and dishonored their obligation to pay for the work and costs undertaken since August 1, 2024, even after the client's express written approval. That put LLPC in a difficult position after months of continuously accumulating out of pocket costs.

143.     Had Curley and NUFIC not acted deceptively and unfairly, as they did, when it was not too late to withdraw, LLPC would have started the steps in September 2024 necessary to

withdraw from the actions in which he represented M.K. and CCI back in September and cut the law practice's losses resulting from the failed payments by NUFIC.

144.    Instead, Curley and NUFIC made it appear that payment was coming, asking to enroll in ACH, implying that Lambert should stay on and continue legal work.  Thereby, Lambert is the only active attorney for M.K. and CCI in a big civil case of the U.S. Securities and Exchange Commission, 19cv4355, in the U.S. District Court for the Southern District of New York. Lambert's work included preparing for an oral argument and undertaking it in the 2nd Circuit, U.S. Court of Appeals, on December 9, 2024.

145.    Knowing about Lambert's extensive, intense, and dedicated work in representing M.K. and CCI for years, Curley and NUFIC, acting in bad faith, misled Lambert into continuing legal work, accumulating costs that, as it now appears, they never intended to repay.

146.    Plaintiffs seek relief on the claim of breach of the covenant of good faith and fair dealing against NUFIC to pay the plaintiffs what they owe under Invoices 128 and 129 and subsequent work and costs undertaken by the plaintiffs.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**
**(stated only against Defendant NUFIC)**

147.    Plaintiffs incorporate by reference the allegations in Paragraphs 1 to 110 above and further allege as follows.  The present Count is stated as an alternative to Count I, 'Breach of Contract,' in the event the Court or jury does not validate the obligations of NUFIC under the retainer Agreement of August 3, 2020, for any reason, in part or whole.

148.    This action states a cause of action for breach of implied contract with the same elements as a cause of action for breach of contract, except that the promise is not expressed in words but implied by the promisor's conduct.

149.    As stated above, Lambert started working on the legal representation subject to the insurance carrier's payments in August 2020 under the Insurance Policy.  The parties established a protocol on which the plaintiffs relied, resulting in payments by check. Until November 2024, Lambert had no grounds no doubt the insurance carrier's payment obligations before LLPC to secure the defense of M.K. and CCI in their cases.

150.    Specifically, NUFIC and Curley received Invoices 128 and 129, which were approved in writing by the client, M.K., on September 11 and October 8, 2024.

151.    Prior to the correspondence on December 12, 2024, Curley, acting as NUFIC's agent, and thus NUFIC, made it appear as though the due payment to the plaintiffs was about to be made, inviting Lambert and LLPC to open an ACH account on AIG form for expediency.  LLPC did so by implementing Curley's instructions.

152.    However, on December 12, 2024, Curley and NUFIC, under whose authority Curley acted, made written statements that reneged and dishonored NUFIC's obligation to pay for the work and costs undertaken since August 1, 2024.

153.    Had Curley and NUFIC not acted deceptively and unfairly, as they did, Lambert would have started in September 2024 to undertake the steps necessary to withdraw from the actions in which he represented M.K. back in September and cut the law practice's losses.  NUFIC gained time reaching a point when LLPC became the only defense attorney for M.K. and CCI, and it was too late to withdraw, in light of the applicable Rules of Professional Conduct.

154.    Curley and NUFIC made it appear that regular payment was coming, asking to enroll in ACH and implicitly encouraging Lambert to stay on and continue work.  Thereby, Lambert is the only active attorney of record for M.K. and CCI in a big civil case of the SEC, 19cv4355, in the U.S. District Court for the Southern District of New York, including appeals.

155.    Knowing about Lambert's extensive, dedicated, and meticulous work in representing M.K. and CCI, Curley and NUFIC, acting in bad faith, misled Lambert and LLPC into continuing legal work, accumulating costs that, as it now appears, they never intended to repay.

156.    In the event the alternative recovery under Count 'Breach of Contract' is found not supported sufficiently by the documentary evidence, Plaintiffs seek the relief of an order against NUFIC to pay the plaintiffs what they owe under Invoices 128 and 129, and subsequent work and costs, undertaken by the plaintiffs.

**COUNT IV**
**PROMISSORY ESTOPPEL**
**(stated against both Defendants)**

157.    Plaintiffs incorporate by reference the allegations in Paragraphs 1 to 110 above and further allege as follows.

158.    The present Count is pleaded in lieu of, and as an alternative of, Count I, 'Breach of Contract', should the court find that evidence of the formation of a contract on August 3, 2020, binding NUFIC was insufficient.  Exhs. 1-3.

159.    The law on the promissory estoppel claim can apply to this matter if the enforceable contract is not established.  Promissory estoppel is the concept that the law can enforce a promise if the promisee is injured or suffers a resulting loss after relying on that promise. The promisor is then barred from arguing that the underlying promise at the heart of the case should not be legally upheld.  Ref. Restatement (Second) of Contracts § 90.  In the alternative, that recovery theory can apply to this case.

160.    NUFIC and Curley received Invoices 128 and 129, which were approved in writing by the client, M.K., on September 11 and October 8, 2024, respectively. The approval was in

writing, with the client's original signatures on the front and last dollar amount summary page, along with dollar amounts up to a cent.

161.    As stated above, before the correspondence on December 12, 2024, Curley, acting as an agent for NUFIC and thus on behalf of NUFIC, made it appear that the payment was being processed and was about to be made, inviting Lambert to open an ACH account for expediency.

162.    On December 12, 2024, Curley and NUFIC stated that they had de facto reneged and dishonored their obligation to pay for the work and costs undertaken since August 1. That put LLPC in a difficult position after months of accumulating costs.

163.    If Curley and NUFIC had not acted in bad faith, deceptively, and unfairly, as they did, Lambert would have started in September 2024 to withdraw from the actions in which he represented M.K. and subsequently cut the law practice's losses. Later, a withdrawal effectively became nearly impermissible, considering the obligations under the Rules of Professional Conduct disallowing attorneys to drop representation suddenly.

164.    Instead, Curley and NUFIC intentionally made it appear that payment was slow but was coming, asking to enroll in ACH and implicitly encouraging Lambert to stay on.  In a quintessential example, Lambert got prepared for an oral argument and undertook it in the 2nd Circuit, U.S. Court of Appeals, on December 9, 2024, without knowing that the defendants were planning to dishonor their obligations.

165.    Knowing about Lambert's extensive and dedicated work in representing the insureds, M.K. and CCI, Curley and NUFIC, acting in bad faith, misled Lambert into continuing legal work, accumulating costs that, as it now appears, they never intended to repay.

166.    Plaintiffs seek relief on the theory of promissory estoppel, to be enforced against NUFIC, ordering it to pay the plaintiffs, what they owe under Invoices 128 and 129, as well as for

subsequent work and costs undertaken by the plaintiffs.  The present Count does not state a material liability of Curley, even though he acted as NUFIC's agent at all relevant times.

**COUNT V**
**QUANTUM MERUIT**
**(stated against Defendant NUFIC)**

167.     Plaintiffs incorporate by reference the allegations in Paragraphs 1 to 110 above and further allege as follows.

168.     This matter satisfies the elements of the claim under quantum meruit theory, where the plaintiff provided, and the defendant assented to and received, a benefit in the form of services under circumstances where, in the ordinary course of common events, a reasonable person receiving such a benefit normally would expect to pay for it.

169.     NUFIC benefited from the plaintiffs' services because they covered NUFIC's responsibility to provide defenses to M.K. in the courts.  *F.H. Paschen, S.N. Nielsen & Associates LLC v. B&B Site Development, Inc.* 311 So.3d 39.

170.     NUFIC and Curley knew that The Lambert Law Firm and Lambert undertook legal work for which they expected and were entitled to be paid as professionals engaged in doing their regular work.

171.     These Defendants knew that Lambert's hourly rate was reasonable and, eventually, on the low end, given the list of his admissions in the Federal Courts, in addition to being admitted in three jurisdictions.  Lambert's rate was reasonable ($500/hr).  That rate was lower than nearly all attorneys whom NUFIC paid in the U.S. (going up to $1,750/hr for Alan Dershowitz, Esq., a Harvard professor of law).

172.     On several occasions, M.K. proposed to Lambert that NUFIC raise Lambert's hourly rate. Lambert repeatedly declined, responding that, given the volume of work in the

insureds' cases and the number of hours needed to work on those, that hourly rate was sufficient for LLPC as it was.

173.   By way of context, when M.K. was arrested in Germany on April 22, 2023, he first called Lambert, asking him to take the first flight to Munich.  By pure coincidence, Lambert had a medium proficiency in spoken German and could read legal literature in German.  NUFIC saved money on Lambert's skills, as Lambert did not need a German interpreter or translator for legal documents.

174.   When NUFIC and Curley received Invoices 128 and 129, those were approved in writing by the client, M.K., on September 11 and October 8, 2024, respectively. The insured's approval was in writing.

175.   The controversial correspondence from Curley on December 12, 2024, revealed no intention to pay.  NUFIC unfairly made it appear that the payment was being processed and about to be made, inviting Lambert to open an ACH account for expediency, ultimately playing for time.

176.   Curley and NUFIC made statements on December 12, 2024, that reneged and dishonored NUFIC's obligation to pay for the work and refund the costs, per two invoices.  That put the plaintiffs in a difficult position after months of accumulating out-of-pocket costs.

177.   Had Curley and NUFIC not acted deceptively and unfairly, as they did, Lambert would have started in September 2024 to take measures to withdraw from the actions in which he represented M.K. and CCI to cut the law practice's losses, within the boundaries of the Rules of Professional Conduct.

178.   Instead, Curley and NUFIC made it appear that payment was coming, asking to enroll in ACH and implicitly encouraging Lambert to stay on and continue work.  That included an example: Lambert was the only attorney for M.K. and CCI in a big civil case of the SEC,

19cv4355, in the U.S. District Court for the Southern District of New York.  Notably, that included preparing for an oral argument and undertaking it in the 2nd Circuit, U.S. Court of Appeals on December 9, 2024, which NUFIC apparently also intended to dishonor to pay but did not alert the plaintiffs on that.

179.    Knowing about LLPC's dedicated, extensive and meticulous work in representing the insureds, M.K. and CCI, Curley and NUFIC, acting in bad faith, misled Lambert into continuing legal work, accumulating costs that, as it now appears, they never intended to pay.

180.    As an alternative theory of recovery, if the enforceable contract is not found prior to, or at trial, plaintiffs seek relief of the Order against NUFIC to pay the plaintiffs, at a minimum, compensation in quantum meruit, corresponding to what they owe under Invoices 128 and 129, as well as subsequent work and costs undertaken by the plaintiffs.

### COUNT  VI.
### DECLARATORY JUDGMENT
### (stated against Defendant NUFIC)

181.    Plaintiffs incorporate by reference the allegations in Paragraphs 1 to 110 above and further allege as follows.

182.    As an underlying principle, insurance industry regulation is mainly left to the States, under the McCarran–Ferguson Act, 15 U.S.C. §§ 1011-1015.  The standards in the insurance industry are established in Florida by state law, under Florida. Stat. §626.9521 which prohibits unfair methods of competition and unfair or deceptive acts or practices. Specifically, it prohibits any trade practice defined as unfair or deceptive under the law or determined to be so.

183.    Florida law requires a plaintiff seeking declaratory relief to show: (1) there is a bona fide, actual, present practical need for the declaration; (2) that the declaration deals with a present, ascertained or ascertainable state of facts or present controversy; (3) that some right or privilege

of the complaining party is dependent upon the facts or the law applicable to the facts; (4) there is some person who has an actual, present adverse interest in the subject matter; (5) all adverse parties are presently before the court; and (6) the relief sought is not merely seeking an advisory opinion. West's F.S.A. § 86.011. *Trianon Condominium Ass'n, Inc. v. QBE Ins*. S.D. Florida, 741 F.Supp.2d 1327. All of these conditions are satisfied here.

184.    Plaintiffs seek a declaration that NUFIC's unwarranted payments to a number of payees, other than LLPC, should not be credited to the contracted insurance budget of $5 million.

185.    Namely, NUFIC made to certain attorneys without a retainer agreement with M.K. or CCI, and/or payments made without proper invoices, and/or without a satisfactory or any description of legal work purportedly done, and/or made to an attorney under the disciplinary restrictions, e.g., deferred suspension of practice for one year, and/or contrary to the standards of the insurance industry. Those unwarranted payments by NUFIC should not be credited to the $5 million contracted under the Insurance Policy. On information and belief, such unwarranted payments by NUFIC that do not satisfy the standards exceeded $1 million.

186.    As the evidence shows, Lambert was the only attorney whose invoices and the underlying contractual documents from August 2020 were transparent, clear, and satisfied the necessary requirements. The work description often meticulously exceeded ten lines in a single day. See Exhs 5-6.

187.    In contrast, most of the other attorneys whose invoices NUFIC paid, without diligence, were completely obscure about the work done, representing inflated amounts of time, as well as the apparent duplication of work, often without any evidence of what was accomplished by an attorney.

188.     As mentioned above, there were numerous issues of NUFIC's and Curley's mishandling of the insurance policy obligations.  Those problems included but was not limited to: (A) failure in the duty to defend the insureds, M.K. and CCI; (B) failure to interview the attorneys whom NUFIC paid without due diligence; (C) other than Lambert, paying other attorneys who made duplicative work or next to no good faith work, instead of paying LLPC; (D) paying legal fees to other attorneys without executed retainer agreements; (E) on the occasions admitted by NUFIC, not having copies of retainer agreements, and (F) clearly overpaying certain attorneys.

189.     As mentioned above, NUFIC admitted failing to interview any German attorneys representing the insured in M.K.'s extradition proceedings.  On an occasion known to LLPC, in January 2024, NUFIC prepaid over $200,000 to an attorney, N.H., who graduated from a German law school only a year earlier, and her associates.  While NUFIC failed to interview or investigate the qualifications and experience, the German attorney lacked the skills to represent a defendant in extradition proceedings, was unqualified, and was unable to prepare legal briefs for the Court by herself.  The claims for payment by N.H. grossly failed to account for the amount she received or explain what her legal fees were for.   NUFIC, wasting funds that way, should be denied credit for such negligent payments.

190.     In another example, NUFIC failed to interview an attorney in Nevada, T.L., and prepaid him about $175,000, contrary to its own purported policy to pay only after work was accomplished.  NUFIC wired that money, about $175,000, even knowing that M.K. refused to sign off a retainer agreement with T.L.  As mentioned above, in the detention hearing at which said attorney argued, it transpired he was largely unfamiliar with M.K.'s case. The government later quoted T.L. from the transcript in its submission for T.L.'s being unable to answer the judge's questions and speaking incoherently.  (Transcript available).

191.    NUFIC unreasonably paid money, without due diligence, to that attorney, who, as it turned out, was subject to disciplinary proceedings in the Supreme Court of Nevada, docket No. 83245.  The said attorney was subject to a one-year suspension of practice, which was deferred for five years.  On information and belief, T.L. never disclosed to any attorney in the case that he was under discipline limitations.  NUFIC and Curley did not send any questions or interview T.L.

192.    NUFIC admitted that it paid under the Insurance Policy to over 20 different firms. NUFIC and Curley did not show the required diligence and made numerous unwarranted payments at the expense of LLPC.  Lambert is unaware of any payee being interviewed by NUFIC and developed an opinion that Curley, eventually busy with other matters, spent impermissibly very little time on what resulted in mishandling the duty to defend under the Insurance Policy.

193.    Some payments of the insurance funds by NUFIC were clearly unwarranted, nearly useless, or extravagant.  For example, NUFIC paid one attorney in Las Vegas, D.G. (notable for his disciplinary proceedings long ago, reaching the U.S. Supreme Court), $50,000 for traveling to Munich with his consultant and spending less than ten hours in the German prison with M.K.  That attorney came into the meetings, as Lambert observed, being largely unfamiliar with M.K.'s case. D.G.'s trip was utterly useless.  D.G. was never retained.  In another example, NUFIC paid a consulting doctor $1,000/hr to visit M.K. in detention, without the right to examine him, to have a conversational meeting.  That was about triple the going rates for medical doctors in his specialty in the area.

194.    That essentially represented NUFIC's waste of financial resources vested in the policy.  Except for LLPC, most of the attorneys claimed time to review the case and dedication to get up to speed, only to drop off from the representation within a short period.  Emails to Curley were not responded to for many weeks at times.  Curley's correspondence with various attorneys

could be best described as a documentary mess, at the expense of the truly indispensable work provided by LLPC.   NUFIC's and Curley's handling of a D&O policy was extraordinarily inefficient.

195.    Other than a diligent attorney Lambert, approaching five years of representing M.K. and related clients, NUFIC paid an extraordinary number of unnecessary or duplicative attorneys from different law firms, sometimes without justification and without conducting due diligence interviews.   NUFIC's policy handling was comparable to a "revolving door" for certain attorneys, which was improper for handling the contracted insurance proceeds.   Attorneys to whom NUFIC paid came, got payment sometimes without proper evidence for what, and left the cases. Sometimes, attorneys were paid but only provided representation for a couple of months.

196.    Some of NUFIC's payments to attorneys were based on invoices with a total number of hours and an amount for the whole month without any supporting documentation, which is also contrary to the due diligence standards.   NUFIC was carrying out and servicing its contractual obligations in bad faith.

197.    The declaratory relief sought herewith should adjudge that those payments made by NUFIC in violation of, or contrary to, standards of due diligence in the insurance industry should not be credited to NUFIC's large misuse of the $5 million budget of the insurance policy. Such judicial determination should disavow the validity of payments by NUFIC under the following criteria, whose credit should be denied:

      A. Payment of about $175,000 NUFIC made to an attorney, T.L., who was under disciplinary restrictions, with a deferred suspension of practice for one year, adjudged by the Supreme Court of a sister State, and without the client's signing

41

the retainer agreement, was improper and should be adjudged no credit under the insurance policy.

B.  NUFIC's payments (s) to any attorney without NUFIC receiving proof that the insureds retained such an attorney were improper and should be denied credit.

C.  Payment(s) made by NUFIC to any attorney that did not contain a proper description of work accomplished should be denied credit, without limitation.

198.    There is no prejudice to NUFIC in bringing that insurance carrier into compliance with the insurance industry standards and, at least, starting to interview the payees' attorneys. NUFIC is free to file actions against the attorneys who obtained the funds from NUFIC under the insurance policy based on defective, insufficient documentation, sometimes missing retainer agreements, missing work description, disciplinary record, if applicable, and due diligence investigation of qualifications.

199.    That relief and adjudication of the declaratory relief here will benefit public interests, as insurance carriers should not get credit for paying out insurance proceeds without the required investigation and necessary documentation.

200.    Lambert and LLPC have a stake in such a declaratory judgment; it is a real party in interest for asserting that claim, as the funds deducted from the insurance policy budget should be paid to LLPC.

201.    Plaintiffs seek the relief of a Declaratory judgment that NUFIC's arbitrary and capricious payments to certain attorneys without proper credentials and documentation are not given credit. Instead, the funds should be directed to pay LLPC, which remains the only law firm representing both insureds, even at this time, without being paid since August 1, 2024.  LLPC has remained loyal to its obligations to protect clients' interests and prevent the insureds' defaults.

202.    Relief of declaratory relief and adjudging amounts of the payments made improperly and contrary to the insurance industry standards should be granted, and the funds that are not credited correctly in the policy should be paid to these plaintiffs.

## COUNT VII.
## EQUITABLE ACCOUNTING
### (against Defendant NUFIC)

203.    Plaintiffs incorporate by reference the allegations in Paragraphs 1 to 110 above and further allege as follows, and further incorporate all paragraphs in Count VII, 'Declaratory Judgment,' Paragraphs 182-202, immediately above.

204.    Accounting is proper for complex business transactions, as is the case here.  In a two-step process of determining a plaintiff's right to accounting, separate from fiduciary duties, plaintiffs rely on *Cassedy v. Alland Investments Corp*. (CA 1, Fla, 2014) 128 So.3d 976.

205.    As a part of the declaratory judgment, plaintiffs, who are the real parties in interest, submit that the Court should order an audit of NUFIC's handling of the Insurance Policy, either private or sponsored by the Florida Office of Insurance Regulation.

206.    To the best of the plaintiffs' knowledge, they are the only law firm that met the most stringent standards for invoicing, with the precision of 6 minutes of work and the costs' expenditures up to a dollar or a cent.  LLPC consistently under-invoiced NUFIC, acting conscientiously and showing goodwill, not counting up to 20 percent of unpaid work.  LLPC will greet any audit of NUFIC's handling of the Insurance Policy.  As opposed to LLPC's knowledge, NUFIC's payments to most of the 20 firms it admittedly paid were questionable.

207.    Relief of audit will help delineate and count the unwarranted payments by NUFIC under the Insurance Policy and order, under the declaratory relief, to return the equivalent of the Insurance Policy asset.

208.    The relief of equitable accounting should be granted.

## COUNT  VIII.
## FRAUDULENT MISREPRESENTATION
### (against both Defendants)

209.    Plaintiffs incorporate by reference the allegations in Paragraphs 1 to 110 above and further allege as follows.

210.    This case states a cause of action for fraudulent misrepresentation, where a plaintiff is required to allege the following elements:  (1) a misrepresentation of a material fact;  (2) which the person making the misrepresentation knew to be false;  (3) that the misrepresentation was made to induce another person to rely upon it;  (4) that the person relied on the misrepresentation to his detriment;  and (5) that this reliance caused damages. *Romo v. Amedex Ins. Co*., 930 So.2d 643.

211.    When NUFIC and Curley received Invoices 128 and 129, approved in writing by the client, M.K., on September 11 and October 8, 2024, they were obligated to state any objections, which they did not make. The approval was in writing, with the client's original signatures on the front and on the last dollar amount summary pages, concrete numbers, and attachments showing the costs and wire transfers.

212.    Curley and NUFIC misled LLPC into continuing work. As cited above, on October 27, 2024, Curley wrote to Lambert, inviting him to open an ACH account with AIG to accelerate payment, implying that the wire was forthcoming. Lambert complied and executed an ACH agreement on that same date.

213.    However, Curley, acting on behalf of NUFIC, only deceptively played for more time and did not intend to have payment sent to LLPC, which severely damaged LLPC (it is still not being paid or having the costs refunded).

214.    On November 6, 2024, as discovered, Curley wrote, as quoted above, to an insurance consultant, D.F., that he had no authority and that NUFIC made its own decisions on paying invoices.

215.    Prior to the correspondence on December 12, 2024, Curley, acting as an agent for NUFIC and thus NUFIC, made it improperly appear as though the payment was being processed and was about to be made, inviting Lambert to open an ACH account for expediency.

216.    However, on December 12, 2024, Curley and NUFIC suddenly made statements that reneged and dishonored their obligation to pay for the work and costs undertaken as early as August 2024. That put LLPC in a difficult position after months of accumulating costs and continuing work without payment.

217.    Curley and NUFIC knew that insurance consultant D.F. had no authority to make decisions or represent any client, but, as it turned out, relied, as a pretext, on his emails to hold off payment to Lambert.

218.    Curley improperly failed to copy most of his correspondence with an insurance consultant, D.F., regarding Lambert and LLPC, which facilitated LLPC's and Curley's misrepresentation and fraud, resulting in damages to Lambert and LLPC.

219.    As a member of the bar, Curely knew that such concealments and deceptive practices, driven by NUFIC's intent not to pay, were contrary to the Model Rules of Professional Conduct, e.g., Rule 4.1 'Truthfulness in Statements to Others'.

220.    Furthermore, Curley's concealment of important correspondence, concerning M.K. and CCI from LLPC, was contrary to Rule 4.2 'Communication with Person Represented by Counsel,' where Lambert represented M.K. and CCI.  Curley failed in his obligation to copy

correspondence with a consultant or any party, concerning the insureds, to Lambert, as the attorney of record for M.K. and CCI.

221.    Had Curley and NUFIC not acted deceptively and unfairly, as they did, Lambert would have started reasonable and fair steps in September 2024 to withdraw from the actions in which he represented M.K. and CCI back in September and cut the law practice's losses.

222.    Instead, Curley and NUFIC made it appear that payment was coming, asking to enroll in ACH and implicitly encouraging Lambert to stay on and continue work.  That obligation to work concerns representing M.K. and CCI in a big civil case of the SEC, 19cv4355, in the U.S. District Court for the Southern District of New York.  As mentioned above, the SEC's claim was for $46.1 million.  That included Lambert's preparing for an oral argument and undertaking it in the 2nd Circuit, U.S. Court of Appeals, on December 9, 2024, contesting the preliminary injunction for that amount. In contrast, NUFIC and Curely failed to alert LLPC that NUFIC would not pay those fees and traveling costs.

223.    Knowing about Lambert's extensive and intense work representing M.K. and CCI, Curley and NUFIC, acting in bad faith and unfairly, misled Lambert and LLPC into continuing legal work and accumulating costs. As it now appears, the defendants never intended to repay what they owed under the approved Invoices.

224.    Plaintiffs are entitled to relief under the cause of action for fraudulent misrepresentation.

### DEMAND OF JURY TRIAL.

Plaintiffs demand a jury trial on all claims so triable.

### WHEREFORE,

(a) Plaintiffs seek damages on all Counts that allow damages against NUFIC for the invoiced $199,517 and 32 cents, and for subsequent work and costs undertaken by LLPC until the plaintiffs are allowed to withdraw, reasonably and prudently, from the cases where Lambert is the only remaining attorney representing the insureds, M.K. and CCI.

(b) Plaintiffs seek damages against Curley on all Counts where he is a co-defendant, commensurately with his acting as an agent for NUFIC, but not the principal, whereas only the principal bears the entire liability.

(c) To the extent the trial shows NUFIC's mishandling of its obligations, awarding punitive or exemplary damages, e.g., under Fla. Stat. §624.155 'Civil remedy' (8) 'Punitive damages.'

(d) Declaratory judgment that, other than Lambert, NUFIC improperly paid a number of other firms without proper credentials and proper documentation, e.g., without a retainer agreement with the insureds, which should be denied credit and should be used towards the debt to LLPC.

(e) The court's referral to the Florida Commissioner of Insurance Regulation, appointed by the Financial Services Commission, suggesting an investigation of the allegations stated herewith by the said agency.

(f) Attorney's fees and costs, to the extent of being applicable.

(g) Such other and further relief as the Court finds just and proper.

(h) Claim under the theory of bad faith against the insurance carrier is reserved in compliance with Order, dated August 8, 2025, Dkt 25.


EXH.S 1-7 (partially redacted).


Respectfully submitted.

Dated: April 24, 2024

_____/signed George Lambert/

 George Lambert, Esq., FL bar 1022697
The Lambert Law Firm
421 Poinciana Drive, #1422,
Sunny Isles Beach, FL 33160;
Email: office.law.323@gmail.com,
Tel. (305) 938 0600, fax (800) 852 1950
Attorney for The Lambert Law Firm P.C. and pro se.

# EXHIBIT 1

EXHIBIT 1

De: Michael R. Delhagen <MDelhagen@tresslerllp.com>

█████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████

Envoyé le: Lu, 3 Aoû 2020 16:53
Sujet: Collector's Coffee et al; Claim # 703-110232

████████ -

Thank you for your email.  We await David's letter, but I wanted to respond to your email below in response to my letter of July 29 regarding your July 24 proposal for new counsel for you and your wife Veronica in the SEC lawsuit pending in the Southern District of New York (the "SEC Action").  I spoke on Friday July 31 with George Lambert and conveyed the substance of the below to him.  He agreed to provide a report setting forth in more detail the current status of the SEC Action as it relates to you and your wife, additional detail regarding proposed staffing and confirmation that he is agreeing to abide by RSUI's Billing and Reporting Guidelines (the "RSUI Guidelines").

To reiterate, RSUI has confirmed that it will approve The Lambert Firm to represent you and your wife Veronica in connection with the SEC Action at the rates proposed, and to approve local counsel to be proposed by Mr. Lambert.  Contrary to the suggestion in your email, RSUI has not foreclosed the approval of additional attorneys to be involved in the defense of the SEC Action subject to a specific request from Mr. Lambert regarding the additional needs of his firm, in accordance with the RSUI Guidelines.

I do not believe there has been any misunderstanding as to the proposal, which we reviewed in detail.  RSUI declined to approve the roster of attorneys proposed because it appears objectively unreasonable. Although you contend that of the seven full-time attorneys proposed by The Lambert Law Firm would be working under the "umbrella" of the Lambert Law Firm and submitting a single invoice, the fact remains that five of the attorneys are solo practitioners, one attorney is affiliated with a corporate law firm, and all are from various jurisdictions.  While Mr. Lambert states that you have requested that his firm serve, in addition to the litigation, "as lead counsel managing the legal team," the fact remains that the "legal team" proposed is comprised of multiple firms.  Your July 24, 2020 request provides no explanation as to why the retention of these particular attorneys from various firms and various jurisdictions is necessary, no explanation as to the work to be performed by each attorney, how the work would be allocated between and among the attorneys proposed, or why their various specialties and backgrounds are necessary in defense of the SEC Action.  There is also no indication if the attorneys listed would be billing at partner or associate rates or which attorneys employ the multiple paralegals proposed to be on the legal team.  The arrangement proposed is atypical and does not appear to comport with the shared goal of staffing the case economically and efficiently.  As noted above, Mr. Lambert agreed to provide a report describing the status, his proposed course of action in connection with the defense of the SEC Action and additional detail regarding proposed staffing and allocation of responsibility among defense counsel.

You state in your July 30, 2020 email that the International Criminal Law Group ("ICLG") "is handling the discovery review only a very separate matter and need." Specifically, you state that the ICLG team consisting of 5 full-time lawyers are working solely on "mostly high level" discovery review and that there are "hundreds of thousands of documents in discovery that still need to be reviewed for the first time relating to the case" and that "must be reviewed properly to defend the case."   It remains unclear why a team of attorneys from a criminal law firm in Ukraine are required to review discovery of documents produced in litigation pending in New York and how that review is being coordinated with U.S. defense counsel.  We discussed this issue only briefly with Mr. Lambert and are also happy to discuss with you and Mr. Feldman.

In addition, you state that because prior law firms failed to complete the review of this discovery, "a larger team is needed to complete the task before trial."  You state that the proposal for five additional ICLG lawyers "would be activated only when we receive a massive dump of new discovery" in connection with subpoenas directed to your and CCI's former counsel (Debevoise & Plimpton, Baker Hostetler, Parker Nelson, and Hutchison and Steffens).  It seems neither reasonable nor efficient for a Ukraine-based law firm to perform the review of what documents produced in the U.S. in an action pending in New York. Please clarify how the discovery review is a "very separate matter" but also must be reviewed "to properly defend the case." Please also provide RSUI with copies of the subpoenas issued to these law firms and the engagement letter between you/CCI and ICLG.

In your email, you state that your legal team is defending two lawsuits within the SEC Action (the SEC Complaint and the Intervenor Complaint) and that "this creates twice the workload relating to defending the case[.]"  As the Intervenor Complaint seeks a declaration essentially to quiet tile of certain CCI assets, it is unclear how the Intervenor Complaint has created "twice the work" in this matter. You and CCI have argued in filings in this matter that there is no present dispute between you and the Intervenor Plaintiffs, and the past dispute between Intervenor Plaintiffs and CCI has been resolved in prior litigation.  Please clarify this point.

Your point below regarding the number of attorneys previously approved by other carriers is confusing both mathematically and conceptually, as it includes counsel that were never retained, double counts counsel proposed to be replaced, and includes multiple attorneys from the Bradley law firm that you now assert are acting in an expert capacity.  Regardless of what has been approved in the past, which is not binding on RSUI, RSUI has been asked to consider the proposal for new counsel for you and your wife in connection with the SEC Action on a going-forward basis and has done so diligently and quickly.

As indicated in our July 29, 2020 letter, RSUI will approve retention of The Lambert Firm to represent you and Veronica Kontilai at the rates you proposed (following rates: $500/hr Partner, $400/hr Associate, and $200/hr Paralegal).  RSUI's approval of The Lambert Firm is subject to the firm's agreement to abide by the RSUI Billing Guidelines.  Please ask George Lambert to confirm that agreement. RSUI will also agree to the retention of local counsel in New York, to be identified by Mr. Lambert, subject to RSUI's approval and that firm's agreement to abide by the RSUI Billing Guidelines.  If Mr. Lambert wishes to involve other U.S. based lawyers or associate with ICLG on certain tasks, he will need to request pre-approval for any lawyer/firm Mr. Lambert would like to retain pursuant to the RSUI Billing Guidelines and provide details of the work to be performed.

Please note that RSUI is currently evaluating coverage for this matter and will be issuing its coverage position in due course. RSUI continues to reserve all rights, remedies and defenses under the Followed Policy, the RSUI Excess Policy, and applicable law.  Nothing stated herein, or not stated, shall be deemed to be a waiver or compromise of any rights, remedies or defenses which RSUI has or may obtain.

Should you have any questions or concerns, please do not hesitate to contact me.

Michael

**Michael R. Delhagen** | Partner
Tressler LLP
Telephone: 646 833 0880
mdelhagen@tresslerllp.com

# EXHIBIT  2

EXHIBIT 2

---

**Subject**: RE: memorandum on strategy and staffing approvals, SEC v. CCI et al. Claim # 703-110232
**From**: "Michael R. Delhagen" <                    >
**To**: "LawDC10.Washington" <lawdc10@gmail.com>,Dave Feldman                                        >
**Cc**: "Courtney E. Scott"                        , Kiera Fitzpatrick                                        , "Krajec, Phil"

**Date Sent**: Wednesday, August 5, 2020 8:51:44 AM GMT-04:00
**Date Received**: Wednesday, August 5, 2020 8:51:47 AM GMT-04:00

George -

The following addresses the contents of your August 3rd memorandum and your email today. As discussed below, in reviewing the memorandum and your email, we have sought to address your requests with respect to any tasks that you identified as necessary to be completed "as emergencies" and within the next couple of weeks, including pending motions to compel, motions for sanctions and for contempt and "30 filings [that] need to be prepared and filed."  We understand your requests to be the following: (

As an initial matter, RSUI approves your request for the retention of Peter A. Joseph, Esq. as local counsel at the approved rate of $500/hr and adherence to the RSUI Billing Guidelines.  Please confirm Mr. Joseph's agreement and proceed with filing notices of appearances, motions to substitute counsel, and an application for *pro hac vice* admission in the SEC Action.

Thank you for agreeing to abide by RSUI's Billing Guidelines.  In your email,  you request that certain exceptions be made to the RSUI Billing Guidelines in connection with billing and paralegal work.

In your email, you also state that The Lambert Law Firm will "submit the consolidated Invoices, from all the affiliates of The Lambert Law Firm, in one presentment, on a synchronized calendar."  However, each attorney/firm approved by RSUI will need to submit that attorney's/firm's invoices separately through Legal-X.  The Lambert Law Firm may choose to submit the invoices on each of the attorney's/firm's behalf through Legal-X but the invoices may not be consolidated.

RSUI understands that the names of the attorneys you are proposing are those attorneys set forth in your July 24, 2020 letter/proposal, but RSUI still needs to know which attorneys

are proposed to perform specific tasks before it can grant approval.  In addition, RSUI finds that retaining one attorney to represent Ms. Kontilai is a reasonable request, however, we ask that you please identify the name of the attorney proposed to represent her so that RSUI may provide approval.

Lastly, with respect to your request for the retention of Alan Dershowitz, RSUI declines to approve this request at this time.  If in the future there are settlement negotiations where Professor Dershowitz's involvement may be helpful, RSUI will reconsider this request.

We look forward to your response.  Please let us know if you have any questions or would like to discuss.  Thanks you.

Michael

**Michael R. Delhagen** | Partner
Tressler LLP
Telephone: 646 833 0880
mdelhagen@tresslerllp.com

---

**From:** LawDC10.Washington <lawdc10@gmail.com>
**Sent:** Tuesday, August 4, 2020 12:58 PM
**To:** Michael R. Delhagen                         ; Dave Feldman
**Subject:** Fwd: memorandum on strategy and staffing approvals, SEC v. CCI et al.

For Michael Delhagen, Esq.,
Tressler LLP
CONFIDENTIAL

Re.: Yesterday's Memorandum on Legal Strategy,
supplemental points addressing the RSUI Billing and Approval Guidelines Relating to Legal Staff Approvals.

Dear Mr. Delhagen:

In addition to the Memorandum sent yesterday, I am responding to your email complying with an official request pursuant to RSUI Billing and Approval guidelines. Peter A. Joseph, Esq., of New York, and I are enthusiastic to work on this case and file our appearances (mine being pro hac vice) immediately upon receiving your approvals for the legal staff needed to defend the case. These approvals are especially important and are outlined in my Memorandum. Given the present juncture in the case, with a significant past due backlog of work, several emergency motions pending, and the massive discovery backlog to be reviewed and served we request amendment to your approvals, which we believe this is a most responsible request.

We have carefully reviewed your RSUI Billing Guidelines. In our Memorandum, I specifically outlined in great detail our request for approval of the specific legal staffing necessary for the defense of the *SEC v Collector's Coffee Inc*. case. While asking for amendment of legal staffing approval, and I will quote the RSUI Guidelines.

The follow-up request, as outlined in the attached Memorandum, includes:

I, George Lambert, will be the lawyer personally assigned as the primary contact with the RSUI and taking responsibility for the case and in reviewing all billing, with the responsibility to keep the billing down whenever possible. I will be personally reviewing every bill, prior to endorsing it. I may question the entries here or there, as in an internal process, if I find those outside of the reasonable estimates for this or that legal task. The Lambert Law Firm will then submit the consolidated Invoices, from all the affiliates of the Lambert Law Firm, in one presentment, on a synchronized calendar. All funds can go through my attorney Escrow account at Bank of America.

This shall include submission of all billing on behalf of all the attorneys affiliated with the case through the Lambert Law Firm. I will also manage, designate, and approve all work for the ICLG Law Firm. I will transmit the ICLG invoices on the same calendar as the Lambert Law Firm invoices.

With regard to the past invoices due for work for past completed work of ICLG prior to my approval I shall submit those in advance.

The detailed names of the attorneys I requested are outlined in your approval letter (on the first page). You indicated in that letter that you found the size of the legal staff requested may be unreasonable, but you also left an understandable option to substantiate the need for additional resources, which was one of the purposes of my yesterday's Memorandum on the strategy.

We request that legal work assigned normally to paralegals outlined in Section J number(s) 1, 2, 3, 5, 6, 7 be allowed to be performed by an attorney at the Associate Rate Approved. As this SEC case is complex and requires knowledge and distinct training in Securities Laws and the Securities Act of 1933, we believe having a paralegal perform key duties which may rely on specialized legal training, could lead to unnecessary risks to the Client and the Insurer. Accordingly, we recommend such work should be upgraded to an Associate Level Attorney. On the balance, we will reduce utilizing paralegals' participation as much as possible when dealing with non-specialized work.

Thank you for your continued support of the Client Mr. and Mrs.        . We hope that our minor requests will be considered and I look forward to your response.

Sincerely, George

George Lambert
Lambert Law Firm

CC:

Very truly, George Lambert

George Lambert, Esq.
The Lambert Law Firm
1025 Connecticut Ave., 1000 NW, Washington, D.C., 20036;
100 Cambridge Str., 14th Floor, Boston, MA 02114;
ARP, 404 Paradise Rd. 2K, Swampscott, MA 01907;
tel. (202) 640 1897; (617) 925 7500; (617) 539 0300, fax (800) 852 1950
Website: www.law-lambert.com; Skype george.lambert.10

Disclaimer. The information in this e-mail may be confidential. It is intended only for the use of the individuals or entities named above as addressees. You are hereby notified that if you are not the intended recipient, or employee or agent responsible for delivering it to the intended recipient, any use, dissemination, distribution or copying of the information in this e-mail is strictly prohibited. If you received this e-mail in error, please notify us by telephone or e-mail. Thank you

---------- Forwarded message ---------
From: **LawDC10.Washington** <lawdc10@gmail.com>
Date: Mon, Aug 3, 2020 at 4:09 PM
Subject: memorandum on strategy and staffing approvals, SEC v. CCI et al.
To: Michael R. Delhagen <mdelhagen@tresslerllp.com>

For Michael Delhagen, Esq.

Dear Mr. Delhagen,

Confidential.

Please find attached the Confidential Memorandum requested from our Friday conference call.  It is encrypted.  I am sending you the password by a separate email in a minute.

I feel that all my requests pursuant to this engagement are more than reasonable for the task required.

My colleague Peter Alan Joseph (NY Counsel), and myself are prepared to make our appearances promptly upon receipt of acceptance of our staffing needs.

I will follow up with a call with you when needed.

Thank you. Best,

George


George Lambert, Esq.
The Lambert Law Firm
1025 Connecticut Ave., 1000 NW, Washington, D.C., 20036;
100 Cambridge Str., 14th Floor, Boston, MA 02114;
ARP, 404 Paradise Rd. 2K, Swampscott, MA 01907;
tel. (202) 640 1897; (617) 925 7500; (617) 539 0300, fax (800) 852 1950
Website: www.law-lambert.com; Skype george.lambert.10

Disclaimer. The information in this e-mail may be confidential. It is intended only for the use of the individuals or entities named above as addressees. You are hereby notified that if you are not the intended recipient, or employee or agent responsible for delivering it to the intended recipient, any use, dissemination, distribution or copying of the information in this e-mail is strictly prohibited. If you received this e-mail in error, please notify us by telephone or e-mail. Thank you

# EXHIBIT  3

EXHIBIT 3

## CONFIDENTIAL MEMORANDUM
## ON REVIEW OF STATUS OF THE CASE AND LEGAL STAFF APPROVALS NECESSARY TO DEFEND

### PRESENTED BY THE LAMBERT LAW FIRM

### U.S. District Court Southern District of New York
### Civil case #: 1:19-cv-04355-LGS-GWG

The undersigned expresses appreciation for the conference held on July 31, 2020, regarding the line-up of the attorneys and the status. This is to confirm a vigorous attempt to compose attorney resources necessary to defend the civil action pending in the Southern District New York, so we can file appearances as soon as possible, for which we request further approvals. For purposes of this memorandum, I am acting herewith with the sponsorship of Harvard Law graduate attorney Peter Alan Joseph, Esq., licensed in New York. The undersigned is reiterating that personally I am not admitted in NYS, but admitted in three jurisdictions: the District of Columbia, Massachusetts and Florida, with the prospective to act pro hac vice under Peter Joseph's sponsorship. As discussed, this memorandum is prepared with the objective of putting forward some suggested litigation strategy points to address the current needs of the prospective clients, with the objective to bring the litigation to exoneration from the claims

I am obligated to be candid before the prospective client(s), while doing my review of the docket sheet and browsing the filings. There are many procedural steps I would have done differently, but I also agree with some other steps.

### A. EXAMPLES OF CONCERNS WITH PRIOR DECISIONS OF DEFENSE CO      L.

First,                    y opinion

The docket sheet reveals

1



2

**(ii). EXAMPLE TWO.**

**(iii) EXAMPLE THREE.**

Assuming it is too late to

Private and Confidential Memorandum for Michael Delhagen, Esq.



## B.  CONSTRUCTIVE EXAMPLE AND ENDORSEMENT.

## C.  IMMEDIATE ATTORNEY NEEDS FOR LITIGATION, OPPOSITIONS AND MOTIONS.

5



6



7



As a        -m

With the above in mind, in order to be productive and have an opportunity to deal with a very complex status, we

8

We would also suggest that, subject to finalization of all steps and appearances, we would hold conferences with your office regularly, for example on a bi-weekly basis, to address ad hoc the most demanding issues on the agenda, including the need of additional resources, based on concrete and urging circumstances, when those arise. We suggest that those should be addressed on a fast track, starting from later this week.

We could file our appearances in the case—even today or tomorrow-- and start grinding into the case as soon as you confirm we generally have an arrangement reached.

cc. ▮▮▮▮▮▮▮▮▮▮▮

cc. Peter Alan Joseph, Esq.

Mr. ▮▮▮▮▮▮▮▮

**APPROVED**
*By The Lambert Law Firm at 4:02 pm, Aug 03, 2020*

9

# EXHIBIT  4

# EXHIBIT 4



## THE LAMBERT LAW FIRM

**1025 Connecticut Ave 1000 NW Washington, DC 20036**
**100 Cambridge St., 14th Fl, Boston, MA 02114; 323 Sunny Isles Blvd 700, Sunny Isles Beach, FL 33160**
**Tel. (202) 640 1897; (617) 926 7500, (305) 838 0600, fax (800) 852 1950;**
**e-mail LawDC10@gmail.com, website: www.Law-Lambert.com**

Gavin J. Curley, Esq.
Manire Galla Curley
450 Lexington Avenue, 4th Floor New York, NY 10017
cc.: Alex Fooksman, Esq.
AIG Clams, Inc.,
28 Liberty Street, 49th Floor, New York, NY 10005
cc.:
Date: June 25, 2023
Re.

### *CONFIDENTIAL; ATTORNEY-CLIENT PRIVILEGE, COMMON INTEREST PRIVILEGE, ATTORNEY WORK PRODUCT, WAIVER FROM CLIENT TO THE EXTENT OF WORKING RELATIONSHIP WITH THE INSURANCE CARRIER*

### MEMORANDUM

The insurance policy covers the subject matter concerning                    ., a
Nevada corporation, and its Chief Executive Officer and director,

---

1        Admissions of Lambert to the U.S. Court of Appeals:
☐        U.S. Court of Appeals for the District of Columbia
☐        U.S. Court of Appeals for the First Circuit
☐        U.S. Court of Appeals for the Second Circuit

**(A) Underlying Relevant Facts.**

---

- ☐ U.S. Court of Appeals for the Third Circuit
- ☐ U.S. Court of Appeals for the Fifth Circuit
- ☐ U.S. Court of Appeals for the Ninth Circuit
- ☐ U.S. Court of Appeals for the Tenth Circuit
- ☐ U.S. Court of Appeals for the Eleventh Circuit
  Admissions at U.S. District Courts:
- ☐ U.S. District Court, District of Columbia
- ☐ U.S. District Court, District of Massachusetts
- ☐ U.S. District Court, Middle District of Florida
- ☐ U.S. District Court, Northern District of Florida
- ☐ U.S. District Court, Southern District of Florida
- ☐ U.S. District Court, District of Colorado



---

[3] According to Dr. Oehmichen, Attorney Galvin Curley advised her that, instead of a wire transfer, a check to Ms. Oehmichen firm was being mailed (presumably by FedEx), Oehmichen International in Berlin.  However, it was only a check for 8 fist days of work, April 22 to 30, 2023, nearly two months after.



PAGE 4, CONFIDENTIAL



Thereby, Lambert's work has included visiting the Client for work meetings' sessions (usually morning and afternoon sessions) in the correctional institution JVA Stadelheimer Strasse 12, 81549 Munich, Germany, with one of the German attorneys, whose presence is required. The work has included: (a) joint reviewing the developments concerning the extradition proceedings, (b) preparation of drafts and formulation of the defenses for the extradition application, (c) addressing the terms and conditions of the Client's confinement, (d) reviewing of all new documents from the relevant pending cases in the US, (e) litigation strategy issues, (f) interaction with the attorneys in the US, (g) preparing correspondence to numerous parties by emails, (h) comparative law, involving the US and German law, (i) review of applicable statutes, (j) searching for precedents for various issues. That work also included (k) formulation of the objections to the extradition, (l) issues of overlaps in the legal provisions in Germany with American law, (m) discussion and approval of the work product prepared by the German attorneys for filing in the Munich Court, (n) suggestions, corrections, and amendments tailored to the Client's case.



The undersigned renews his expression of gratitude for the attention in this matter.

Respectfully submitted,

/signed George Lambert/     **APPROVED**
                            *By LambertLaw at 6:46 pm, Jun 25, 2023*

# EXHIBIT  5

# EXHIBIT 5

**Director of Claims**
**AIG Clams, Inc., AIG - National Union Fire Insurance Co of Pittsburg P.A.**
**1271 Ave of the Americas, 35th Fl. New York, NY 10020**

**Gavin J. Curley, Esq.**
**Manire Galla Curley**
**450 Lexington Avenue,**
**4th Floor New York, NY 10017**

**Re.: representation of**
**August 1-31, 2024**

**Invoice submission by**
**The Lambert Law Firm, offices at:**
**1025 Connecticut Ave., 1000 NW, Washington, D.C., 20036;**
**100 Cambridge Str., 14th Floor, Boston, MA 02152;**
**421 Poinciana Dr., #1422, Sunny Isles Beach, FL 33160;**
**Tel.  (202) 640 1897; (617) 925 7500; (617) 539 0300, (305) 938 0600, fax (800) 852 1950**

**Tax ID:  The Lambert Law Firm Professional Corp.**
**EIN 93-4814613**
**Claim number: 7030110232-00**
**Policy number NHS671155**

X  _Approved_

**Invoice Number: CCI/MK #128**
Invoice Period: from August 1-31, 2024
Payment Terms: Upon Receipt

Invoice from The Lambet Law Firm Professional Corp., with annexes, August 1-31, 2024    Page 1

**Director of Claims**
**AIG Clams, Inc., AIG - National Union Fire Insurance Co of Pittsburg P.A.**
**1271 Ave of the Americas, 35th Fl. New York, NY 10020**

**Gavin J. Curley, Esq.**
**Manire Galla Curley**
**450 Lexington Avenue,**
**4th Floor New York, NY 10017**

cc.:

**Re.: representation of**
**August 1-31, 2024**

**Invoice submission by**
**The Lambert Law Firm, offices at:**
**1025 Connecticut Ave, 1000 NW, Washington, D.C., 20036;**
**100 Cambridge Str., 14th Floor, Boston, MA 02152;**
**421 Poinciana Dr., #1422, Sunny Isles Beach, FL 33160;**
**Tel. (202) 640 1897; (617) 925 7500; (617) 539 0300, (305) 938 0600, fax (800) 852 1950**

**Tax ID:  The Lambert Law Firm Professional Corp.**
**EIN 93-4814613**
**Claim number: 7030110232-00**
**Policy number NHS671155**

**Invoice Number: CCI/MK #128**
Invoice Period: from August 1-31, 2024
Payment Terms: Upon Receipt

Invoice from The Lambet Law Firm Professional Corp., with annexes, August 1-31, 2024     Page 1

| Date | Time-keeper | Description | Hrs GL | Hrs AT MM |
|------|-------------|-------------|--------|-----------|
| August 1 |  | | 5.2 | |
| August 2 | | | 5.3 | |
| August 3 | | | 3.8 | |

















| | | | | |
|---|---|---|---|---|
| August 30 | AT | | 6.9 | |
| August 31 | MM | | 3.6 | |
| August 1-31 | AT | Paralegal support, high tech services, , during the month of August, 3 hours | | 3.0 |
| August 1-31 | MM | Paralegal support, High tech services, , 7.5 hours | | 7.5 |
| Total GL | | Hours | 174.7 | |
| Total AT | | Hours | | 3.0 |

| | | | | |
|---|---|---|---|---|
| Total MM | Hours | | | 7.5 |
| Total GL | Rate: $500 | Amount | | $87,350 |
| Total AT | Rate: $100 | Amount | | $300 |
| Total MM | Rate: $200 | Amount | | $1,500 |
| **Total** | **Amount** | **Without Costs** | | **$89,150** |

**COSTS, EXPENDITURES, OUT-OF-POCKET, ADVANCES**

| | | |
|---|---|---|
| 8/14/24 | | $2,500 |
| 8/1/24 | | $5,000 |
| 8/1-8/31 Full month | | $3,041.54 |
| 8/1-8/31 Full month | | $4,917.80 |
| 8/24 | | $425.00 |
| 8/1-8/31 | | $157.00 |
| **TOTAL COSTS, OUT OF POCKET PAID** | | **$16,041 and 34 cents** |
| **GRAND TOTAL FOR PAYMENT** | | **$105,191 and 34 cents** |

The Firm's Timekeepers in this matter:

| Total MM | | Hours | | 7.5 |
|---|---|---|---|---|
| Total GL | Amount | Rate: $500 | $87,350 | |
| Total AT | Amount | Rate: $100 | | $300 |
| Total MM | Amount | Rate: $200 | | $1,500 |
| | | | | |
| **Total** | **Amount** | **Without Costs** | **$89,150** | |
| | | | | |
| | | **COSTS, EXPENDITURES, OUT-OF-POCKET, ADVANCES** | | |
| 8/14/24 | | | $2,500 | |
| 8/1/24 | | | $5,000 | |
| 8/1-8/31 Full month | | | $3,041.54 | |
| 8/1-8/31 Full month | | | $4,917.80 | |
| 8/24 | | | $425.00 | |
| 8/1-8/31 | | | $157.00 | |
| | | | | |
| **TOTAL COSTS, OUT OF POCKET PAID** | | | **$16,041 and 34 cents** | |
| **GRAND TOTAL FOR PAYMENT** | | | **$105,191 and 34 cents** | |

The Firm's Timekeepers in this matter:

X _____

Approved

# EXHIBIT 6

George Lambert, Esq.                          ($500 per hour)

Alexey Tereshko, high-tech paralegal          ($100 per hour)

Mark Meltser, senior high-tech paralegal      ($200 per hour)

**For credit to:**
**Bank of America**
**Massachusetts IOLTA Trust Accounts**
**George A Lambert / The Lambert Law Firm**
**Wire Transfer ABA: 026009593**
**SWIFT: BOFAUS3N**

**Annexes:  Costs, disbursements, out-of-pocket, evidence documents**

**ANNEX ONE**

**COSTS, EXPENDITURES**

**AND OUT-OF-POCKET PAYMENTS TO OTHER ATTORNEYS, CO-COUNSEL**

 

## GLatty - 9316 : Account Activity

**Bank of America**

Online Banking





Available Credit includes purchases that have been authorized but have not yet posted to your account.

| Posting Date | Description | Amount | Balance |
|---|---|---|---|
| | | | |
| | | | |

**Go to:** August 26, 2024



**High Tech PARALEGALS**

*We will make electronics enjoyable for you*

*Where Technology meets the Law*

# INVOICE #

September 10, 2024

**To:** **Mr. George Lambert, Esq.**
**Address:** *421 Poinciana Dr., #1422, Sunny Isles Beach*    **Florida**    **33160**
**eMail:** lawdc10@gmail.com
**Phone:** 617.846.2697

## A. Items and Material

| # | Qty | Description | Price | Total |
|---|-----|-------------|-------|-------|
| 1 | 1.00 | Downie 4 program for downloading Vimeo video | $19.99 | $19.99 |
| 2 | 1.00 | 1 month "We transfer" membership | $15.00 | $15.00 |
| 3 | 1.00 | 64 GB flash drive | $8.00 | $8.00 |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |

| | | |
|---|---|---|
| **Subtotal Items and Material** | | $42.99 |
| **Tax 7.0% (If applicable)** | | $3.01 |

## B. Labor

| # | Hrs | Description | Price | Total |
|---|-----|-------------|-------|-------|
| 1 | 1 | Download video from Vimeo, Youtube, etc. based on MK letter and GL lists | $1,500 | $1,500.00 |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |

| | | |
|---|---|---|
| **Subtotal Labor** | | $1,500.00 |
| **Total Main** | | $1,546.00 |

**Direct Deposit**

**Wire:** **TD Bank**
Routing        **67014822**
Account #     **4384026980**

**Direct Payment**

**Venmo:** **MarkMeltser or** sasolia@protonmail.com
**Zelle** **5852004124**

X _____ (signature) *Approved*

## Thank you for your business!

1904 S. Ocean Dr Apt 1104S; Hallandale Beach, FL 33009  (585)200-4124  hightechparalegals@mail.com

Director of Claims
AIG Clams, Inc., AIG – National Union Fire Insurance Co of Pittsburg P.A.
1271 Ave of the Americas, 35th Fl. New York, NY 10020

Gavin J. Curley, Esq.
Manire Galla Curley
450 Lexington Avenue,
4th Floor New York, NY 10017

cc.:

Re.: representation of
September 1-30, 2024

Invoice submission by
The Lambert Law Firm, offices at:
1025 Connecticut Ave, 1000 NW, Washington, D.C., 20036;
100 Cambridge Str., 14th Floor, Boston, MA 02152;
421 Poinciana Dr., #1422, Sunny Isles Beach, FL 33160;
Tel. (202) 640 1897; (617) 925 7500; (617) 539 0300, (305) 938 0600, fax (800) 852 1950

Tax ID:  The Lambert Law Firm Professional Corp.
EIN 93-4814613
Claim number: 7030110232-00
Policy number NHS671155

# Invoice Number: CCI/MK #129

Invoice Period: from September 1-30, 2024
Payment Terms: Upon Receipt

# EXHIBIT  6



$94,325 and 98 cents

X 9ML

Approved

Invoice from The Lambet Law Firm Professional Corp., with annexes, September 1-30, 2024    Page 11

| Date | Time-keeper | Description | Hrs GL | Hrs AT MM |
|---|---|---|---|---|
| September 1 |  | | 5.6 | |
| September 2 | | | 6.5 | |
| September 3 | | | 6.2 | |



Invoice from The Lambet Law Firm Professional Corp., with annexes, September 1-30, 2024    Page 2











| | | September 18 | 6.7 |
| | | September 19 | 6.9 |
| | | September 20 | 6.4 |







| | | | |
|---|---|---|---|
| September 1-30 | AT | Paralegal support, high tech services, 3 hours | 3.0 |
| September 1-30 | MM | Paralegal support, High tech services, 2.5 hours | 2.5 |
| Total GL | | Hours | 172.6 |
| Total AT | | Hours | 3.0 |
| Total MM | | Hours | 2.5 |
| Total GL | Sum | Rate: $500 | $86,300 |
| Total AT | Sum | Rate: $100 | $300 |
| Total MM | Sum | Rate: $200 | $500 |
| **Total** | **Sum** | **Without Costs** | **$87,100** |
| | | **COSTS, EXPENDITURES, OUT-OF-POCKET, ADVANCES** | |
| 9/1-9/30 Full month | | | $2,530.23 |
| 9/1-9/30 Full month | | | $4,422.00 |



| | | | |
|---|---|---|---|
| 8/28/24 | | | $1,954.25 |
| 9/21/24 | | | $213.75 |
| 9/10/24 | | | $60.00 |
| **TOTAL COSTS, OUT OF POCKET PAID** | | | **$7,225 and 98 cents** |
| **GRAND TOTAL FOR PAYMENT** | | | **$94,325 and 98 cents** |

The Firm's Timekeepers in this matter:

George Lambert, Esq. ($500 per hour)

Alexey Tereshko, high-tech paralegal ($100 per hour)

Mark Meltser, senior high-tech paralegal ($200 per hour)

**For credit to:**
**Bank of America**
**Massachusetts IOLTA Trust Accounts**
**George A Lambert / The Lambert Law Firm**
**Wire Transfer ABA: 026009593**
**SWIFT: BOFAUS3N**
**Account Number: 466002743967**

**Annexes:  Costs, disbursements, out-of-pocket, evidence documents**

**Director of Claims**
AIG Claims, Inc., AIG - National Union Fire Insurance Co of Pittsburg P.A.
1271 Ave of the Americas, 35th Fl. New York, NY 10020

Gavin J. Curley, Esq.
Manire Galla Curley
450 Lexington Avenue,
4th Floor New York, NY 10017

cc.: David Feldman, Esq.

Re.: representation of Mvkalai Kontilai, CEO of Collector's Coffee Inc.
September 1-30, 2024

Invoice submission by
The Lambert Law Firm, offices at:
1025 Connecticut Ave, 1000 NW. Washington, D.C., 20036;
100 Cambridge Str., 14th Floor, Boston, MA 02152;
421 Poinciana Dr., #1422, Sunny Isles Beach, FL 33160;
Tel. (202) 640 1897; (617) 925 7500; (617) 539 0300, (305) 938 0600, fax (800) 852 1950

Tax ID: The Lambert Law Firm Professional Corp.
EIN 93-4814613
Claim number: 70301102232-00
Policy number NH5671155

X _____
Approved

**Invoice Number: CCI/MK #129**
Invoice Period: from September 1-30, 2024
Payment Terms: Upon Receipt

Invoice from The Lambert Law Firm Professional Corp., with annexes, September 1-30, 2024     Page 1

**ANNEX ONE**

**COSTS, EXPENDITURES**

**AND OUT-OF-POCKET PAYMENTS TO OTHER ATTORNEYS, CO-COUNSEL**





\* Available Credit includes purchases that have been authorized but have not yet posted to your account.



Go to: September 26, 2024

# EXHIBIT  7



# EXHIBIT 7

# Collectors Coffee - D&O/EPLI - February 24, 2017 to February 24, 2018

QBE $5MM ............................................................................................. 2

Westchester $5MM XS $5MM ................................................................ 29

RSUI $5MM XS $10MM ......................................................................... 40

RLI $5MM XS $15MM ............................................................................ 55

AIG SIDE A $5MM XS $20MM .............................................................. 66

POLICY NUMBER:   QPL0045639



QBBP-3010 (09-14)

### *The Solution*
### General Terms and Conditions Declarations

**QBE Insurance Corporation**

Wall Street Plaza, 88 Pine Street, New York, New York 10005

Home Office:  c/o CT Corporation System,116 Pine Street, Suite 320, Harrisburg, Pennsylvania  17101

**THE LIABILITY COVERAGE PARTS PROVIDE CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD.  THE LIMIT OF LIABILITY TO PAY JUDGMENTS OR SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DEFENSE COSTS.  PLEASE READ THIS POLICY CAREFULLY.**

**Item 1**:    **Parent Company:**    Collectors Coffee

             **Mailing Address:**    8020 Las Vegas Boulevard South
                                       Las Vegas, NV 89123

**Item 2**:    **Policy Period:**    From: February 24, 2017 To: February 24, 2018
                                  At 12:01 A.M. Standard Time at the mailing address stated in Item 1

**Item 3**:    **Limit of Liability:**    $5,000,000 Combined Maximum Aggregate Limit of Liability for Liability Coverage Parts

**Item 4**:    **Coverage Parts:**    Directors & Officers and Entity Liability
                                    Employment Practices Liability

**Item 5**:    **A. Notice to Insurer of a Claim or circumstance:**    **B. All Other Notices to Insurer:**

| | |
|---|---|
| QBE Insurance Corporation | QBE Insurance Corporation |
| Attn: The Claims Manager | Attn: Underwriting |
| Wall Street Plaza | Wall Street Plaza |
| 88 Pine Street, 18th Floor | 88 Pine Street, 18th Floor |
| New York, New York 10005 | New York, New York 10005 |
| Telephone: (877) 772-6771 | Telephone: (877) 772-6771 |
| Email: professional.liability.claims@us.qbe.com | Email: MLPLadmin@us.qbe.com |

**Item 6**:    **Extended Reporting Period:**
             Premium:   100% of annual premium
             Length:     One Year

**Item 7**:    **Premium:** $54,808

In witness whereof, the Insurer has caused this Policy to be executed, but it shall not be valid unless also signed by a duly authorized representative of the Insurer.

# QBE® Insurance Corporation
A Stock Company



### *The Solution* **for Management Liability**

---

**Home Office:**

c/o CT Corporation System
116 Pine Street, Suite 320
Harrisburg, Pennsylvania  17101

**Administrative Office:**

Wall Street Plaza
 88 Pine Street
New York, New York  10005
 1-877-772-6771

QBE and the links logo are registered service marks of QBE Insurance Group Limited.

**This policy consists of:**     Declarations
One or more coverage parts.
A coverage part consists of:
— One or more coverage forms
— Applicable forms and endorsements

**QBE Insurance Corporation**

In Witness Whereof, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

Robert V. James
President

Jose Ramon Gonzalez, Jr.
Secretary



*The Solution*
**General Terms and Conditions**

In consideration of the payment of the premium, the Insurer and the **Insureds** agree as follows:

**I.    PREAMBLE**

The insurance coverages offered in this Policy are part of a portfolio of insurance coverages, consisting of this General Terms and Conditions ("GTC") and any individual **Liability Coverage Parts** and **Non-Liability Coverage Parts** purchased, as stated in Item 4 of the Declarations of this GTC. The type of coverage provided by each of the **Liability Coverage Parts** and **Non-Liability Coverage Parts** are identified in each particular Coverage Part. Unless expressly stated to the contrary, the terms, conditions and limitations in this GTC apply to the entire Policy, whereas the terms, conditions and limitations of each individual Coverage Part only apply to that particular Coverage Part. In the event of a conflict between any terms, conditions or limitations of the GTC and any terms, conditions and limitations of any individual Coverage Part, the terms, conditions and limitations of the individual Coverage Part shall control.

**II.    EXCLUSIONS**

No coverage shall be provided under any **Liability Coverage Part** for **Loss** on account of that portion of a **Claim**:

A.  Bodily Injury/Property Damage - for bodily injury, mental anguish, emotional distress, humiliation, sickness, disease or death of any person or damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is damaged or destroyed;

B.  Conduct - based upon, arising out of or resulting from any deliberate fraud, deliberate criminal act or deliberate violation of any statute or regulation, or any illegal profit or remuneration, by an **Insured**, established by a final, non-appealable adjudication adverse to such **Insured** in any underlying action, and the Insurer shall not utilize a declaratory action or proceeding brought by or against the Insurer to establish such final, non-appealable adjudication;

C.  ERISA - for any violation of the responsibilities, obligations or duties imposed by **ERISA** or for any functions identified in **ERISA** Section 3(21)(A) as not being the functions of a fiduciary, and commonly referred to as "settlor" functions;

D.  Pending or Prior Proceedings - based upon, arising out of or resulting from an action, proceeding or **Claim** commenced against an **Insured** pending on or prior to the Pending or Prior Proceedings Date stated in the Declarations of each applicable **Liability Coverage Part**;

E.  Pollution - based upon, arising out of or resulting from any:

1.  discharge, emission, release, dispersal or escape of any **Pollutants** or any threat thereof;

2.  treatment, removal or disposal of any **Pollutants**; or

3.  regulation, order, direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any **Pollutants**,

including any **Claim** for financial loss to a **Company**, its securityholders or its creditors based upon, arising from or in consequence of any matter described in paragraphs 1, 2, or 3 above;

F.  Prior Notice - based upon, arising out of or resulting from any claim reported, or any circumstance reported and accepted, under the insurance policy (including any policies of which such policy is a renewal policy) replaced by this Policy; and

G.  Wage and Hour - based upon, arising out of or resulting from any violation of the responsibilities, obligations or duties imposed by any law governing wage, hour or payroll, including the Fair Labor Standards Act;

Exclusions D and F above shall not apply where this Policy is a renewal of a policy issued by the Insurer to the **Parent Company**.

With respect to all Policy exclusions, no conduct or knowledge of any **Insured** shall be imputed to any other **Insured Person**, and solely with respect to Exclusion B, only the conduct or knowledge of any past, present or future chief executive officer or chief financial officer of a **Company** shall be imputed to such **Company** and its **Subsidiaries**.

**III.    RETENTION OR DEDUCTIBLE**

A.  Any Retention or Deductible applicable to any Coverage Part shall apply as set forth in each Coverage Part and in the amount(s) stated in the Declarations of each Coverage Part. If different parts of a single **Claim** are

subject to different Retentions or Deductibles, then the total amount of **Loss** applied to the applicable Retentions or Deductibles shall not exceed the largest applicable Retention or Deductible.

B. No Retention shall apply to any **Loss** for which an **Insured Person** is not indemnified by a **Company** because of such **Company's Financial Impairment**.

## IV. LIMIT OF LIABILITY

A. The Combined Maximum Aggregate Limit of Liability, stated in Item 3 of the Declarations of this GTC, represents the maximum amount payable under all **Liability Coverage Parts** during the **Policy Period** for all **Liability Coverage Parts** combined.

B. The Limit of Liability, stated in Item 2 of the Declarations of each **Liability Coverage Part**, represents the maximum amount payable under each **Liability Coverage Part** during the **Policy Period** for any one **Claim** and in the aggregate as set forth in each such **Liability Coverage Part**.

C. **Defense Costs** are part of, and not in addition to, the Limit of Liability of each **Liability Coverage Part**.

D. The remaining portion of each of the limits of liability described above shall be the limits of liability available during any Extended Reporting Period applicable to any Coverage Part.

## V. REPORTING

A. Notice of any **Claim** under any **Liability Coverage Part** is considered timely when reported to the Insurer as soon as practicable after the **Parent Company's** chief executive officer or chief financial officer first becomes aware of such **Claim**. The Insurer shall not assert that notice of a **Claim** was untimely unless the Insurer is materially prejudiced by the untimely notice. However, in no event shall any notice be provided later than:

1. if the applicable **Liability Coverage Part** expires (or is otherwise terminated) without being renewed with the Insurer, 60 days after the effective date of such expiration or termination; or

2. the expiration date of the Extended Reporting Period, if applicable.

B. Notice requirements involving any **Non-Liability Coverage Part** shall be in accordance with the reporting requirements set forth in such **Non-Liability Coverage Part**.

C. Notice of any circumstance which could give rise to a **Claim** under any **Liability Coverage Part** is optional. If an **Insured** elects to report any circumstance which could give rise to a **Claim**:

1. such notice shall include information regarding the nature of any **Wrongful Acts** or alleged or potential damages and the names of any actual or potential defendants; and

2. any **Claim** that may subsequently arise out of a reported circumstance shall be deemed to have been first made during the **Policy Period** in which such circumstance was first reported.

## VI. DEFENSE AND SETTLEMENT

A. With respect to any **Claim** under any **Liability Coverage Part**, the Insurer shall have the right and duty to defend any **Claim**, unless otherwise specifically stated in a particular **Liability Coverage Part**. The Insurer shall have such right and duty to defend even if any of the allegations in such **Claim** are groundless, false or fraudulent. Any such duty to defend shall cease upon exhaustion of the applicable Limit of Liability.

B. With respect to any **Claim** under any **Liability Coverage Part**:

1. the **Insured** shall:

   (a) not agree to any settlement, stipulate to any judgment, incur any **Defense Costs**, admit any liability or assume any contractual obligation, without the Insurer's prior written consent, provided that, unless otherwise stated in a particular **Liability Coverage Part**, the **Insured** may settle any **Claim**, without the Insurer's prior written consent, where the amount of such settlement, including **Defense Costs**, does not exceed the applicable Retention or Deductible;

   (b) not do anything that could prejudice the Insurer's position or its potential or actual rights of recovery; and

   (c) agree to provide the Insurer with all information, assistance and cooperation which the Insurer may reasonably require,

   provided that the failure of any **Insured** to comply with any of the requirements in paragraphs (a) - (c) above, shall not impair the rights of any **Insured Person** under this Policy; and

2. the Insurer:

(a) may make any investigation it deems reasonably necessary and may, with the consent of the **Insureds**, make any settlement of any **Claim** it deems appropriate; and

(b) shall not be liable for any such settlement, stipulation, incurred **Defense Costs**, admission or assumed obligation to which it has not given its prior written consent, and the Insurer shall not unreasonably withhold such consent.

**VII.   ALLOCATION**

If in any **Claim**, the **Insureds** who are afforded coverage for a **Claim** incur **Loss** that is covered by this Policy and loss that is not covered by this Policy because such **Claim** includes both covered and uncovered matters, 100% of **Defense Costs** incurred by such **Insured** shall be covered **Loss**, and all loss other than **Defense Costs** shall be allocated between covered **Loss** and uncovered loss based upon the relative legal exposures of the parties to such matters.

**VIII.   TREATMENT OF RELATED CLAIMS**

All **Related Claims** shall be deemed a single **Claim** first made during the policy period in which the earliest of such **Related Claims** was either first made or deemed to have been first made in accordance with Section V. REPORTING above.

**IX.   SUBROGATION**

A.   In the event of any payment under this Policy, the Insurer shall be subrogated to the extent of such payment to all of the **Insureds'** rights of recovery, and the **Insureds** shall take all reasonable actions to secure and preserve the Insurer's subrogation rights.

B.   In no event shall the Insurer exercise any subrogation right against an **Insured Person**.  In any subrogation action against a **Company**, it is agreed that each **Company** agrees to fulfill any indemnification obligations to the fullest extent permitted by law and any contract or agreement providing an indemnification obligation exceeding any such law.

C.   If the Insurer recovers, either through subrogation or recoupment, any portion of an amount paid under this Policy, the Insurer shall reinstate the applicable limit of liability with any amounts recovered up to such amount paid, less any costs incurred by the Insurer in its recovery efforts.

**X.   EXTENDED REPORTING PERIOD**

With respect to all **Liability Coverage Parts**:

A.   If this Policy does not renew, or terminates other than for non-payment of premium, the **Insureds** shall have the right to purchase an ERP for the premium and time period stated in Item 6 of the Declarations. In the event of the non-renewal or termination of one or more **Liability Coverage Parts** of this Policy, the **Insureds** may purchase an ERP solely as respects the **Liability Coverage Part(s)** that has been non-renewed or terminated.

B.   The right to an ERP shall lapse unless written notice of election to purchase such ERP, together with payment of the specified premium, is received by the Insurer within 30 days after the effective date of non-renewal or termination of the Policy. In the event the **Parent Company** elects not to purchase an ERP and an individual **Insured** or group of **Insureds** elects to purchase such ERP, such ERP shall only apply to **Claims** against such **Insured** or group of **Insureds**.

C.   The premium for the ERP shall be deemed fully earned at the inception of the ERP.

D.   Any ERP purchased shall become part of the **Policy Period**, extending such **Policy Period** to the expiration of the time period stated in Item 6 of the Declarations, but only with respect to **Loss** on account of a **Claim** for a **Wrongful Act** taking place before the effective date of non-renewal or termination.

**XI.   CHANGES IN EXPOSURE**

A.   New Companies and Old Companies

This Policy's treatment of **Subsidiaries** shall be as stated below and as supplemented by any individual Coverage Part.

Any **Insured** of a **Subsidiary**:

1.   acquired before or during the **Policy Period** is eligible for coverage under any:

(a) **Liability Coverage Part**, but only for **Loss** on account of a **Claim** for a **Wrongful Act** which occurs after the date of such acquisition; and

    (b) **Non-Liability Coverage Part**, but only after the effective date of such acquisition, and with respect to the Crime Coverage Part, subject to Section VIII. Other Insurance of such Coverage Part.

  2. ceasing to be a **Subsidiary** before or during the **Policy Period** is eligible for coverage under any:

    (a) **Liability Coverage Part**, but only for **Loss** on account of a **Claim** for a **Wrongful Act** which occurs while such entity was a **Subsidiary**; and

    (b) **Non-Liability Coverage Part**, as provided in such **Non-Liability Coverage Part**, but such **Subsidiary** and its **Insureds** shall cease to be **Insureds** under such **Non-Liability Coverage Part** as of the date of such cessation.

B. Acquisition of the **Parent Company**

In the event of a **Change in Control** of the **Parent Company** during the **Policy Period**:

  1. any **Liability Coverage Part** shall remain in force until the expiration of the **Policy Period**, but only for any **Claim** for a **Wrongful Act** which occurs prior to such acquisition;

  2. the entire premium for this Policy shall be deemed fully earned as of the effective date of such **Change in Control**; and

  3. the **Parent Company** shall be entitled to receive a quote for an extension of the **Liability Coverage Parts** ("Run-Off Coverage") solely for **Claims** for **Wrongful Acts** which occurred prior to a **Change in Control**. Coverage offered pursuant to such quote shall be subject to additional or different terms and conditions and payment of additional premium. Any Run-Off Coverage purchased shall replace any Extended Reporting Period provided under Section X. EXTENDED REPORTING PERIOD.

## XII.   NOTICE

A. All notices to the Insurer under this Policy of any event, loss, **Claim** or circumstances which could give rise to a **Claim** shall be given in writing to the address listed in Item 5A of the Declarations, and any such notice shall be deemed notice under the Policy in its entirety.

B. All other notices to the Insurer under this Policy shall be given in writing to the address listed in Item 5B of the Declarations.

C. Any notice under this Policy shall be effective on the date of mailing or receipt by the Insurer, whichever is earlier.

## XIII.   TERMINATION OF POLICY

This Policy shall terminate at the earliest of:

A. 20 days after receipt by the **Parent Company** of written notice from the Insurer of termination for non-payment of premium;

B. expiration of the **Policy Period**; or

C. surrender of the Policy to the Insurer by the **Parent Company** or notice to the Insurer by the **Parent Company** stating when such cancellation will take effect, and in either case any returned premium shall be computed on a pro rata basis.

## XIV.   REPRESENTATIONS, SEVERABILITY AND NON-RESCINDABLE COVERAGE

A. In issuing this Policy, the Insurer has relied upon the information and representations in the **Application** as being true and accurate, and the **Application** is the basis for, and considered incorporated into, this Policy.

B. The **Application** shall be construed as a separate request for coverage by each **Insured**, without any knowledge possessed by an **Insured** being imputed to any other **Insured Person**.

C. If the **Application** contains any misrepresentation made with the actual intent to deceive or which, for reasons other than simple negligence or oversight, materially affect the Insurer's acceptance of the risk or the hazard assumed, the Insurer shall not be liable for **Loss** on account of any **Claim** based upon, arising out of or resulting from either of such misrepresentations:

  1. with respect to any **Insured Person** who had actual knowledge of any misrepresentation described in paragraph C above, and the Insurer can demonstrate that with such actual knowledge, such **Insured Person** reasonably believed that a **Claim** would arise from such misrepresentation;

  2. with respect to any **Company**, if the **Insured Person** described in paragraph 1 above is a past or present chief executive officer or chief financial officer of the **Parent Company**.

D.  The Insurer shall not be entitled under any circumstances to void or rescind this Policy with respect to any **Insured**.

### XV.  EFFECT OF BANKRUPTCY

Bankruptcy or insolvency of any **Insured** shall not relieve the Insurer of its obligations nor deprive the Insurer of its rights or defenses under this Policy.

### XVI.  WORLDWIDE TERRITORY

This Policy shall apply anywhere in the world, and any reference to laws, however described, shall include all U.S. federal, state and local statutory laws, all amendments to and rules and regulations promulgated under any such laws, common law, and any equivalent body of law anywhere in the world, unless specifically stated to the contrary.

### XVII.  ROLE OF THE PARENT COMPANY

The **Parent Company** shall act on behalf of each **Insured** with respect to paying premiums, receiving any return premiums, agreeing to endorsements to this Policy and the giving or receiving of any notice provided for in this Policy (except notices of a **Claim** or circumstance which could give rise to a **Claim** or notice to apply for an ERP).

### XVIII.  VALUATION AND FOREIGN CURRENCY

All premiums, limits, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America. If any element of **Loss** under this Policy is stated in a currency other than United States of America dollars, payment under this Policy shall be made in United States of America dollars at the exchange rate published in The Wall Street Journal on the date the element of **Loss** is due.

### XIX.  ALTERATION, ASSIGNMENT AND HEADINGS

A.  Any change in or modification of this Policy or assignment of interest under this Policy must be agreed to in writing by the Insurer.

B.  The descriptions and headings and sub-headings of this Policy are solely for convenience, and form no part of the terms, conditions and limitations of coverage.

### XX.  ESTATES, HEIRS, LEGAL REPRESENTATIVES, ASSIGNS, SPOUSES AND DOMESTIC PARTNERS

With respect to any **Liability Coverage Part**, **Insured Person** shall include:

A.  the estate, heirs, legal representatives or assigns of any **Executive**, if such **Executive** is deceased, legally incompetent, insolvent or bankrupt; and

B.  the lawful spouse or domestic partner of any **Executive** solely by reason of such spouse's or domestic partner's: 1. status as such; or 2. ownership interest in property which a claimant seeks as recovery for an alleged **Wrongful Act** of such **Executive**,

provided that no coverage shall apply with respect to loss arising from an act, error or omission by any estate, heir, legal representative, assign, spouse or domestic partner of an **Insured Person**.

### XXI.  TRADE SANCTIONS

This insurance coverage does not apply to the extent that trade or economic sanctions of any country prohibit the insurer or any member of the insurer's group from providing insurance coverage.

### XXII.  GLOSSARY

The following terms shall have the meaning ascribed to such terms in each applicable Coverage Part: **Claim**, **Defense Costs**, **Insured**, **Insured Person**, **Loss** and **Wrongful Act**.

A.  **Application** means where provided to the Insurer, the application and any accompanying documentation submitted to the Insurer for this Policy or any documentation submitted to the Insurer in connection with the underwriting of this Policy.

B.  **Change in Control** means:

1.  the **Parent Company's** merger with, or acquisition by, another entity or the acquisition of all or substantially all of its assets by another entity, such that the **Parent Company** is not the surviving entity; or

2.  when a person or entity or group of persons or entities acting in concert, acquires securities or voting rights which result in ownership or voting control by such person(s) or entity(ies) of more than 50% of the

outstanding securities or voting rights representing the present right to vote for or appoint directors or **Managers** of the **Parent Company**.

C.  **Company** means the **Parent Company** and any **Subsidiary**, any foundation, political action committee or charitable trust controlled or sponsored by the **Parent Company** or any **Subsidiary**, and the **Parent Company** or any **Subsidiary** in its capacity as a debtor in possession under United States bankruptcy law.

D.  **Employee** means any natural person whose labor or service was, is or will be engaged and directed by a **Company**, including a part-time, seasonal, leased and temporary employee, intern or volunteer.  **Employee** does not include an independent contractor.

E.  **ERISA** means the Employee Retirement Income Security Act of 1974 (including amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") and the Health Insurance Portability and Accountability Act of 1996 ("HIPAA")).

F.  **Executive** means any natural person who was, now is or shall become:

1.  a duly elected or appointed director, officer, **Manager**, trustee, regent, governor, risk manager, comptroller or in-house general counsel of any **Company** organized in the United States of America, or in a functionally equivalent  or comparable role to any of the foregoing; or

2.  a holder of a functionally equivalent position or comparable role to those described in paragraph 1 above in a **Company** that is organized in a jurisdiction other than the United States of America, including any position on an advisory board or committee.

G.  **Extradition** means any formal process by which an **Insured** located in any country is or is sought to be surrendered to any other country for trial or otherwise to answer any criminal accusation, including the execution of an arrest warrant where such execution is an element of such process.

H.  **Financial Impairment** means the status of a **Company** resulting from: 1. the appointment by a state or federal official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to control, supervise, manage or liquidate such **Company**; or 2. such **Company** becoming a debtor in possession under United States bankruptcy law.

I.  **Liability Coverage Part** means any Coverage Part identified in this Policy as a "Liability Coverage Part" within the heading to such Coverage Part or providing third party liability coverage in such Coverage Part.

J.  **Manager** means any natural person, who was, now is, or shall become, a manager, member of the Board of Managers or equivalent executive of a **Company** that is a limited liability company.

K.  **Non-Liability Coverage Part** means any Coverage Part or insuring clause in this Policy that does not provide any third party liability coverage.

L.  **Parent Company** means the entity named in Item 1 of the Declarations.

M.  **Policy Period** means the period of time stated in Item 2 of the Declarations of this GTC (subject to any termination in accordance with Section XIII. TERMINATION OF POLICY) and the ERP, if applicable.

N.  **Pollutants** means any solid, liquid, gaseous or thermal irritants or contaminants, including smoke, soot, vapor, fumes, acids, chemicals, alkalis, asbestos, asbestos products or waste. Waste includes materials to be reconditioned, recycled or reclaimed.

O.  **Related Claims** means all **Claims** based upon, arising out of or resulting from the same or related, or having a common nexus of, facts, circumstances or **Wrongful Acts**.

P.  **Subsidiary** means:

1.  any entity while more than 50% of the outstanding securities or other equity ownership, representing the present right to vote for election of, or to appoint, directors, **Managers**, or the foreign equivalent of any such directors or **Managers** of such entity, are owned or controlled by the **Parent Company** directly or indirectly through one or more **Subsidiaries**; or

2.  any entity while the **Parent Company** has the right, pursuant to either written contract or the bylaws, charter, operating agreement or similar documents of a **Company**, to elect or appoint a majority of the Board of Directors of a corporation or **Managers**.

POLICY NUMBER:  QPL0045639

QBBP-3006 (05-14)

⚠ **QBE**®

*The Solution* for Directors & Officers and Entity Liability
Coverage Part Declarations

**QBE Insurance Corporation**
Wall Street Plaza, 88 Pine Street, New York, New York 10005
Home Office:  c/o CT Corporation System,116 Pine Street, Suite 320, Harrisburg, Pennsylvania  17101

**THIS COVERAGE PART PROVIDES CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD.  THE LIMIT OF LIABILITY TO PAY JUDGMENTS OR SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DEFENSE COSTS. PLEASE READ THIS POLICY CAREFULLY.**

**Item 1**:      **Parent Company:**      Collectors Coffee

**Item 2**:      **A.  Limit of Liability:**

>     $5,000,000 per Claim
>     $5,000,000 in the aggregate

>     **B.  Securityholder Derivative Demand Investigation Limit:** $250,000

**Item 3**:      **Additional Limit for Non-Indemnifiable Loss:** $250,000

**Item 4**:      **Retention:**

>     A.   Insuring Clause B: $100,000 per Claim
>     B.   Insuring Clause C: $100,000 per Claim

**Item 5**:      **Pending or Prior Proceedings Date:** August 4, 2008



*The Solution* **for Private Company**
**Directors & Officers and Entity Liability**
**Coverage Part**

In consideration of the payment of the premium and subject to the General Terms and Conditions, the Insurer and the **Insureds** agree as follows:

**I. INSURING CLAUSE**

A. Side A - Non-Indemnifiable Loss Coverage for Insured Persons

The Insurer shall pay, on behalf of an **Insured Person**, **Loss** on account of a **Claim** first made during the **Policy Period**, to the extent that such **Loss** has not been paid or indemnified by any **Company**.

B. Side B - Corporate Reimbursement Coverage for Indemnification of Insured Persons

The Insurer shall pay, on behalf of a **Company**, **Loss** on account of a **Claim** first made during the **Policy Period** to the extent the **Company** pays or indemnifies an **Insured Person** for such **Loss**.

C. Side C - Entity Coverages

The Insurer shall pay, on behalf of a **Company**, **Loss** on account of a **Claim**, and **Defense Costs** on account of a **Securityholder Derivative Demand Investigation**, first made during the **Policy Period**.

**II. EXCLUSIONS**

In addition to the Exclusions set forth in Section II. EXCLUSIONS of the GTC, no coverage shall be provided under this Coverage Part for **Loss** on account of that portion of a **Claim**:

A. Insured v. Insured - brought by, or on behalf of:

1. a **Company** against another **Company**;

2. a **Company** or **Outside Entity** against an **Insured Person**;

3. an **Insured Person**, in any capacity, against an **Insured**,

provided that:

(a) Exclusion A2 above shall not apply to a **Claim** brought: (i) outside the United States of America, Canada or their territories or possessions; (ii) while the **Parent Company** or **Outside Entity** is in **Financial Impairment**; (iii) as a securityholder derivative action; or (iv) while an **Insured Person** is no longer serving in his capacity as such; and

(b) Exclusion A3 above shall not apply to any **Claim**: (i) for employment-related **Wrongful Acts** against an **Insured Person**; (ii) for contribution or indemnity; (iii) brought by an **Insured Person** who has ceased serving in his capacity as such for at least 1 year; or (iv) brought by, on behalf of or with the participation of a whistleblower;

B. Publicly Traded Securities - based upon, arising out of or resulting from any public offering of, or purchase or sale of, equity or debt securities issued by any **Company** or **Outside Entity**, provided that this Exclusion B shall not apply to any **Claim** based upon, arising out of or resulting from the **Company's**: 1. securities that are not required to be registered; 2. failure to undertake or complete an initial public offering or sale of its securities; or 3. preparation for any public offering, including any "road show" presentation to potential investors or other similar presentation;

Exclusions C - I below shall only apply to Insuring Clause C, Side C - Entity Coverages:

C. Antitrust - based upon, arising out of or resulting from anti-trust, price fixing or discrimination, restraint of trade, monopolization, unfair trade practices, predatory pricing or false advertising;

D. Contract - based upon, arising out of or resulting from any liability in connection with any contract or agreement to which a **Company** is a party, provided that this Exclusion D shall not apply to the extent that such **Company** would have been liable in the absence of such contract or agreement;

E. Employment Practices - based upon, arising out of or resulting from any employment-related **Wrongful Act**;

F. Intellectual Property - based upon, arising out of or resulting from any infringement of copyright, patent, trademark, trade dress, trade name or service mark or any misappropriation of ideas, trade secrets or other intellectual property rights;

G. Personal Injury - based upon, arising out of or resulting from any defamation (including libel and slander), disparagement, wrongful entry or eviction, invasion of privacy, false arrest, false imprisonment, assault, battery, loss of consortium, malicious use or abuse of process or malicious prosecution.

H. Professional Services - based upon, arising out of or resulting from the performance of or failure to perform **Professional Services**; and

I. Third Party Discrimination or Harassment - based upon, arising out of or resulting from any discrimination against, or harassment of, any third party.

With respect to this Coverage Part, the following exceptions shall apply to Section II. EXCLUSIONS of the GTC:

1. Exclusion A. Bodily Injury/Property Damage shall not apply to any **Claim** under Insuring Clause A; and

2. Exclusion E. Pollution shall not apply to any **Claim**: (a) under Insuring Clause A; or (b) brought by a securityholder of a **Company** against an **Insured Person**.

**III.    RETENTION**

No retention shall apply to any **Claim** under Insuring Clause A or to any **Securityholder Derivative Demand Investigation**.

**IV.    LIMIT OF LIABILITY**

A. The Securityholder Derivative Demand Investigation Limit stated in Item 2B of the Declarations of this Coverage Part represents the maximum amount payable under this Coverage Part during the **Policy Period** for **Defense Costs** on account of all **Securityholder Derivative Demand Investigations**, which amount shall be part of, and not in addition to, the Limit of Liability stated in Item 2A of such Declarations.

B. The Additional Limit for Non-Indemnifiable Loss stated in Item 3 of the Declarations of this Coverage Part represents an additional limit of liability available solely to an **Executive** or natural person **General Partner** for **Loss** on account of a **Claim** covered under Insuring Clause A. This additional limit of liability shall be in addition to and not part of, and excess of any other insurance written specifically as excess of, the Limit of Liability stated in Item 2A of such Declarations.

**V.    ADVANCEMENT**

A. If a **Company** fails to respond to an **Insured Person's** request for indemnification within 60 days of the **Insured Person's** request to the **Company** for such indemnification, then upon the reporting of the **Claim**, the Insurer shall advance **Defense Costs** and any other incurred **Loss** until such time that the **Company** accepts the **Insured's** request for indemnification or the Limit of Liability set forth in Item 2A of the Declarations of this Coverage Part has been exhausted, whichever occurs first. In any other **Claim**, the Insurer shall advance **Defense Costs** on a current basis, but no later than 60 days after receipt of the legal bills and any supporting documentation.

B. If it is determined by a final adjudication that any advanced **Defense Costs** are not covered under this Coverage Part, the **Insureds**, severally according to their respective interests, shall repay such uncovered **Defense Costs** to the Insurer, provided that nothing in this paragraph B shall limit the final non-appealable adjudication requirement in Exclusion B. Conduct of Section II. EXCLUSIONS of the GTC.  If the Insurer recovers any portion of an amount paid under this Coverage Part, the Insurer shall reinstate the applicable limit of liability with any amounts recovered up to such amount paid, less any costs incurred by the Insurer in its recovery efforts.

**VI.    REPORTING**

Notice of a **Securityholder Derivative Demand Investigation** is optional, but only **Loss** incurred after such **Securityholder Derivative Demand Investigation** is reported is eligible for coverage under this Coverage Part. If an **Insured** elects to report any **Securityholder Derivative Demand Investigation**, any **Claim** that may subsequently arise out of any reported **Securityholder Derivative Demand Investigation** shall be deemed to have been first made during the **Policy Period** in which such investigation was first reported.

**VII.    OTHER INSURANCE**

A. With the exception of insurance written specifically as excess of the Limit of Liability of this Coverage Part, this Coverage Part shall be excess of and shall not contribute with any valid and collectible insurance providing coverage for **Loss** for which this Coverage Part also provides coverage, provided that any payment by an **Insured** of a retention or deductible under any such other insurance shall reduce the applicable Retention under this Coverage Part by the amount of such payment which would otherwise have been **Loss** under this Coverage Part.

B. This Coverage Part shall also be excess of and shall not contribute with any indemnity provided, and any valid and collectible insurance maintained, by an **Outside Entity** for an **Insured Person** serving in his capacity as such for the **Outside Entity**.

C. Any personal umbrella excess liability insurance, independent directors liability insurance or any other similar personal liability insurance available to an **Insured** shall be specifically excess of this Coverage Part.

## VIII.   PRIORITY OF PAYMENTS

A. In the event that **Loss** under Insuring Clause A and any other **Loss** are concurrently due under this Coverage Part, then the **Loss** under Insuring Clause A shall be paid first. In all other instances, the Insurer may pay **Loss** as it becomes due under this Coverage Part without regard to the potential for other future payment obligations under this Coverage Part.

B. The coverage provided by this Coverage Part is intended first and foremost for the benefit and protection of **Insured Persons**. In the event a liquidation or reorganization proceeding is commenced by or against a **Company** pursuant to United States bankruptcy law:

1. the **Insureds** hereby agree not to oppose or object to any efforts by the Insurer, the **Company** or an **Insured** to obtain relief from any stay or injunction issued in such proceeding; and

2. the Insurer shall first pay **Loss** on account of a **Claim** for a **Wrongful Act** occurring prior to the date such liquidation or reorganization proceeding commences, and then pay **Loss** in connection with a **Claim** for a **Wrongful Act** occurring after the date such liquidation or reorganization proceeding commences.

## IX.   SECURITIES OFFERING

If during the **Policy Period**, a **Company** intends a public offering of securities under the Securities Act of 1933 and gives written notice to the Insurer within 30 days of the effective date of the Registration Statement for such offering together with any additional information requested by the Insurer, the Insurer shall provide the **Company** with a quote for coverage with respect to such offering.  Coverage offered pursuant to this quote shall include coverage for **Wrongful Acts** occurring in the course of any "road show" presentation to potential investors or other similar presentation and shall be subject to additional or different terms and conditions and payment of additional premium.

## X.   GLOSSARY

A. **Claim** means:

1. with respect to Insuring Clauses A and B, any investigation, evidenced by any written document, including a subpoena, target letter or search warrant, against an **Insured Person** for a **Wrongful Act**; and

2. with respect to Insuring Clauses A, B and C:

   (a) a written demand for monetary or non-monetary (including injunctive) relief, including demands for arbitration, mediation, waiving or tolling of a statute of limitations or **Extradition**;

   (b) a civil or criminal proceeding evidenced by: (i) the service of a complaint or similar pleading in a civil proceeding; or (ii) the filing of an indictment, information or similar document or an arrest in a criminal proceeding; and

   (c) a formal administrative or regulatory proceeding, evidenced by the filing of a formal notice of charges or the entry of a formal order of investigation,

   against an **Insured** for a **Wrongful Act**, including any appeal therefrom.

The time when a **Claim** shall be deemed first made for the purposes of this Coverage Part shall be the date on which the **Claim** is first made against, served upon or received by the **Insured** or the applicable notice or order is filed or entered.

B. **Defense Costs** means that part of **Loss** consisting of:

1. reasonable costs, charges, fees (including, attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries, fees or benefits of any **Insured**) incurred in: (a) investigating, defending, opposing or appealing any **Claim** or (b) any **Securityholder Derivative Demand Investigation**; and

2. the premium for appeal, attachment or similar bonds (but the Insurer shall be under no obligation to furnish any bond).

C. **Insured** means any **Company** or **Insured Person**.

D. **Insured Person** means:

1. an **Executive**;

2. an **Employee**, but only with respect to a **Claim**: (a) brought by a securityholder of a **Company** in his capacity as such; or (b) that is also brought and maintained against an **Insured Person** included in paragraph 1 above; or

3. a holder of an equivalent position to those included in paragraph 1 above in an **Outside Entity**, while serving at the specific request or direction of the **Company**.

E. **Loss** means the amount that an **Insured** becomes legally obligated to pay on account of any **Claim** including:

1. compensatory damages;

2. judgments and settlements, including a judgment or settlement awarding plaintiffs' attorneys fees, provided that with respect to any settlement including plaintiffs' attorneys fees, that portion of the settlement can be demonstrated to be reasonable, taking into consideration the nature of legal action, time and expense involved in prosecuting such action, and the likelihood of a court awarding a similar amount as part of a judgment;

3. pre and post-judgment interest;

4. **Defense Costs**;

5. solely with respect to Insuring Clause A, taxes imposed by law upon an **Insured Person** in his capacity as such in connection with any bankruptcy, receivership, conservatorship or liquidation of a **Company**, to the extent such taxes are insurable by law; and

6. punitive, exemplary or multiplied damages, fines or penalties, if and to the extent that any such damages, fines or penalties are insurable under the law of the jurisdiction most favorable to the insurability of such damages, fines or penalties.

In determining the most favorable jurisdiction as set forth in paragraph 6 above, due consideration shall be given to the jurisdiction with a substantial relationship to the relevant **Insureds** or to the **Claim** giving rise to such damages, fines or penalties, and the Insurer shall not challenge any opinion of independent legal counsel (mutually agreed to by the Insurer and the **Insured**) that such damages, fines or penalties are insurable under applicable law.

**Loss** does not include any portion of such amount that constitutes any:

(a) amount not insurable under the law pursuant to which this Coverage Part is construed;

(b) cost incurred to comply with any order for injunctive or other non-monetary relief, or to comply with an agreement to provide such relief;

(c) amount that represents or is substantially equivalent to an increase in consideration paid (or proposed to be paid) by a **Company** in connection with its purchase of any securities and assets;

(d) tax, other than taxes described in paragraph 5 above; or

(e) cost incurred to clean up, remove, contain, treat, detoxify or neutralize **Pollutants**.

F. **Outside Entity** means:

1. any non-profit entity, community chest, fund or foundation; or

2. any other entity specifically added as an **Outside Entity** by endorsement to this Coverage Part,

that is not a **Company**.

G. **Professional Services** means services which are performed for others for a fee.

H. **Securityholder Derivative Demand Investigation** means an investigation by a **Company** to determine whether it is in the best interest of such **Company** to prosecute the claims alleged in a securityholder derivative demand or lawsuit. Where a **Securityholder Derivative Demand Investigation** is initiated because of a lawsuit rather than a demand, any coverage provided for **Defense Costs** on account of such **Securityholder Derivative Demand Investigation** shall in no way limit the coverage otherwise afforded under this Coverage Part to an **Insured** for **Loss** on account of a **Claim**.

J. **Wrongful Act** means:

1. any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted by: (a) an **Insured Person** in his capacity as such; or (b) by a **Company**; or

2. any other matter claimed against an **Insured Person** solely by reason of serving in his capacity as such.

POLICY NUMBER:   QPL0045639

QBBP-3007 (05-14)

**QBE.**

*The Solution* for Employment Practices Liability
Coverage Part Declarations

**QBE Insurance Corporation**
Wall Street Plaza, 88 Pine Street, New York, New York 10005
Home Office:  c/o CT Corporation System,116 Pine Street, Suite 320, Harrisburg, Pennsylvania  17101

**THIS COVERAGE PART PROVIDES CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD.  THE LIMIT OF LIABILITY TO PAY JUDGMENTS OR SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DEFENSE COSTS. PLEASE READ THIS POLICY CAREFULLY.**

**Item 1**:     **Parent Company:**     Collectors Coffee

**Item 2**:     **Limit of Liability:**

       $5,000,000 per Claim
       $5,000,000 in the aggregate

**Item 3**:     **Retention:** $25,000 per Claim

**Item 4**:     **Pending or Prior Proceedings Date:** August 4, 2008



*The Solution* for Employment Practices Liability
Coverage Part

In consideration of the payment of the premium and subject to the General Terms and Conditions, the Insurer and the **Insureds** agree as follows:

**I.    INSURING CLAUSE**

The Insurer shall pay, on behalf of an **Insured**, **Loss** on account of a **Claim** first made during the **Policy Period**.

**II.   EXCLUSIONS**

In addition to the Exclusions set forth in Section II. EXCLUSIONS of the GTC, no coverage shall be provided under this Coverage Part for **Loss** on account of that portion of a **Claim**:

A. Breach of Written Employment Contract - based upon, arising out of or resulting from any breach of any written employment contract or agreement, provided that this Exclusion A shall not apply to: 1. **Loss** to the extent an **Insured** would have been liable for such **Loss** in the absence of such written employment contract or agreement; or 2. **Defense Costs**;

B. OSHA, Workforce Notification and Labor Relations - based upon, arising out of or resulting from any violation of the responsibilities, obligations or duties imposed by the Occupational Safety and Health Act, the Worker Adjustment and Retraining Notification Act, the National Labor Relations Act or any similar law; and

C. Workers Compensation, Disability Benefits, Social Security, Unemployment - based upon, arising out of or resulting from any failure to comply with any obligation under any workers compensation, disability benefits, social security or unemployment insurance law;

Exclusions A - C above shall not apply to any **Claim** for **Retaliation**.

With respect to this Coverage Part, the following exceptions shall apply to Section II. EXCLUSIONS of the GTC:

1. Exclusion A. Bodily Injury/Property Damage shall not apply to **Loss** for any mental anguish, emotional distress or humiliation when alleged as part of a **Claim** otherwise covered under this Coverage Part; and

2. Exclusion C. ERISA and E. Pollution shall not apply to any **Claim** for **Retaliation**.

**III.  OTHER INSURANCE**

A. With respect to any **Claim** for an **Employment Practices Wrongful Act**, other than that portion of a **Claim** made against a leased or temporary employee or **Independent Contractor**, this Coverage Part shall be primary insurance.

B. With respect to:

1. that portion of any **Claim** made against any leased or temporary employee or **Independent Contractor**; or

2. any **Claim** for a **Third Party Wrongful Act**, where **Loss** is covered under this Coverage Part and other valid and collective insurance,

this Coverage Part shall be specifically excess of and shall not contribute with any other valid and collectible insurance policy (other than a policy that is issued specifically as excess of the insurance afforded by the Coverage Part), regardless of whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise.

**IV.   COORDINATION OF COVERAGE**

Any **Loss** covered under this Coverage Part and one or more other **Liability Coverage Parts** shall first be covered under this Coverage Part, subject to its terms, conditions and limitations. Any remaining portion of such **Loss** shall be covered under such other **Liability Coverage Part(s)**, subject to its terms, conditions and limitations.

**V.    GLOSSARY**

A. **Benefits** means any payments (including insurance premiums), deferred compensation, perquisites or fringe benefits, in connection with an employee benefit plan and any other payment to or for the benefit of an employee arising out of the employment relationship. However, **Benefits** shall not include salary, wages, bonuses, commissions, **Stock Benefits** or non-deferred cash incentive compensation.

B. **Claim** means any:

1. written demand for monetary or non-monetary (including injunctive) relief, including demands for arbitration, waiving or tolling of a statute of limitations, reinstatement, reemployment or re-engagement;

2. civil or criminal proceeding, evidenced by: (a) the service of a complaint or similar pleading in a civil proceeding; or (b) the filing of an indictment, information or similar document or an arrest in a criminal proceeding; and

3. arbitration proceeding pursuant to an employment contract or agreement, policy or practice of a **Company**;

4. administrative, regulatory or tribunal proceeding, other than a labor, grievance or other proceeding under a collective bargaining agreement, evidenced by the filing of a formal notice of charges or the entry of a formal order of investigation; or

5. any audit of an **Insured** conducted by the United States of America Office of Federal Contract Compliance Programs ("OFCCP"),

against an **Insured** for a **Wrongful Act**, including any appeal therefrom.

The time when a **Claim** shall be deemed first made for the purposes of this Coverage Part shall be the date on which the **Claim** is first made against, served upon or received by the **Insured** or the applicable notice or order is filed or entered.

C. **Defense Costs** means that part of **Loss** consisting of:

1. reasonable costs, charges, fees (including, attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries, fees or benefits of any **Insured**) incurred in investigating, defending, opposing or appealing any **Claim**; or

2. the premium for appeal, attachment or similar bonds (but the Insurer shall be under no obligation to furnish any bond).

D. **Discrimination** means any violation of any employment discrimination law.

E. **Employment Practices Wrongful Act** means any:

1. breach of any employment contract or agreement or contractual obligation, including any contract or agreement or contractual obligation arising out of any employee handbook, personnel manual, policy statement or other representation;

2. **Discrimination**;

3. **Harassment**;

4. **Retaliation**;

5. **Workplace Tort**; or

6. **Wrongful Employment Decision**

committed, attempted, or allegedly committed or attempted by an **Insured** while acting in his or its capacity as such.

F. **Harassment** means any:

1. sexual harassment that is made a condition of employment with, used as a basis for employment decisions by, interferes with performance or creates an intimidating, hostile or offensive working environment within, a **Company**; or

2. workplace harassment, including bullying that interferes with performance or creates an intimidating, hostile or offensive working environment within a **Company**.

G. **Independent Contractor** means any natural person working for a **Company** pursuant to a written contract or agreement between such natural person and the **Company** which specifies the terms of the **Company's** engagement of such natural person.

H. **Insured** means any **Company** or **Insured Person**.

I. **Insured Person** means any:

1. **Executive** or **Employee**; or

2. **Independent Contractor**, but only if the **Company** agrees to indemnify the **Independent Contractor** in the same manner as **Employees** for liability arising out of a **Claim**.

J. **Loss** means the amount that an **Insured** becomes legally obligated to pay on account of any **Claim** including:

1. compensatory damages (including back pay and front pay);

2. judgments and settlements, including a judgment or settlement awarding plaintiffs' attorneys fees, provided that with respect to any settlement including plaintiffs' attorney fees, that portion of the settlement can be demonstrated to be reasonable, taking into consideration the nature of legal action, time and expense involved in prosecuting such action, and the likelihood of a court awarding a similar amount as part of a judgment;

3. pre and post-judgment interest;

4. liquidated damages awarded pursuant to the Age Discrimination in Employment Act, Family Medical Leave Act or Equal Pay Act;

5. **Defense Costs**; and

6. punitive, exemplary or multiplied damages, if and to the extent that any such damages are insurable under the law of the jurisdiction most favorable to the insurability of such damages.

In determining the most favorable jurisdiction as set forth in paragraph 6 above, due consideration shall be given to the jurisdiction with a substantial relationship to the relevant **Insureds**, to the **Company**, or to the **Claim** giving rise to such damages, and the Insurer shall not challenge any opinion of independent legal counsel (mutually agreed to by the Insurer and the **Insured**) that such damages are insurable under applicable law.

**Loss** does not include any portion of such amount that constitutes any:

(a) amount not insurable under the law pursuant to which this Coverage Part is construed;

(b) cost incurred to comply with any order for injunctive or other non-monetary relief, or to comply with an agreement to provide such relief;

(c) future salary, wages, commissions, or **Benefits** or other monetary payments of a claimant who has been or shall be hired, promoted or reinstated to employment pursuant to a settlement, order or other resolution of any **Claim**;

(d) salary, wages, commissions, **Benefits** or other monetary payments which constitute severance payments or payments pursuant to a notice period;

(e) **Benefits** due or to become due or the equivalent value of such **Benefits**;

(f) cost associated with providing any accommodation for persons with disabilities or any other status which is protected under any law, including the Americans with Disabilities Act and the Civil Rights Act of 1964;

(g) tax, fine or penalty imposed by law; or

(h) cost incurred to clean up, remove, contain, treat, detoxify or neutralize **Pollutants**.

K. **Retaliation** means retaliatory treatment against an **Employee** of a **Company** on account of such individual:

1. exercising his or her rights under law, refusing to violate any law or opposing any unlawful practice;

2. having assisted or testified in or cooperated with a proceeding or investigation (including any internal investigation conducted by the **Company's** human resources or legal department) regarding alleged violations of law by the **Insured**;

3. disclosing or threatening to disclose to a superior or any governmental agency any alleged violations of law; or

4. filing any claim against the **Company** under the Federal False Claims Act, Section 806 of the Sarbanes Oxley Act or any other whistleblower law.

L. **Stock Benefits** means any:

1. offering, plan or agreement between a **Company** and any **Employee** which grants stock, warrants, shares or stock options of the **Company** to such **Employee**, including grants of restricted stock, performance stock shares, membership shares or any other compensation or incentive granted in the form of securities of the **Company**; or

2. payment or instrument, the amount or value of which is derived from the value of securities of the **Company**, including stock appreciation rights or phantom stock plans or arrangements,

provided that **Stock Benefits** shall not include amounts claimed under any employee stock ownership plans or employee stock purchase plans.

M.  **Third Party** means any natural person who is not an **Insured Person**.

N.  **Third Party Wrongful Act** means any sexual harassment, or discrimination based upon status protected under any anti-discrimination law, against a **Third Party** committed, attempted, or allegedly committed or attempted by any **Insured** while acting in his or its capacity as such.

O.  **Workplace Tort** means any employment-related:

1.  misrepresentation, defamation (including libel and slander), invasion of privacy, wrongful infliction of emotional distress, mental anguish or humiliation; or

2.  negligent retention, supervision, hiring or training, failure to provide or enforce consistent employment-related corporate policies and procedures, false imprisonment, negligent evaluation, wrongful discipline or wrongful deprivation of career opportunity,

but only when alleged as part of a **Claim** for any **Wrongful Employment Decision**, breach of employment contract, **Discrimination**, **Harassment** or **Retaliation**.

P.  **Wrongful Act** means an **Employment Practices Wrongful Act** or **Third Party Wrongful Act**.

Q.  **Wrongful Employment Decision** means any wrongful termination, discharge of employment, demotion, denial of tenure, failure or refusal to employ or promote, or wrongful or negligent employee reference.

**POLICY NUMBER: QPL0045639**

**Endorsement Effective Date: February 24, 2017**                                    **QBBP-5085 (05-14)**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## NEVADA AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided under the following:

GENERAL TERMS AND CONDITIONS

It is hereby agreed that:

**I.**   Section **XIII. TERMINATION OF POLICY** is amended by the addition of the following:

The notice shall state the effective date of cancellation and an explanation of the specific reason for cancellation.  If notice is mailed, it shall be sent by certified or first-class mail to the **Parent Company** at the address set forth in the Declarations of the GTC.  Proof of mailing shall be sufficient proof of notice.

**II.**   This Policy is amended by the addition of the following:

**NON-RENEWAL**

If the Insurer decides not to renew this Policy, the Insurer will deliver or mail written notice of non-renewal to the **Parent Company** at the address set forth in the Declarations of the GTC at least sixty (60) days before the expiration date of the Policy.  The notice shall provide an explanation of the specific reason for non-renewal.  If notice is mailed, it shall be sent by certified or first-class mail.  Proof of mailing shall be sufficient proof of notice.

**RENEWAL**

If the Insurer offers to renew this Policy on different terms or rates, the Insurer will deliver or mail written notice to the **Parent Company** at the address set forth in the Declarations of the GTC at least thirty (30) days before the different terms or rates become effective.  If notice is mailed, it shall be sent by certified or first-class mail.  Proof of mailing shall be sufficient proof of notice.

All other terms and conditions of this Policy remain unchanged.

**POLICY NUMBER:   QPL0045639**
**Endorsement Effective Date: February 24, 2017**                                                              **QBBPP-2215 (05-14)**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**AMEND PROFESSIONAL SERVICES EXCLUSION**

This endorsement modifies insurance provided under the following:

DIRECTORS & OFFICERS AND ENTITY LIABILITY COVERAGE PART

It is hereby agreed that Exclusion H. Professional Services in Section **II. EXCLUSIONS** is replaced by the following:

H.    Professional Services - for the performance of or failure to perform **Professional Services**, provided that this Exclusion H shall not apply to any **Claim** brought by a securityholder or limited partner of a **Company** against an **Insured Person**; and

All other terms and conditions of this Policy remain unchanged.

**POLICY NUMBER:   QPL0045639**
**Endorsement Effective Date: February 24, 2017**                          **QBBPP-2220 (10-14)**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## WAGE AND HOUR CLAIM DEFENSE COSTS SUBLIMIT ENDORSEMENT

This endorsement modifies insurance provided under the following:

EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

It is hereby agreed that:

I.    Section **I. INSURING CLAUSE** is amended by the addition of the following:

The Insurer shall pay, on behalf of an **Insured**, **Defense Costs** on account of a **Wage and Hour Claim** first made during the **Policy Period**.

II.    Section **V. GLOSSARY** is amended by the addition of the following:

**Wage and Hour Claim** means any:

1.    written demand for monetary or non-monetary (including injunctive) relief, including demands for arbitration, waiving or tolling of a statute of limitations, reinstatement, reemployment or re-engagement;

2.    civil proceeding, evidenced by the service of a complaint or similar pleading;

3.    arbitration proceeding, evidenced by the receipt of a demand for arbitration; or

4.    administrative, regulatory or tribunal proceeding, other than a labor, grievance or other proceeding under a collective bargaining agreement, evidenced by the filing of a formal notice of charges or the entry of a formal order of investigation,

which is brought by an **Employee** against an **Insured** and is based upon, arising out of or resulting from any violation of the responsibilities, obligations or duties imposed by the Fair Labor Standards Act (except the Equal Pay Act) or any similar law governing wage, hour or payroll.

The time when a **Wage and Hour Claim** shall be deemed first made for the purposes of this Coverage Part shall be the date on which the **Wage and Hour Claim** is first made against, served upon or received by the **Insured** or the applicable notice or order is filed or entered.

III.    This Coverage Part is amended by the addition of the following:

**LIMIT OF LIABILITY**

All **Defense Costs** arising from a **Wage and Hour Claim** shall be subject to a Wage and Hour Sublimit of Liability of $25,000 which shall be part of, and not in addition to, the Limit of Liability set forth in Item 2 of the Declarations of this Coverage Part and shall be excess of a Wage and Hour Retention of $25,000.

IV.    Exclusion G. Wage and Hour in Section **II. EXCLUSIONS** of the GTC shall not apply to **Defense Costs** for a **Wage and Hour Claim**.

All other terms and conditions of this Policy remain unchanged.

**POLICY NUMBER:  QPL0045639**
**Endorsement Effective Date: February 24, 2017**                              **QBBPP-2045 (06-15)**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ILLEGAL ALIEN INVESTIGATIVE DEFENSE COSTS SUBLIMIT ENDORSEMENT**

This endorsement modifies insurance provided under the following:

EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

It is hereby agreed that:

**I.**   The definition of **Claim** in paragraph B. of Section **V. GLOSSARY** is amended by the addition of the following:

   **Claim** shall also mean a criminal investigation of the **Company** by any governmental agency for allegedly hiring or harboring illegal aliens.

**II.**   This Coverage Part is amended by the addition of the following:

   All **Defense Costs** arising out of all **Claims** made against the **Insured** with respect to the coverage provided by this endorsement shall be subject to a sublimit of liability of $25,000 which shall be part of, and not in addition to, the Limit of Liability set forth in Item 2 of the Declarations of this Coverage Part.

All other terms and conditions of this Policy remain unchanged.

**POLICY NUMBER:  QPL0045639**
**Endorsement Effective Date: February 24, 2017**                    **QBBPP-2120 (05-14)**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## ANTITRUST EXCLUSION DELETED ENDORSEMENT

This endorsement modifies insurance provided under the following:

DIRECTORS & OFFICERS AND ENTITY LIABILITY COVERAGE PART

It is hereby agreed that Exclusion C. Antitrust in Section **II. EXCLUSIONS** is deleted.

All other terms and conditions of this Policy remain unchanged.

**POLICY NUMBER: QPL0045639**
**Endorsement Effective Date: February 24, 2017**                                        **QBBPP-2117 (04-15)**


# THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## INSURED PERSON AMENDED TO INCLUDE ANY ADVISORY BOARD MEMBER ENDORSEMENT


This endorsement modifies insurance provided under the following:

DIRECTORS & OFFICERS AND ENTITY LIABILITY COVERAGE PART

It is hereby agreed that:

**I.**  The definition of **Insured Person** in paragraph D. of Section **X. GLOSSARY** is amended by the addition of the following:

An **Insured Person** shall include any natural person who was, now is or shall be a board observer or duly elected member of an advisory board including a **Scientific Advisory Board**.

**II.**  Section **X. GLOSSARY** is amended by the addition of the following:

**Scientific Advisory Board** means a group of scientists, independent from management, created by or requested by the **Company** to provide objective feedback and guidance on the **Company's** progress and goals.

All other terms and conditions of this Policy remain unchanged.

POLICY NUMBER:   QPL0045639
Endorsement Effective Date: February 24, 2017                                                      QBBPP-2273 (08-15)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# PRIVATE COMPANY ENHANCEMENT ENDORSEMENT

It is hereby understood and agreed that this endorsement modifies insurance as follows:

The GTC is amended by the addition of the following:

It is hereby agreed that in the event there is an inconsistency between a state amendatory endorsement attached to this Policy and any other term or condition of this Policy, then where permitted by law, the Insurer shall apply those terms and conditions of either the state amendatory endorsement or the Policy, whichever are more favorable to the **Insured**.

If the DIRECTORS & OFFICERS AND ENTITY LIABILITY COVERAGE PART has been purchased, the following changes apply:

1.  Section **II. EXCLUSIONS**, paragraph D. is replaced by the following:

    D.  Contract - for any liability in connection with any contract or agreement to which a **Company** is a party, provided that this Exclusion D shall not apply to the extent that such **Company** would have been liable in the absence of such contract or agreement;

2.  Section **II. EXCLUSIONS**, paragraph H. is replaced by the following:

    H.  Professional Services - for the performance of or failure to perform **Professional Services**, provided that this Exclusion H shall not apply to any **Claim** brought by a securityholder of a **Company** against a **Company**. However, in no event shall any coverage be provided for any portion of such **Claim** that is brought by the securityholder in solely his capacity as a client of such **Company**; and

3.  The definition of **Insured Person** in paragraph D. of Section **X. GLOSSARY** is replaced by the following:

    D.  **Insured Person** means:

        1.  an **Executive**;

        2.  an **Employee**; or

        a holder of an equivalent position to those included in paragraph 1 above in an **Outside Entity**, while serving at the specific request or direction of the **Company**.

If the EMPLOYMENT PRACTICES LIABILITY COVERAGE PART has been purchased, the following changes apply:

1.  Exclusion G. Wage and Hour in Section **II. EXCLUSIONS** of the GTC shall not apply to any **Claim** for any violation of the responsibilities, obligations or duties imposed by the Equal Pay Act.

2.  The definition of **Claim** in paragraph B.1. of Section **V. GLOSSARY** is amended by the addition of the word "mediation," after the word "arbitration," and by the addition of the following:

    **Claim** shall also mean a criminal investigation of the **Company** by any governmental agency for allegedly hiring or harboring illegal aliens.

3.  The definition of **Retaliation** in paragraph K. of Section **V. GLOSSARY** is amended by deleting the word "**Employee**" and replacing it with the word "**Insured Person**".

4.  The definition of **Harassment** in paragraph F. of Section **V. GLOSSARY** is replaced by the following:

    F.  **Harassment** means any:

    1.  sexual harassment that is made a condition of employment with, used as a basis for employment decisions by, interferes with performance or creates an intimidating, hostile or offensive working environment; or

    2.  workplace harassment, including bullying that interferes with performance or creates an intimidating, hostile or offensive working environment.

5.  This Coverage Part is amended by the addition of the following:

All **Defense Costs** arising out of all **Claims** for criminal investigations of a **Company** by any governmental agency for allegedly hiring or harboring illegal aliens, made against the **Insured** shall be subject to a sublimit of liability of $25,000, which shall be part of, and not in addition to, the Limit of Liability set forth in Item 2 of the Declarations of this Coverage Part.

If the FIDUCIARY LIABILITY COVERAGE PART has been purchased, the following changes apply:

1.  Section **III. RETENTION** is amended by the addition of the following:

No retention shall apply to **Loss** constituting civil penalties imposed upon an **Insured** for inadvertent violation of the Patient Protection and Affordable Care Act ("PPACA") or the Pension Protection Act of 2006 ("PPA").

2.  Section **IV. LIMIT OF LIABILITY** is amended by the addition of the following:

All **Loss** arising from **Claims** alleging inadvertent violations of PPACA or the PPA shall be subject to a sublimit of liability of $50,000, which amount shall be part of, and not in addition to, the Limit of Liability set forth in Item 2 of this Coverage Part.

3.  The definition of **Loss** in paragraph F.7. of Section **IX. GLOSSARY** is amended by the addition of the following:

any civil penalties imposed upon an **Insured** for inadvertent violation of PPACA or the PPA.

All other terms and conditions of this Policy remain unchanged.

| **Westchester** A Chubb Company | Westchester Fire Insurance Company |
|---|---|
| | ## Excess Liability Insurance Policy Declarations |

**This Policy is issued by the stock insurance company listed above (herein "Insurer").**

**UNLESS OTHERWISE PROVIDED IN THE FOLLOWED POLICY, THIS POLICY IS A CLAIMS MADE POLICY WHICH COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD. PLEASE READ THIS POLICY CAREFULLY.**

**Policy No.** G27955708 002                    **Renewal Of** G27955708 001

| **Item 1.** | Insured Company | Collector's Coffee, Inc. |
|---|---|---|
| | Principal Address: | 8020 Las Vegas Boulevard South Las Vegas, Nevada 89123 |
| **Item 2.** | Coverages Provided: | Excess Directors and Officers Liability, Employment Practices Liability |
| **Item 3.** | Followed Policy: | QBBP-1004; QBBP-1000; QBBP-1002 |
| | Insurer: | QBE Insurance Corporation |
| | Policy Number | QPL0045639 |

**Item 4.**  Policy Period
From 12:01 A.M.    02/24/2017    To 12:01 A.M.    02/24/2018
(Local time at the address shown in Item 1.)

**Item 5.**  Premium

$   30,730            Policy Premium

$   30,730.00        Total Amount Due

**Item 6.**  Limit of Liability/Aggregate Limit:

$   5,000,000                          for all Loss under all Coverages combined.

**Item 7.**  Underlying Policy Limits/Attachment Point:

$   5,000,000

**Item 8.**  PENDING & PRIOR LITIGATION DATE:

02/24/2016

This Policy is intended to follow the Pending & Prior Litigation Exclusion of the Followed Form, subject to the date indicated above.

**Item 9.**     NOTICE TO INSURER

    **A.**  Notice of Claim, Wrongful Act or Loss:

        PO Box 5119
        Scranton, PA  18505-0549
        First Notices Fax:
        215.640.5040 or 1.877.746.4671
        General Correspondence Fax:
        1.866.635.5688
        First Notices Email:
        aceclaimsfirstnotice@chubb.com

    **B.**  All other notices:

        Westchester Specialty Group
        Attention: Professional Liability Dept.
        Royal Centre Two, 11575 Great Oaks Way
        Suite 200
        Alpharetta, GA 30022

**THESE DECLARATIONS, TOGETHER WITH THE COMPLETED AND SIGNED APPLICATION AND THE POLICY FORM ATTACHED HERETO, CONSTITUTE THE INSURANCE POLICY.**

Date:  _____2/24/2017_____
                MO/DAY/YR.

                                      JOHN J. LUPICA, President
                                     Authorized Representative

# SIGNATURES

| Named Insured<br>Collector's Coffee, Inc. | | | Endorsement Number |
|---|---|---|---|
| Policy Symbol<br>DOX | Policy Number<br>G27955708 002 | Policy Period<br>02/24/2017 **to**   02/24/2018 | Effective Date of Endorsement<br>02/24/2017 |
| Issued By (Name of Insurance Company)<br>Westchester Fire Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

THE ONLY SIGNATURES APPLICABLE TO THIS POLICY ARE THOSE REPRESENTING THE COMPANY NAMED ON THE FIRST PAGE OF THE DECLARATIONS.

By signing and delivering the policy to you, we state that it is a valid contract.

**INDEMNITY INSURANCE COMPANY OF NORTH AMERICA** (A stock company)
**BANKERS STANDARD FIRE AND MARINE COMPANY** (A stock company)
**BANKERS STANDARD INSURANCE COMPANY** (A stock company)
**ACE AMERICAN INSURANCE COMPANY** (A stock company)
**ACE PROPERTY AND CASUALTY INSURANCE COMPANY** (A stock company)
**INSURANCE COMPANY OF NORTH AMERICA** (A stock company)
**PACIFIC EMPLOYERS INSURANCE COMPANY** (A stock company)
**ACE FIRE UNDERWRITERS INSURANCE COMPANY** (A stock company)
**WESTCHESTER FIRE INSURANCE COMPANY** (A stock company)

436 Walnut Street, P.O. Box 1000, Philadelphia, Pennsylvania 19106-3703

REBECCA L. COLLINS, Secretary

JOHN J. LUPICA, President

_____
Authorized Representative

Chubb. Insured.™



# Excess Liability
# Insurance Policy

## I.   INSURING AGREEMENT

In consideration of the payment of the premium and in reliance upon all statements made in the application including the information furnished in connection therewith, and subject to all terms, definitions, conditions, exclusions and limitations of this policy, the Insurer agrees to provide insurance coverage to the Insureds in accordance with the terms, definitions, conditions, exclusions and limitations of the Followed Policy, except as may be modified by endorsement(s) attached hereto and forming part of the policy.

## II.   LOSS PAYABLE PROVISION

It is agreed the Insurer shall pay on behalf of the Insured as defined in the Followed Policy for Loss by reason of exhaustion by payments of all Underlying Policy Limits of all underlying policies by the underlying insurers issuing such underlying policies and/or the Insureds, subject to i) the terms and conditions of the Followed Policy as in effect the first day of the Policy Period; ii) the Limit of Liability as stated in Item 6 of the Declarations; and iii) the terms and conditions of, and the endorsements attached to, this Policy.  In no event shall this policy grant broader coverage than would be provided by the Followed Policy.

## III.   DEFINITIONS

A.   The Terms "Insurer" and "Followed Policy" shall have the meanings attributed to them in the Declarations.

B.   The term "Insureds" means those individuals and entities insured by the Followed Policy.

C.   The term "Policy Period" means the period set forth in Item 4 of the Declarations.

D.   The term "Underlying Policy Limits/Attachment Point" means an amount equal to the aggregate of all limits of liability as set forth in Item 7 of the Declarations for all Underlying Policies, plus the uninsured retention, if any, applicable to the Underlying Policies.

## IV.   POLICY TERMS

A.   This policy is subject to the same representations contained in the Application for the Followed Policy and has the same terms, definitions, conditions, exclusions and limitations (except as regards the premium, the limits of liability, the policy period and as may be modified by endorsement) as are contained in the Followed Policy.

B.   If during the Policy Period or any Discovery Period the terms, conditions, exclusions or limitations of the Followed Policy are changed in any manner, the Insureds shall as a condition precedent to their rights to coverage under this policy give to the Insurer written notice of the full particulars thereof and secure the Insurers affirmative consent to such modification before coverage will be effective.

C.   As a condition precedent to their rights under this policy, the Insureds shall give to the Insurer as soon as practicable written notice and the full particulars of the payment of the covered loss that exceeds 50% of the Underlying Policy Limits.

D.   Application of Recoveries:  All recoveries or payments recovered or received subsequent to a Loss settlement under this policy shall be applied as if recovered or received prior to such settlement and all necessary adjustments shall then be made between the Insureds and the Insurer, provided always that the foregoing shall not affect the time when Loss under this policy shall be payable.



Collector's Coffee, Inc.
_____
Policyholder

## POLICYHOLDER DISCLOSURE
## NOTICE OF TERRORISM
## INSURANCE COVERAGE

Coverage for acts of terrorism is included in your policy. You are hereby notified that under the Terrorism Risk Insurance Act, as amended in 2015, the definition of act of terrorism has changed.  As defined in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury---in consultation with the Secretary of Homeland Security, and the Attorney General of the United States---to be an act of terrorism; to be a  violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of  certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.  Under your coverage, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act, as amended.  However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events.  Under the formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020, of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

The portion of your annual premium that is attributable to coverage for acts of terrorism is  $0, and does not include any charges for the portion of losses covered by the United States government under the Act.

**SUB-LIMITS OF LIABILITY IN UNDERLYING POLICIES**

| Named Insured<br>Collector's Coffee, Inc. | | | Endorsement Number |
|---|---|---|---|
| Policy Symbol<br>DOX | Policy Number<br>G27955708 002 | Policy Period<br>02/24/2017 **to**   02/24/2018 | Effective Date of Endorsement<br>02/24/2017 |
| Issued By (Name of Insurance Company)<br>Westchester Fire Insurance Company | | | |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

**EXCESS LIABILITY INSURANCE POLICY**

It is agreed that Section II, Loss Payable Provision, is amended by adding the following at the end thereof:

The Insurer shall not make payment under this policy unless and until the Underlying Policy Limits of all underlying policies have been exhausted pursuant to the terms and conditions of the above paragraph.  The Insurer shall not be obligated to make payment under this policy because of the existence or exhaustion of any sub-limit of liability in any underlying policy. Notwithstanding any other provision in this policy, the Insurer shall not provide coverage for any risk, exposure, or Loss (whether damages, judgments, settlements, defense costs or expenses, or otherwise) for which coverage is provided by any underlying insurer subject to a sub-limit of liability.  This policy shall recognize reduction or exhaustion of the Underlying Policy Limits by reason of the insurers of those limits providing insurance coverage and/or the Insureds paying for such Loss, subject to all other terms, conditions, limitations and exclusions of this policy and the Follow Policy.

All other terms and conditions of this policy remain unchanged.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

| Named Insured<br>Collector's Coffee, Inc. | | | Endorsement Number |
|---|---|---|---|
| Policy Symbol<br>DOX | Policy Number<br>G27955708 002 | Policy Period<br>02/24/2017 **to**   02/24/2018 | Effective Date of Endorsement<br>02/24/2017 |
| Issued By (Name of Insurance Company)<br>Westchester Fire Insurance Company | | | |

## Cap On Losses From Certified Acts Of Terrorism

A.  If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act.  The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1.  The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

B.  The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any "loss" that is otherwise excluded under this Policy.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative



**NOTICE TO POLICYHOLDERS**
**NEVADA**

### BINDING ARBITRATION

The Nevada Division of Insurance requires that if an insurance policy contains a mandatory arbitration provision, such provision must be acknowledged and approved by the insured. (Bulletin No. 13-008, October 22, 2013)

This notice is to advise you that the policy to which this notice is attached contains a mandatory arbitration provision.

You are advised to read your policy and the arbitration provision, and discuss any questions with your agent or a company representative. If this provision is acceptable to you, please acknowledge below.

I agree to and authorize the mandatory arbitration provision included in this policy:


Policy Number: _____

Insured Name: _____

Insured Signature: _____

Date: _____

## TRADE OR ECONOMIC SANCTIONS ENDORSEMENT

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| Collector's Coffee, Inc. | | | |
| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
| DOX | G27955708 002 | 02/24/2017 **to**   02/24/2018 | 02/24/2017 |
| Issued By (Name of Insurance Company) | | | |
| Westchester Fire Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This insurance does not apply to the extent that trade or economic sanctions or similar laws or regulations prohibit us from providing insurance, including, but not limited to, the payment of claims.  All other terms and conditions of policy remain unchanged.

Authorized Agent



# U.S. Treasury Department's Office Of Foreign Assets Control ("OFAC") Advisory Notice to Policyholders

This Policyholder Notice shall not be construed as part of your policy and no coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site - http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.



**Chubb Producer Compensation
Practices & Policies**

Chubb believes that policyholders should have access to information about Chubb's practices and policies related to the payment of compensation to brokers and independent agents.  You can obtain that information by accessing our website at http://www.chubbproducercompensation.com or by calling the following toll-free telephone number: 1-866-512-2862.

ALL-20887 (10/06)

# EXCESS LIABILITY POLICY DECLARATIONS

**RSUI**

Corporate Office
945 E. Paces Ferry Rd.
Suite 1800
Atlanta, GA 30326

| COMPANY SYMBOL | POLICY PREFIX & NUMBER | RENEWAL OF |
|---|---|---|
| N | HS671155 | N/A |

●THIS IS A CLAIMS MADE POLICY.  PLEASE READ IT CAREFULLY.●

THIS POLICY IS ISSUED BY:   RSUI Indemnity Company (hereinafter referred to as the Insurer)

**ITEM 1.**   INSURED'S NAME AND MAILING ADDRESS                    PRODUCER'S NAME AND ADDRESS

COLLECTORS COFFEE, INC.

8020 LAS VEGAS BOULEVARD SOUTH

LAS VEGAS, NV 89123

IN CONSIDERATION OF THE PAYMENT OF THE PREMIUM, IN RELIANCE UPON THE STATEMENTS HEREIN OR ATTACHED HERETO, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, THE INSURER AGREES TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

**ITEM 2. POLICY PERIOD:**

FROM   2/24/2017   TO   2/24/2018   12:01 AM Standard Time at the Insured's address as stated herein

**ITEM 3. LIMIT OF LIABILITY:**   $   5,000,000   (A) Aggregate Limit of Liability each policy period

$   10,000,000   (B) Underlying Limits of Liability

**ITEM 4. PREMIUM:**   $   19,750.00

**ITEM 5. COVERAGE:**   Directors and Officers Liability

**ITEM 6. POLICY FORM AND ENDORSEMENTS MADE A PART OF THIS POLICY AT THE TIME OF ISSUE:**
SEE RSG 230014 1007 - SUPPLEMENTAL DECLARATIONS - SCHEDULE OF ENDORSEMENTS; RSG 231007 0609 - EXCESS LIABILITY POLICY - 2009

**ITEM 7. FOLLOWED POLICY**

| Insurer | Policy Number | Limits | Premium |
|---|---|---|---|
| QBE Insurance Corporation | QPL0045639 | $5,000,000 | $54,808.00 |

**ITEM 8. UNDERLYING INSURANCE**

**(A) Primary Policy:**

| Insurer | Policy Number | Limits | Premium |
|---|---|---|---|
| QBE Insurance Corporation | QPL0045639 | $5,000,000 | $54,808.00 |

**(B) Underlying Excess Policy(ies):**

| Insurer | Policy Number | Limits | Premium |
|---|---|---|---|
| Westchester Fire Insurance Company | G27955708 002 | $5,000,000 x/s $5,000,000 | $30,730.00 |

THESE DECLARATIONS TOGETHER WITH THE COMPLETED, SIGNED AND DATED APPLICATION, POLICY FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

Countersigned: _____   April 13, 2017   _____

DATE   AUTHORIZED REPRESENTATIVE

RSG 230012 0807                                           A member of Alleghany Insurance Holdings LLC

**EXCESS LIABILITY POLICY SUPPLEMENTAL DECLARATIONS**



POLICY NUMBER:   NHS671155

SCHEDULE OF ENDORSEMENTS

| TITLE | FORM NUMBER |
| --- | --- |
| Disclosure Pursuant to Terrorism Risk Insurance Act | RSG 204123 0116 |
| Cap on Losses From Certified Acts of Terrorism | RSG 204081 0315 |
| Exclusion - Prior and or Pending Litigation | RSG 236010 0204 |

RSG 230014 1007

RSUI INDEMNITY COMPANY

**THIS ENDORSEMENT IS ATTACHED TO AND MADE A PART OF THIS POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THIS POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

**SCHEDULE\***

| | |
|---|---|
| **Terrorism Premium** | **$0** |

**Additional information, if any, concerning the terrorism premium:**
**The portion of your premium for the policy term attributable to coverage for all acts of terrorism covered under this policy including terrorist acts certified under the Act is listed above.**

*\*Information required to complete this Schedule, if not shown above, will be shown in the Declarations Page.*

A. **Disclosure of Premium**

In accordance with the federal Terrorism Risk Insurance Act, as amended, the **Insurer** is required to provide the **Insured** with a notice disclosing the portion of the **Insured's** premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of the **Insured's** premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations Page.

As defined in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury – in consultation with the Secretary of Homeland Security, and the Attorney General of the United States –to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

B. **Disclosure of Federal Participation in Payment of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. Under the formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020, of covered terrorism losses that exceeds the applicable **Insurer** retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

C. **Cap Insurer Participation in Payment of Terrorism Losses**

If aggregate **Insured** losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and the **Insurer** has met our **Insurer** deductible under the Terrorism Risk Insurance Act, the **Insurer** will not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case **Insured** losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of Treasury.

**Policy No.:** NHS671155     **Effective:** 2/24/2017

RSG 204123 0116

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

*This Endorsement Changes The Policy.  Please Read It Carefully.*

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS LIABILITY POLICY – NOT FOR PROFIT ORGANIZATIONS**
**DIRECTORS AND OFFICERS LIABILITY POLICY - PUBLIC COMPANY**
**DIRECTORS AND OFFICERS LIABILITY POLICY - PRIVATE COMPANY**
**EXCESS DIRECTORS AND OFFICERS LIABILITY POLICY**
**EXCESS LIABILITY POLICY**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and the **Insurer** has met our insurer deductible under the Terrorism Risk Insurance Act, the **Insurer** shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**Certified Act of Terrorism** means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act to be an act of terrorism pursuant to such Act.  The criteria contained in the Terrorism Risk Insurance Act for a **Certified Act of Terrorism** include the following:

1.  The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Policy, such as losses excluded by the Nuclear Exclusion.

All other terms and conditions of this policy remain unchanged.

**Policy No.:**  NHS671155      **Effective:**  2/24/2017

RSG 204081 0315

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – PRIOR AND/OR PENDING LITIGATION

This endorsement modifies insurance provided under the following:

**EXCESS DIRECTORS AND OFFICERS LIABILITY POLICY**
**EXCESS LIABILITY POLICY**

The **Insurer** shall not be liable to make any payment for loss in connection with any claim made against any **Insured** alleging, arising out of, based upon or attributable to, in whole or in part, any litigation involving any **Insured** that was commenced or initiated prior to, or pending at the inception date of this policy, or arising out of or based upon, in whole or in part, any facts or circumstances underlying or alleged in any such prior or pending litigation.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NHS671155      **Effective:** 2/24/2017

RSG 236010 0204



**RSUI Indemnity Company**

**Corporate Office**
945 East Paces Ferry Rd.
Atlanta, GA  30326-1160

# EXCESS LIABILITY POLICY

**NOTICE:** THIS IS A **CLAIMS** MADE AND REPORTED POLICY THAT APPLIES ONLY TO THOSE **CLAIMS** FIRST MADE AGAINST THE **INSURED** DURING THE **POLICY PERIOD** AND REPORTED TO THE INSURER DURING THE **POLICY PERIOD**.  THE LIMIT OF LIABILITY AVAILABLE TO PAY **LOSS** MAY BE REDUCED OR TOTALLY EXHAUSTED BY PAYMENT OF DEFENSE EXPENSES. PLEASE REFER TO THE **FOLLOWED POLICY** FOR MORE INFORMATION.

**PLEASE READ YOUR POLICY CAREFULLY**

## CLAIM NOTICE

| | |
|---|---|
| **Mail notices to:** | **RSUI Group, Inc.**<br>**945 East Paces Ferry Rd.**<br>**Suite 1800**<br>**Atlanta, GA 30326-1160** |
| **Fax notices to:** | **(404) 231-3755**<br>**Attn: Claims Department** |
| **E-mail notices to:** | **reportclaims@rsui.com** |

*A member of Alleghany Insurance Holdings LLC*

Words and phrases that appear in **bold** text have special meaning.  Refer to SECTION II. - DEFINITIONS.

**I.   INSURING AGREEMENT**

The Insurer designated on the Declarations Page, in consideration of the payment of the premium and in reliance upon all applications, documents and information provided or made available to it by or on behalf of the **Insured**, and subject to all of the terms, conditions and other provisions of this policy, including endorsements hereto, agrees with the **Insured** that the Insurer shall provide the **Insured** with insurance during the **Policy Period** which is in excess of the total limits of liability and any retention or deductible amounts under the **Underlying Insurance**, as set forth in Item 8. of the Declarations Page, and shall pay **Loss** arising from a **Claim** for a **Wrongful Act** first made during the **Policy Period.**

**II.   DEFINITIONS**

**A.   Followed Policy** means the policy indicated in Item 7. of the Declarations page**.**

**B.   Insured** means any natural person or entity designated as such in the **Underlying Insurance**.

**C.   Policy Period** means the period beginning at the inception date and ending at the expiration date stated in Item 2. of the Declarations Page or any earlier cancellation or termination date.

**D.   Underlying Insurance** means the **Primary Policy** and **Underlying Excess Policy(ies)** listed in Item 8. of the Declarations page.

**E.**   The terms **Wrongful Act**, **Loss** and **Claim** shall each have the same meaning as defined in the **Primary Policy**.

**III.   LIMIT OF LIABILITY AND PAYMENTS UNDER UNDERLYING INSURANCE**

**A.**   The Insurer shall be liable to pay **Loss** only after any combination of the **Insured** and all Insurers that issued the **Underlying Insurance** shall have paid the full amount of the limits provided by the **Underlying Insurance**.   The Insurer shall then be liable to pay only such additional amount up to the Limit of Liability set forth in Item 3. (A) of the Declarations Page.

**B.**   Any **Claim**, **Loss** or coverage that is subject to any Sublimit shall not be considered a covered **Loss** under this policy, but shall, for purposes of this policy's attachment, be deemed to have reduced or exhausted the **Underlying Insurance** limits.

**C.**   In the event of the reduction or exhaustion of the aggregate limits of liability in the **Underlying Insurance** by reason of **Loss** paid thereunder for **Claim(s)** first made during the **Policy Period**, this policy shall (1) in the event of reduction, continue in force in excess of the remaining amount of **Underlying Insurance**; or (2) in the event of total exhaustion, continue in force as would the **Followed Policy**, subject to all terms, conditions and other provisions of this policy, including endorsements hereto; provided that in the event of this policy becoming primary insurance, it shall only pay excess of the retention or deductible amount, if any, that would be applicable in the absence of **Underlying Insurance** exhaustion, which retention or deductible amount shall be applied to any subsequent **Loss**. Notice of reduction or exhaustion of any limits of liability within the **Underlying Insurance** shall be given to the Insurer promptly upon such reduction or exhaustion. Nothing herein shall be construed to provide for any duty on the part of the Insurer to defend any **Insured** or to pay defense costs or any other part of **Loss** in addition to the Limit of Liability set forth in Item 3. (A) of the Declarations Page.

**IV.   MAINTENANCE OF UNDERLYING INSURANCE**

**A.**   This policy is subject to the same terms, conditions, other provisions and endorsements (except as regards the premium, the amount and limits of liability, and duty to defend, and except as otherwise provided herein) as are contained in the **Followed Policy** as such policy has been represented to the Insurer to be issued, or as may be added at a later time to restrict coverage. Any changes made to such **Followed Policy** to expand or broaden it shall be effective as part of this policy solely where accepted in writing by the Insurer.

**B.**   The **Underlying Insurance** shall be maintained in full effect while this policy is in force, except for any reduction of the aggregate limits contained therein (as provided for in Section III. C. above), and such maintenance shall be a condition precedent to the attachment of any liability of the Insurer under this policy. To the extent that any **Underlying Insurance** is not maintained in full effect while this policy is in force, the **Insured** shall be deemed to be self-insured for the amount of the **Underlying Insurance** limit(s) that is not maintained.

**C.**   The Insurer's obligation under this policy shall not be increased, expanded or otherwise modified or changed as a result of the receivership, insolvency, inability or refusal to pay any **Underlying Insurance**.  It is agreed that the Insurer shall not pay any amount until all retentions and all **Underlying Insurance** limits have actually been paid by any combination of the **Insured** and all Insurers constituting the **Underlying Insurance**.

**V.   CLAIM AND OTHER NOTICES**

The Insurer shall be given notice in writing as soon as practicable: (a) in the event of cancellation or non-renewal of any **Underlying Insurance**; and (b) of any additional or return premiums assessed in connection with any **Underlying Insurance**. Any changes in policy provisions in the **Underlying Insurance** or any changes in the **Insured** that would require notice under the **Underlying Insurance** shall be reported to the Insurer in writing as soon as practicable, provided always that the Insurer shall not be bound by any such changes without its consent.

Written notice of **Claim** made against any **Insured** or any circumstances or matters that might later result in a **Claim** shall be given to the Insurer in the same manner and at the same time as given to the **Followed Policy**.

**In Witness Whereof**, the Insurer has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the Insurer.

Secretary

President



February 14, 2017

**Excess Warranty Language**

Please be advised that the undersigned officer of **Collectors Coffee, Inc. (d/b/a Collectors Café)** declares that the following statement is true:

No person(s) or entity(ies) proposed for this insurance has knowledge of any fact, circumstance, situation, act, inquiry, investigation, error or omission which he/she/it has reason to believe could result in any claim(s) within the scope of the proposed coverage with respect to the $5,000,000 limit of liability purchased in excess of $10,000,000.

No person(s) or entity(ies) proposed for this insurance has knowledge of any fact, circumstance, situation, act, inquiry, investigation, error or omission which he/she/it has reason to believe could result in any claim(s) within the scope of the proposed coverage with respect to the $5,000,000 limit of liability purchased in excess of $15,000,000.

Furthermore, it is agreed by the undersigned, on behalf of all proposed Insureds, that with respect to the above statement, if any such knowledge currently exists by the person(s) or entity(ies) proposed for this insurance, any claim arising therefrom is excluded from the proposed insurance as to all Insureds.

This letter shall be deemed incorporated into and become part of the Policy.

_____   2-14-17
Mykalai Kintilai
Founder & CEO

## *The Solution* Renewal Application



### Notice

The liability coverage parts provide claims made coverage, which applies only to claims first made against the Insureds during the policy period. The limit of liability to pay judgments or settlement amounts shall be reduced and may be exhausted by payment of defense costs.

### Applicant information

Applicant name

Collectors Coffee, Inc.

Applicant address

Collectors Coffee, Inc.          8020 Las Vegas Boulevard South, Las Vegas, NV 89123

Describe any changes in nature of operations during last 12 months or proposed for next 12 months:

None

In the past 12 months or in the next 12 months is the Applicant contemplating the following:

| | | | |
|---|---|---|---|
| Any actual or proposed merger, acquisition, or divestiture? | ☐ Yes | ☒ No |
| Any creation of a new business, subsidiary or division? | ☐ Yes | ☒ No |
| Any registration for a public offering or a private placement of securities? | ☐ Yes | ☒ No |
| Any reorganization or arrangement with creditors under federal or state law? | ☐ Yes | ☒ No |
| Any branch, location, facility, office, or subsidiary closings, consolidations or layoffs? | ☐ Yes | ☒ No |

In the last 12 months:
Has the Applicant or any Subsidiary been in breach of any debt covenant, loan
Agreement or contractual obligation?                                  ☐ Yes    ☒ No

If any of the above questions were answered "Yes", please attach an explanation, including the timing, the essential terms of the event, arrangement, and the surrounding circumstances.

### Financial Statement Information

Most recent annual financial report with notes and interim financial statements required

Has there been any change in auditor during last 12 months?          ☐ Yes    ☒ No
Any plans to change auditor during next 12 months?                   ☐ Yes    ☒ No

### Complete the following

| | Current | Prior Year | |
|---|---|---|---|
| Current Assets | | | |
| Total Assets | | | |
| Current Liabilities | | | See attached |
| Total Liabilities | | | |
| Revenue | | | |
| Net Income | | | |
| Cash Flow From Operations | | | |

## Directors & Officers Liability Coverage Part

| | | |
|---|---|---|
| Does the Charter or By-laws of the Organization provide indemnification to its Directors and Officers to the fullest extent permitted by law? | ☒ Yes | ☐ No |
| Are there any securities that are convertible to voting stock?<br>If "yes" attach explanation | ☐ Yes | ☒ No |
| Have there been any changes in the Board of Directors or Senior Management of the Applicant within the past 12 months for reasons other than death or retirement?<br>If "Yes", please attach an explanation | ☐ Yes | ☒ No |
| Do all Shareholders that own 10% or more of the voting shares, either directly or beneficially, have a representative on the board of Directors?<br>If "No" please attach an explanation | ☒ Yes | ☐ No |
| Is any shareholder a trust that qualifies as an Employee Stock Ownership Plan under ERISA or holds securities for the benefit of employees? | ☐ Yes | ☒ No |

## Employment Practices Liability Coverage Part

| | | |
|---|---|---|
| With respect to employee terminations, does the Applicant consult with legal counsel or Human Resources personnel prior to every termination?<br>If "No", please attach an explanation describing your procedures | ☒ Yes | ☐ No |
| Please indicate whether the Applicant conducts human resources training, including sexual harassment training for managers and supervisors? | ☒ Yes | ☐ No |
| Is the company subject to Office of Federal Contract Compliance Programs (OFCCP) oversight? | ☐ Yes | ☒ No |
| Have employment policies and procedures been reviewed by legal counsel within the past 12 months? | ☒ Yes | ☐ No |

## Complete the following

| Employee Count | Current | Prior Year |
|---|---|---|
| U.S. Full Time | | |
| U.S. Part Time | | |
| U.S. Seasonal | | |
| U.S. Temporary | | |
| Independent Contractors | | |
| Leased Contractors | | |
| Volunteers | | |
| Foreign Full Time | | |
| Foreign Part Time | | |

| Provide % of Employees by State | Current | Prior Year |
|---|---|---|
| AL, CA, TX | | |
| AK, AZ, CO, FL, GA, IL, IN, NM, PR | | |
| AR, DC, HI, NY, VA | | |
| CT, DE, KS, KY, LA, MA, MN, MS, MO, NV, NJ, NC, OR, PA, SC, TN | | |
| All Other | | |

## Fiduciary Liability Coverage Part

Complete Chart for all Plans for which coverage is requested

| Full plan name | Plan type* | Current asset value | Latest FYE annual contributions | Current number of participants | Plan status** |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

*Plan Types: Defined Benefit (DB) Defined Contributions (DC) ESOP (E) Self-Funded Welfare Benefit Plan (W) Other (O) – Attach Explanation
**Plan Status: (A)=Active (F)=Frozen (S)=Sold (T)=Terminated (if any plan has been terminated, indicate date of transaction)

| | | |
|---|---|---|
| Has any plan been amended within the last 12 months in a way that will result in the reduction of benefits or are any such amendments anticipated within the next 12 months? | ☐ Yes | ☐ No |
| Has any plan been merged with another plan, terminated or sold within the past two years or anticipated in the next 12 months?<br>If "Yes", please attach an explanation detailing whether a blackout period will result and any associated plans for implementation and disclosure to participants | ☐ Yes | ☐ No |
| Are there any outstanding or delinquent plan contributions or plan loans, leases or debt obligations that are in default or classified as uncollectible? | ☐ Yes | ☐ No |
| Do all plans have a written investment policy?<br>If "No" explain by attachment | ☐ Yes | ☐ No |
| Are all plan assets managed by a third party investment manager? | ☐ Yes | ☐ No |
| If so, does the third party investment manager have full investment discretion? | ☐ Yes | ☐ No |
| Are all Employee Benefit Plans in compliance with the Health Insurance Portability and Accountability Act (HIPPA)? | ☐ Yes | ☐ No |
| Is each plan reviewed every 24 months to assure there are no violations of ERISA?<br>(e.g., prohibited transactions or party-in-interest rules)? If "No", please attach an explanation | ☐ Yes | ☐ No |

Please provide name of firm(s) providing the following services:

| CPA | Attorney | Actuary | Investment advisor |
|---|---|---|---|
|  |  |  |  |

## Crime – coverage part

| | | |
|---|---|---|
| Are owners active in the day to day oversight of business operations? | ☐ Yes | ☐ No |
| Does someone other than the person responsible for reconciling bank accounts: | | |
|     Make Deposits? | ☐ Yes | ☐ No |
|     Make Withdrawals? | ☐ Yes | ☐ No |
|     Sign Checks? | ☐ Yes | ☐ No |
| Is countersignature of checks required? | ☐ Yes | ☐ No |
|     If Yes, what is the dual signing limit? | | |
| Is segregation of duties practiced in the following areas: | | |
|     Inventory management? | ☐ Yes | ☐ No |
|     Cash receipts? | ☐ Yes | ☐ No |
|     Vendor approval? | ☐ Yes | ☐ No |
|     Oversight of blank check stock? | ☐ Yes | ☐ No |
|     Purchase order approval and payment? | ☐ Yes | ☐ No |
|     Retail checks and credit card receipts? | ☐ Yes | ☐ No |
|     Wire transfer receipts and payments? | ☐ Yes | ☐ No |
| Are there controls in place so that no single person can control a transaction from beginning to end (e.g. approve a voucher, request and sign a check)? | ☐ Yes | ☐ No |
| Are all incoming checks stamped "for deposit only" immediately upon receipt? | ☐ Yes | ☐ No |
| Is a physical count of inventory conducted at least annually?<br>    If Yes, who conducts the inventory? | ☐ Yes | ☐ No |
| Is dual authorization required for all wire transfers?<br>    If No, at what amount is dual authorization required? | ☐ Yes | ☐ No |

Do you perform any of the following on candidates for new employment:

| | | |
|---|---|---|
| Verification of Prior Employment? | ☐ Yes | ☐ No |
| Credit History? | ☐ Yes | ☐ No |
| Drug Testing? | ☐ Yes | ☐ No |
| Criminal History? | ☐ Yes | ☐ No |
| Education Verification? | ☐ Yes | ☐ No |

Does the applicant have custody or control over any funds, accounts, or materials of any of its clients?     ☐ Yes    ☐ No

If the company is requesting Client Coverage, please describe the services provided to Clients

### Unique/significant exposures

Please indicate any of the following characteristics or exposures that apply to your business operations:

☐ Precious Metals or Gemstones
☐ ATM
☐ Prepaid debit/calling cards
☐ Computer chips
☐ Proprietary Trading Activity
☐ Joint Ventures
☐ None Applicable

☐ Proprietary credit cards
☐ Armored car
☐ Managed Assets of Others
☐ Art collection or other valuable collectibles
☐ Warehousing operations
☐ Narcotics

**If you checked any of the characteristics or exposures above, please provide details that quantify the exposure and briefly describe the controls in place to protect you from loss in a separate attachment**

### Material change

**If there is any material change in the answers to the questions in this Application before the policy inception date, the applicant must immediately notify the Insurer in writing, and any outstanding quotation may be modified or withdrawn.**

### Fraud warnings

Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Notice to Alaska residents:** "A person who knowingly and with intent to injure, defraud or deceive an insurance company files a claim containing false, incomplete, or misleading information may be prosecuted under state law."

**Notice to Arizona residents:** "For your protection Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties."

**Notice to California residents:** "For your protection California law requires the following to appear on this form. Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison."

**Notice to Colorado residents:** "It is unlawful to knowingly provide false, incomplete or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies."

**Notice to Delaware residents:** "Any person who knowingly, and with intent to injure, defraud or deceive any insurer, files a statement of claim containing any false, incomplete or misleading information is guilty of a felony."

**Notice to Florida residents:** "Any person who knowingly and with intent to injure, defraud or deceive any insurer files a statement of claim or an application containing any false, incomplete or misleading information is guilty of a felony of the third degree."

**Notice to Idaho residents:** "Any person who knowingly and with intent to defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is guilty of a felony."

**Notice to Indiana residents:** "A person who knowingly and with intent to defraud an insurer files a statement of claim containing any false, incomplete or misleading information commits a felony."

**Notice to Kansas residents:** "A 'fraudulent insurance act' means an act committed by any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto."

**Notice to Kentucky residents:** "Any person who knowingly and with intent to defraud any insurance company or other person files a statement of claim or an application containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits an fraudulent insurance act, which is a crime."

**Notice to Maryland residents:** "Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison."

**Notice to Maine residents:** "It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits."

**Notice to Minnesota residents:** "A person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime."

**Notice to New Hampshire residents:** "Any person who, with a purpose to injure, defraud, or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is subject to prosecution and punishment for insurance fraud, as provided in RSA 638:20."

**Notice to New Jersey residents:** "Any person who knowingly files a statement of claim containing any false or misleading information is subject to criminal and civil penalties."

**Notice to New Mexico residents:** "Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to civil fines and criminal penalties."

**Notice to Ohio residents:** "Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud."

**Notice to Oklahoma residents:** "WARNING: Any person who knowingly, and with intent to injure, defraud or deceive an insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony."

**Notice to Oregon residents:** "Any person who knowingly and with intent to defraud or solicit another to defraud the insurer by submitting an application containing a false statement as to any material fact may be violating state law."

**Notice to Pennsylvania residents:** "Any person who knowingly and with intent to defraud any insurance company or other person files a statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties."

**Notice to Tennessee, Virginia and Washington residents:** "It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits."

**Notice to Texas residents:** "Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison."

**Notice to Vermont residents:** "Any person who knowingly presents a false statement in an application for insurance may be guilty of a criminal offense and subject to penalties under state law."

**Notice to New York residents**: "Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each violation."

## Signatures

Name (please print)                                      Title (please print)


Signature                                                Date


If this application is completed in Florida, please provide the insurance agent's name and license number as designated.
If this application is completed in Iowa, please provide the insurance agent's name only.

Name of insurance agent                                  License number

## Required Attachments

**General**
- Most recent annual financial report with notes
- Interim financial statements
- List of all subsidiaries including: nature of operations, percentage ownership, and whether such subsidiaries are foreign or domestic

**Directors and Officers Liability**
- List of Directors with corporate affiliations

**Employment Practices Liability**
- Copies of any amendments to employment handbook, policies and procedures during last 12 months
- Most recent EEO-1 report, if Applicant has 1,000 or more employees

**Fiduciary Liability**
- Most recent Form 5500 for each plan.
- Plan financial statements for defined benefit plans and self-insured welfare plans.
- ESOP Valuation, if any plan is an ESOP or if any plan has 10% or more of plan assets invested in employer securities

# Excess Liability Policy Declarations

**RLI**®

RLI Insurance Company
9025 North Lindbergh Drive
Peoria, Illinois 61615
Phone: (309) 692-1000

A stock insurance company,
herein called the Company.

**UNLESS OTHERWISE PROVIDED IN THE PRIMARY POLICY, THIS POLICY IS WRITTEN ON A CLAIMS MADE BASIS AND COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD. PLEASE READ YOUR POLICY CAREFULLY.**

Policy No.  EPG0018619

Item 1.  **Insured** - Name and Address:

Collectors Coffee, Inc.
8020 South Las Vegas Boulevard
Las Vegas, NV 89123

Item 2.  **Policy Period**:

From:  02/24/2017
To:      02/24/2018
at 12:01 a.m. at the address stated in Item 1.

Item 3.  Aggregate Limit of Liability:  $5,000,000 excess of $15,000,000

Item 4.  **Underlying Insurance**:

| | Insurer | Policy Number | Limits | Policy Period |
|---|---|---|---|---|
| (A) **Primary Policy**: | QBE Insurance Corporation | QPL0045639 | $5,000,000 | 2/24/2017 to 2/24/2018 |

Type of Coverage: Excess Follow Form Employment Practices Liability and Excess Follow Form Private Company Directors, Officers and Corporate Liability

| | Insurer | Policy Number | Limits | Policy Period |
|---|---|---|---|---|
| (B) Other Policies: | Insurer | Policy Number | Limits | Policy Period |
| First Excess | Westchester Fire Insurance Company | G27955708 002 | $5,000,000 XS of $5,000,000 | 2/24/2017 to 2/24/2018 |
| Second Excess | RSUI Indemnity Company | NHS671155 | $5,000,000 XS of $10,000,000 | 2/24/2017 to 2/24/2018 |

Item 5.  Endorsements Effective at Inception:
EPG 900 (01/15), EPG 900 (01/15), ILF 0001C (04/16), ILF 0001C (04/16), MNU-XFF 013 (10/13), MNU-XFF 013 (10/13), RIL 110A (01/08), RIL 110A (01/08), RIL 200 (10/00), RIL 200 (10/00), RIL 2133C (01/15), RIL 2133C (01/15), UW 20342 (03/12), UW 20342 (03/12)

Item 6.  Termination of Prior Policies:  N/A

Item 7.  Pending or Prior Date:  February 24, 2017
This Policy is intended to follow the Pending or Prior Litigation Exclusion of the **Primary Policy**, subject to the date indicated above.

Item 8.  Premium: $17,000

Item 9.   Notice to the Insurer:

(A)   Notice of claim, wrongful act or loss:

RLI Insurance Company
Attention: Claim Department
9025 North Lindbergh Drive
Peoria, Illinois 61615-1431
Fax:  1-866-692-6796
E-mail:  new.claim@rlicorp.com

(B)   All other notices:

RLI Insurance Company
Attention: Risk Services
9025 North Lindbergh Drive
Peoria, Illinois 61615-1431

The Insurer issuing this Policy has caused this Policy to be signed by its authorized officers, but it shall not be valid unless also signed by a duly Authorized Representative.

Date:  March 9, 2017

Authorized Company Representative

XFF 100 (09/10)

Insured

**RLI Insurance Company**

9025 North Lindbergh Drive, Peoria, IL 61615

## SUPPLEMENTAL DECLARATIONS

Policy No:  EPG0018619

Named Insured and Mailing Address

Collectors Coffee, Inc.
8020 South Las Vegas Boulevard
Las Vegas, NV 89123

Portion of premium attributable to coverage for Certified Acts of Terrorism     $0

RIL 110A (01/08)

Insured



# IMPORTANT NOTICE TO POLICYHOLDERS

## TERRORISM RISK INSURANCE ACT, AS AMENDED

Under the Terrorism Risk Insurance Act, as amended (the "**Act**"), we must make coverage for "**certified acts of terrorism**" available in the policies we offer. We notified you at the time of offer and purchase of the policy to which this Notice is attached that this coverage would be a part of your policy. The premium allocated for such coverage is shown on the Declarations page of the policy.

You should know that where coverage is provided by this policy for losses resulting from certified acts of terrorism, such losses may be partially reimbursed by the United States government under a formula established by federal law. Under this formula, the United States government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning January 1, 2018; 81% beginning January 1, 2019 and 80% beginning January 1, 2020 of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.

You should also know that the Act contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses in any one calendar year exceeds $100 billion. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

Specific coverage terms for terrorism, including limitations and exclusions, are more fully described in endorsements attached to the policy. Your policy may contain an exclusion for losses that are not eligible for federal reinsurance under the Act.

Definitions:

"**Certified act of terrorism**," as defined in Section 102(1) of the Act, means an act that is certified by the Secretary of the Treasury – in consultation with the Secretary of Homeland Security, and the Attorney General of the United States – to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Policy Number: EPG0018619

**RLI Insurance Company**

# Excess Liability Policy

In consideration of the payment of the premium and subject to the Declarations, limitations, conditions, provisions and other terms of this Policy, RLI Insurance Company, herein called the "Insurer," and the **Insureds** agree as follows:

## INSURING CLAUSE

1. Subject to and except as otherwise stated in this Policy, the Insurer shall provide the **Insureds** with insurance in accordance with the limitations, conditions, provisions and other terms of the **Primary Policy** and, to the extent coverage is further limited or restricted thereby, of any other **Underlying Insurance**. In no event shall this Policy grant broader coverage than would be provided by any of the **Underlying Insurance**. Liability shall attach to the Insurer only after the insurers of the **Underlying Insurance**, the **Insureds** or an excess DIC insurer pay in legal currency as loss covered thereunder the full amount of the **Underlying Limit**. The Insurer's maximum aggregate liability for all loss covered under this Policy shall be the Aggregate Limit of Liability as stated in Item 3. of the Declarations. Under no circumstances shall this Policy drop down into or pay losses within the **Underlying Limit**, and the risk of uncollectability of the **Underlying Insurance** is retained by the **Insureds**.

## DEFINITIONS

2. The term:

   (a) "**Insureds**" means those persons or organizations insured under the **Primary Policy**.

   (b) "**Primary Policy**" means the policy scheduled in Item 4.(A) of the Declarations or any policy issued by the same insurer replacing or renewing such policy.

   (c) "**Policy Period**" means the period of time specified in Item 2. of the Declarations.

   (d) "**Underlying Insurance**" means all policies scheduled in Item 4. of the Declarations and any policies issued replacing or renewing such policies.

   (e) "**Underlying Limit**" means the amount equal to the aggregate of all limits of liability as set forth in Item 4. of the Declarations for all **Underlying Insurance** plus the applicable uninsured retention, if any, under the **Underlying Insurance**.

## CONDITIONS

3. All **Underlying Insurance** shall be maintained in full effect with solvent insurers during the **Policy Period** and any Discovery Period. If during the **Policy Period** or any Discovery Period the limitations, conditions, provisions or other terms of the **Underlying Insurance** are changed in any manner, the **Insureds** shall as a condition precedent to their rights to coverage under this Policy give to the Insurer written notice of the full particulars thereof and secure the Insurer's affirmative consent to such changes prior to the effective date of such changes. If any **Underlying Insurance** is not so maintained or is changed without the Insurer's consent during the **Policy Period** or any Discovery Period, the Insurer shall not be liable under this Policy to a greater extent than it would have been had such **Underlying Insurance** been so maintained and not changed.

4. As a condition precedent to their rights under this Policy, the **Insureds** shall give to the Insurer as soon as practicable written notice and the full particulars of the payment of covered losses that exceed fifty percent (50%) of the **Underlying Limit**.

5. Any amounts recovered after payment hereunder, through subrogation or otherwise, shall be apportioned in the inverse order of payment of loss hereunder. The expenses of all recovery proceedings shall be apportioned among the recipients of the recovery in the ratio of their respective recoveries.

Insured

6. Any policies specified in Item 6. of the Declarations shall terminate, if not already terminated, as of the inception date of this Policy.

7. Notice to the Insurer shall be given at the respective address shown in Item 9. of the Declarations. Any notice to the insurer of **Underlying Insurance** shall not constitute notice to the Insurer unless also given to the Insurer as provided above.

8. The Insurer may, at its sole discretion, fully and effectively associate with the **Insureds** in the investigation, defense or settlement of any claim or potential claim reported to the Insurer under this Policy even if the **Underlying Limit** has not been exhausted.  No action by any other insurer shall bind the Insurer under this Policy.

9. The additional premium for any elected Discovery Period shall be the same percentage of this Policy's annual premium as the percentage stated in the **Primary Policy** for calculating the Discovery Period premium thereunder. The Discovery Period shall not be available under this Policy unless the **Insured** has elected the Discovery Period in all unexhausted **Underlying Insurance** and has provided proof thereof to the Insurer.

In witness whereof, the Insurer issuing this Policy has caused this Policy to be signed by its authorized officers, but it shall not be valid unless also signed by a duly authorized representative of the Company.

_____
Corporate Secretary

_____
President & COO

Insured

Coverage:  **Excess Liability**                                    Insurer: **RLI Insurance Company**

Effective date of                                                 To be attached to and form part of
this endorsement: **02/24/2017**                                  Policy No.  **EPG0018619**

Issued to: **Collectors Coffee, Inc.**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

With respect to any one or more certified acts of terrorism, we will not pay any amount for which we are not responsible under the terms of the Terrorism Risk Insurance Act, as amended ("Terrorism Risk Insurance Act"), due to the application of any clause which results in a cap on our liability for payments for terrorism losses.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in  consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism pursuant to the Terrorism Risk Insurance Act. The Terrorism Risk Insurance Act includes the following criteria for a certified act of terrorism:

1.   The act resulted in aggregate losses in excess of $5 million; and

2.   The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to certified acts of terrorism under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to the pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

Under this formula, the United States government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning January 1, 2018; 81% beginning January 1, 2019 and 80% beginning January 1, 2020 of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.

We will have no liability for any certified act of terrorism should the Terrorism Risk Insurance Act be terminated, not renewed, allowed to expire, or otherwise discontinued. Regardless of when during the Policy Period such termination, nonrenewal, expiration, or discontinuation occurs, our liability for any certified act of terrorism will cease immediately at the date and time of such termination, nonrenewal, expiration, or discontinuation of the Terrorism Risk Insurance Act.

If the Terrorism Risk Insurance Act is terminated, not renewed, allowed to expire, or otherwise discontinued during the Policy Period and we have charged premium for coverage under the Terrorism Risk Insurance Act, we will reimburse the premium, if any, charged for coverage under the Terrorism Risk Insurance Act on a customary pro rata basis.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Insured

Effective date of                                                        Insurer:   **RLI Insurance Company**
this endorsement:  **02/24/2017**


Issued to:  **Collectors Coffee, Inc.**

To be attached to and form part of
Policy No.   **EPG0018619**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## INCLUDE ANY OTHER SOURCE & DELETE NO BROADER PRIMARY FOLLOW FORM ENDORSEMENT

It is agreed that:

1.  **INSURING CLAUSE** 1. of this Policy is deleted in its entirety and replaced by the following:

    Subject to and except as otherwise stated in this Policy, the Insurer shall provide the **Insureds** with insurance in accordance with the limitations, conditions, provisions and other terms of the **Primary Policy**. Liability shall attach to the Insurer only after the insurers of the **Underlying Insurance**, the **Insureds**, an excess DIC insurer or any other source shall have paid in legal currency as loss covered thereunder the full amount of the **Underlying Limit**. The Insurer's maximum aggregate liability for all loss covered under this Policy shall be the Aggregate Limit of Liability as stated in Item 3. of the Declarations.

2.  The first sentence of Section 3. of this Policy is deleted.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Insured

Policy Number:  EPG0018619



**RLI Insurance Company**
Peoria, Illinois 61615

# ATTENTION POLICYHOLDER:

## <u>KEEP THIS NOTICE WITH YOUR INSURANCE PAPERS</u>

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false, incomplete, or misleading information, or conceals information concerning any material fact thereto, commits a fraudulent insurance act, which is a crime punishable by incarceration, and shall also be subject to civil penalties.

Insured

Policy Number: EPG0018619



**RLI Insurance Company**
Peoria, Illinois 61615

# NOTICE TO POLICYHOLDERS

## REGARDING THE UNITED STATES TREASURY DEPARTMENT – OFFICE OF FOREIGN ASSETS CONTROL (OFAC)

This Policyholder Notice does not provide coverage nor can it be construed to replace any provisions of your policy. Please read your policy carefully to determine your rights, duties, and what is and what is not covered by your policy. This Notice should only be used to provide information concerning the possible impact of your insurance coverage as it relates to directives issued by OFAC.

**PLEASE READ THIS NOTICE CAREFULLY.**

OFAC administers and enforces economic and trade sanctions and places restrictions on certain transactions. OFAC acts pursuant to Executive Orders of the President of the United States and specific legislation. OFAC has identified and named numerous foreign agents, front organizations, terrorists, terrorist organizations, and narcotics traffickers, among others, as "Specially Designated Nationals and Blocked Persons." The complete list can be found on the United States Treasury website – http://www.treas.gov/ofac.

Various trade or economic sanctions and other laws or regulations prohibit us from providing insurance in certain circumstances. In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance contract is considered a blocked or frozen contract and will be considered null and void. When an insurance policy is considered to be a blocked or frozen contract, all provisions of this insurance will be immediately subject to OFAC, and neither payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments may also apply.

Insured

Policy Number: EPG0018619 RLI Insurance Company

# SIGNATURE PAGE

In Witness Whereof, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

Corporate Secretary President & COO



## National Union Fire Insurance Company of Pittsburgh, Pa.

A capital stock company

POLICY NUMBER: 01-232-99-82          REPLACEMENT OF POLICY NUMBER: N/A

**NOTICES:** DEPENDING ON THE TERMS, CONDITIONS AND LIMITATIONS OF THE **FOLLOWED POLICY**, THIS POLICY MAY: (1) ONLY PROVIDE COVERAGE FOR LIABILITY FROM **CLAIMS** FIRST MADE OR FIRST MADE AND REPORTED, OR PRE-CLAIM INQUIRIES FIRST RECEIVED OR FIRST RECEIVED AND REPORTED, DURING ITS **POLICY PERIOD** OR **DISCOVERY PERIOD** (IF APPLICABLE); (2) HAVE ITS **LIMIT OF LIABILITY** REDUCED BY THE PAYMENT OF DEFENSE COSTS; AND (3) NOT IMPOSE A DUTY TO DEFEND ON THE **INSURER**.

PLEASE READ THE **FOLLOWED POLICY** AND THIS POLICY CAREFULLY AND DISCUSS THE COVERAGE AND TERMS WITH YOUR INSURANCE AGENT OR BROKER.

## DECLARATIONS

| Named Entity: | COLLECTOR'S COFFEE, INC. | | |
|---|---|---|---|
| Named Entity Address: | 3565 LAS VEGAS BLVD S # 337 <br> LAS VEGAS, NV 89109-8919 | Limit of Liability: <br> Total Underlying Limits: | $5,000,000 <br> $20,000,000 |
| Named Entity Domicile: | Nevada | Policy Period: From: | 02/24/2017 |
| | | To: | 02/24/2018 |
| Insurer Address: | 175 Water Street, 18th Floor <br> New York, NY 10038 | Premium: <br> **TRIA Premium** | $8,144 <br> $81 |
| Claims Address: <br> e-mail: <br> Mail: | c-claim@aig.com <br> AIG, Financial Lines Claims <br> P.O. Box 25947 <br> Shawnee Mission, KS 66225 | | |
| Passport | This policy [ serves; **X** does not serve] as a master Passport policy. | | |
| Reinstatement Feature | This policy [ does; **X** does not] include a Reinstatement Feature. If it does, see the Reinstatement Addendum for details. | | |

© All rights reserved.

SCHEDULE OF UNDERLYING COVERAGE

| | Underlying Insurer | Underlying Policy | Underlying Limit | Underlying Policy Period |
|---|---|---|---|---|
| * | QBE Insurance Corporation | QPL0045639 | $5,000,000 Primary | 02-24-2017 to 02-24-2018 |
| | Westchester Fire Insurance Company | G27955708 002 | $5,000,000 xs $5,000,000 | 02-24-2017 to 02-24-2018 |
| | RSUI Indemnity Company | RSG 231007 0609 | $5,000,000 xs $10,000,000 | 02-24-2017 to 02-24-2018 |
| | RLI Insurance Company | EPG0018619 | $5,000,000 xs $15,000,000 | 02-24-2017 to 02-24-2018 |

The **Policy Period** incepts and expires as of 12:01 A.M. at the **Named Entity Address.** Subject to the *CHANGES* Clause, **"Followed Policy"** means the policy in the Schedule with an "*" at the beginning of its row. If that policy is comprised of multiple coverage sections, "**Followed Policy**" only means the directors and officers liability insurance coverage section of that policy. **"TRIA Premium"** means the premium for Certified Acts of Terrorism Coverage under Terrorism Risk Insurance Act 2002. Amount indicated above is included in **Premium**. A copy of the TRIA disclosure sent with the original quote is attached hereto.

© All rights reserved.

IN WITNESS WHEREOF, the Insurer has caused this Policy to be signed by its President, Secretary and Authorized Representative. This Policy shall not be valid unless signed below at the time of issuance by an authorized representative of the insurer.

**PRESIDENT**
National Union Fire Insurance
Company of Pittsburgh, Pa.

**SECRETARY**
National Union Fire Insurance
Company of Pittsburgh, Pa.

**AUTHORIZED REPRESENTATIVE**

_____    _____    _____
COUNTERSIGNED AT                  DATE           COUNTERSIGNATURE

*ARC EXCESS & SURPLUS LLC*
*113 SOUTH SERVICE ROAD*
*POB 9012*
*JERICHO, NY 11753*

*1638438*

117121 (12/13)                  3

© All rights reserved.

## POLICYHOLDER DISCLOSURE
## NOTICE OF TERRORISM INSURANCE COVERAGE
(RIGHT TO PURCHASE COVERAGE)

You are hereby notified that under the Terrorism Risk Insurance Act, as amended, that you have a right to purchase insurance coverage for losses resulting from acts of terrorism. As defined in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury-in consultation with the Secretary of Homeland Security, and the Attorney General of the United States-to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

YOU SHOULD KNOW THAT WHERE COVERAGE IS PROVIDED BY THIS POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THE FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES 85% THROUGH 2015; 84% BEGINNING ON JANUARY 1, 2016; 83% BEGINNING ON JANUARY 1, 2017; 82% BEGINNING JANUARY 1, 2018; 81% BEGINNING JANUARY 1, 2019 and 80% BEGINNING ON JANUARY 1, 2020, OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. THE PREMIUM CHARGED FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS THAT MAY BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.

## COPY OF DISCLOSURE SENT WITH ORIGINAL QUOTE

Insured Name: *COLLECTOR'S COFFEE, INC.*

Policy Number: *01-232-99-82*
Policy Period Effective Date From: *February 24, 2017*    To: *February 24, 2018*

© 2015 National Association of Insurance Commissioner



### SIDE-A EDGE<sup>SM</sup>

Guide

1. **INSURING AGREEMENTS** ......................................................2.

   - *Excess and Difference in Conditions ("DIC") Insured Person Side-A Coverage*
   - *DIC Events*
   - *Follow Form*
   - *Followed Sublimits*
   - *Underlying Match Assurance*

2. **EXTENSIONS AND ADDITIONAL PROTECTION** ...........................4

   - *Blanket, For Profit Outside Director Liability*
   - *Civil Fines & Penalties*
   - *Enhanced Discovery*
   - *Executive Protection Suite*
   - *Non-rescindable*

   *Recognition Of Erosion*

3. **WORLDWIDE AND CROSS-BORDER** ...........................................6

   - *Global Liberalization*
   - *Passport Master Policy Program*

4. **EXCLUSION** .............................................................................6.

   - *Exclusions Not Followed*
   - *Conduct Exclusion*

5. **GENERAL TERMS AND CONDITIONS** ..........................................6

   - *Limits Of Liability*
   - *Claims Made & Pre-Claim Inquiries Received*
   - *Other Insurance & Indemnification*
   - *Notices & Authority*
   - *Rights*
   - *Changes*
   - *Conformance To Law*

6. **DEFINITIONS** .........................................................................9.

ADDENDUM:  REINSTATEMENT FEATURE, if included.

© All rights reserved.

# SIDE-A EDGE

In consideration of the payment of the premium, the **Insurer** and the **Insured Persons** agree as follows:

## 1. INSURING AGREEMENTS

This policy provides coverage to **Insured Persons** solely for **Loss** that arises from **Claims** first made against **Insured Persons**, and **Pre-Claim Inquiry Costs** that arise from any **Pre-Claim Inquiry** first reported, during the **Policy Period** or the applicable **Discovery Period**. This policy is an excess follow form and difference in conditions insurance policy. It only protects and benefits **Insured Persons**. No entity is covered in any respect under this policy.

A term in bold typeface not defined in this policy or stated in the Declarations shall have the same meaning as the same term defined in the **Followed Policy**.

| | |
|---|---|
| *Excess and Difference in Conditions ("DIC") Insured Person Side-A Coverage* | This policy shall pay:<br><br>(i) the **Loss** of any **Insured Person**, where such **Loss** arises from any **Claim** for any **Wrongful Act** of such **Insured Person**; and<br><br>(ii) the **Pre-Claim Inquiry Costs** of any **Insured Person**;<br><br>in either case: (a) excess of amounts paid under any **Underlying Policy** and of amounts indemnified or advanced from an **Organization** or **Outside Entity**; or (b) on a drop-down basis solely as provided in the *Difference in Conditions ("DIC") Event Coverage* below. |
| *DIC Events* | The policy will drop down and pay the **Loss** or **Pre-Claim Inquiry Costs** insured under the *Excess and DIC Insured Person Side-A Coverage* upon the occurrence of any one or more of the following events:<br><br>(i) this policy affords broader coverage than the **Underlying Policy**;<br><br>(ii) the **Organization** fails or refuses for any reason to advance, pay or indemnify **Loss** or **Pre-Claim Inquiry Costs** of an **Insured Person** within any applicable retention of an **Underlying Policy**;<br><br>(iii) an **Outside Entity** and the **Organization** fails or refuses for any reason to advance, pay or indemnify **Loss** or **Pre-Claim Inquiry Costs** of an **Insured Person** serving as an **Outside Entity Executive** within any applicable retention of any **Underlying Policy** or management liability policy issued to the **Outside Entity**;<br><br>(iv) the refusal in writing of an **Underlying Insurer** for any reason to pay any **Loss** or **Pre-Claim Inquiry Costs** of any **Insured Person** pursuant to the terms and conditions of its **Underlying Policy**; |

## 1. INSURING AGREEMENTS (Continued)

                © All rights reserved.

## SIDE-A EDGE

(v) the failure of an **Underlying Insurer** for any reason to pay or advance any **Loss** or **Pre-Claim Inquiry Costs** of any **Insured Person** within sixty (60) days of a written request from the **Named Entity** or an **Insured Person**;

(vi) the actual or intended avoidance, rescission or cancellation of an **Underlying Policy** by an **Underlying Insurer**;

(vii) the **Organization** fails or refuses to advance, pay or indemnify **Loss** or **Pre-Claim Inquiry Costs** of an **Insured Person** by reason of bankruptcy, receivership or any similar proceeding;

(viii) an **Outside Entity** and the **Organization** fails or refuses to advance, pay or indemnify **Loss** or **Pre-Claim Inquiry Costs** of an **Insured Person** serving as an **Outside Entity Executive** by reason of bankruptcy, receivership or any similar proceeding; or

(ix) the financial inability by reason of bankruptcy, receivership, liquidation or any similar proceeding of an **Underlying Insurer** to provide coverage to any **Insured Person**.

Advancement, payment or indemnification of an **Insured Person** by an **Organization, Outside Entity** or **Underlying Insurer** is deemed:

(a) "failed" if it has been requested by or on behalf of an **Insured Person** in writing and has not been provided by, agreed to be provided by or acknowledged as an obligation by, or is not collectible from, an **Organization, Outside Entity** or **Underlying Insurer**, respectively, within sixty (60) days of such request.

(b) "refused" if an **Organization, Outside Entity** or **Underlying Insurer** gives a written notice of the refusal to the **Insured Person**.

*Follow Form*

This policy shall provide coverage for **Insured Persons** in accordance with the terms, conditions and limitations of the coverage for non-indemnified **Loss** and **Pre-Claim Inquiry Costs** of **Insured Persons** within the **Followed Policy** as they were in existence at the inception of the **Policy Period**, as modified by and subject to the terms, conditions and limitations of this policy.

*Followed Sublimits*

If any **Loss** or **Pre-Claim Inquiry Costs** are subject to a sublimit of liability under the **Followed Policy**, this policy shall pay such **Loss** or **Pre-Claim Inquiry Costs** of any **Insured Person** excess of amounts actually paid under any **Underlying Policy**, regardless of whether the full limit of liability of any **Underlying Policy** has been exhausted. This policy shall provide coverage for such **Loss** subject to a sublimit of liability equal to that set forth in the **Followed Policy**, which shall be part of and not in addition to this policy's **Limit of Liability**.

1. INSURING AGREEMENTS (Continued)

                    © All rights reserved.

# SIDE-A EDGE

*Underlying Match Assurance*

For any **Claim** against or **Pre-Claim Inquiry** received by any **Insured Person**, this policy shall be extended to include coverage for **Loss** of **Insured Persons** provided by any **Underlying Policy** (including but not limited to the **Followed Policy**) that is not already encompassed in this policy, excess of amounts actually paid under any **Underlying Policy** and amounts actually indemnified or advanced from an **Organization** or **Outside Entity**. In no event shall this provision increase any limit of liability of this policy.

## 2. EXTENSIONS AND ADDITIONAL PROTECTION

*Blanket, For Profit Outside Director Liability*

In addition to the definition of **"Outside Entity Executive"** set forth in the **Followed Policy**, **Outside Entity Executive** under this policy shall also mean any **Executive** of an **Organization** who is or was acting at the specific and verifiable request or direction of an **Organization** as an **Executive** of any for-profit entity, but only when such specific and verifiable request or direction occurs prior to the **Wrongful Act** giving rise to a **Claim**.

In addition to the definition of **"Outside Entity"** set forth in the **Followed Policy**, **Outside Entity** under this policy shall also mean any for-profit entity.

*Civil Fines & Penalties*

In addition to the definition of **"Loss"** set forth in the **Followed Policy**, **Loss** shall also include civil fines and civil penalties assessed by any **Enforcement Body** against any **Insured Person** in connection with a **Claim** if such assessment does not relate to any determination of a grossly negligent or deliberate violation of law by such **Insured Person** and is not otherwise prohibited by the assessment itself.

*Enhanced Discovery*

This policy shall follow the terms, conditions and limitations of the Discovery Section or Clause of the **Followed Policy**.

Additionally, in the event the **Named Entity** first becomes the subject of a bankruptcy case (or the equivalent in a **Foreign Jurisdiction**) during the **Policy Period**, the **Insured Persons** shall have the right to a discovery period of unlimited duration commencing on the date of entry of a final order of dissolution in such bankruptcy case, in which to give the **Insurer** written notice of:

(a) **Claims** first made against an **Insured Person**;
(b) **Pre-Claim Inquiries** first received by an **Insured Person**; and
(c) circumstances of which an **Insured Person** shall become aware;

after the date of entry of a final order of dissolution in such bankruptcy case and solely with respect to a **Wrongful Act** that occurs prior to such date. Such discovery period shall be provided upon payment of an additional premium equal to 100% of the premium level in effect for this policy.

## 2. EXTENSIONS AND ADDITIONAL PROTECTION (Continued)

          © All rights reserved.

## SIDE-A EDGE

Any **Executive** that ceases to serve as an **Executive** during the **Policy Period** shall be provided, for no additional premium, with a discovery period of unlimited duration in which to give the **Insurer** written notice of: (i) **Claims** first made against such former **Executive**; and (ii) **Pre-Claim Inquiries** first received by such former **Executive**; after the effective date of such former **Executive's** ceasing to serve in their capacity as **Executive** and solely with respect to a **Wrongful Act** that occurs prior to such date. This discovery period for former **Executives** shall be specifically excess of any valid and collectible insurance otherwise in place for such former **Executives. The Limit of Liability** for any discovery period provided under this policy shall be part of, and not in addition to, the corresponding **Limit of Liability** for the **Policy Period.** This discovery period of unlimited duration, however, shall not apply to any **Executive** who ceases to serve as an **Executive** as a result of a **Transaction.**

*Executive Protection Suite*

**Loss** shall also mean the following items, provided that they arise out of a **Claim** or **Pre-Claim Inquiry**:

(1) **Clawback Costs**;

(2) **Extradition Costs**;

(3) **UK Corporate Manslaughter Act Defense Costs**

(4) **Executive ReputationGuard Expenses**, subject to a $100,000 per **Executive** and a $500,000 aggregate sublimit of liability; and

(5) **Asset Protection Costs**, subject to a $50,000 per **Executive** and a $250,000 aggregate sublimit of liability.

*Non-rescindable*

The **Insurer** shall not be entitled, under any circumstances, to rescind or void this policy in whole or in part.

*Recognition Of Erosion*

This policy shall recognize erosion of an **Underlying Limit** of an **Underlying Policy** through payments by others of **Loss** insured under that **Underlying Policy.**

◊ All rights reserved.

# SIDE-A EDGE

## 3. WORLDWIDE AND CROSS-BORDER

*Global*
*Liberalization*

The coverage afforded by this policy shall apply anywhere in the world.

For **Loss** from that portion of any **Claim**, or **Pre-Claim Inquiry Costs** from that portion of any **Pre-Claim Inquiry**, maintained in a **Foreign Jurisdiction**, the **Insurer** shall apply the terms and conditions of this policy as amended to include those of any **Foreign Policy** in the **Foreign Jurisdiction** that are more favorable to **Insured Persons** in the **Foreign Jurisdiction**. This *Global Liberalization* Clause shall not apply to any provision of any **Foreign Policy** that has worldwide effect, including but not limited to any provision addressing limits of liability (primary, excess or sublimits), retentions, other insurance, non-renewal, duty to defend, defense within or without limits, taxes, conformance to law or excess liability coverage, any claims made provisions, and any endorsement to this policy that excludes or limits coverage for specific events or litigation or that specifically states that it will have worldwide effect.

*Passport Master*
*Policy Program*

If the Passport option box has been checked on the Declarations, then this policy shall act as a master policy and the coverage afforded by this policy shall be provided in conjunction with the Passport foreign underlyer policy issued in each jurisdiction selected by the **Named Entity**. The specific structure of the coverage provided by this master policy in conjunction with each Passport foreign underlyer policy is set forth in the Passport Structure Appendix attached to this policy.

## 4. EXCLUSION

*Exclusions Not*
*Followed*

This policy shall not follow the Exclusions Section or Clause of the **Followed Policy**.

*Conduct*
*Exclusion*

The **Insurer** shall not be liable to make any payment for that portion of **Loss** in connection with any **Claim** made against any **Insured Person** that arises out of, is based upon or is attributable to: (a) any remuneration, profit or other advantage to which a final, non-appealable adjudication in the underlying action establishes that the **Insured Person** was not legally entitled; or (b) any deliberate criminal or deliberate fraudulent act by the **Insured Person**, if a final, non-appealable adjudication in the underlying action establishes that such deliberate criminal or deliberate fraudulent act was committed; provided, however: (i) this exclusion shall not apply to **Defense Costs**; and (ii) part (a) of this exclusion shall not apply in a **Claim** alleging violations of Section 11, 12 or 15 of the Securities Act of 1933, as amended, to the portion of any **Loss** attributable to such violations.

## 5. GENERAL TERMS AND CONDITIONS

# SIDE-A EDGE

*Limits Of Liability*

The **Limit of Liability** is the aggregate limit of the **Insurer**'s liability for all **Loss** and **Pre-Claim Inquiry Costs** arising from all **Claims** first made, and all **Pre-Claim Inquiries** first received, during the **Policy Period** or **Discovery Period** (if applicable).

*Claims Made & Pre-Claim Inquiries Received*

This policy provides coverage for **Claims** first made against an **Insured Person**, and **Pre-Claim Inquiries** first received by an **Insured Person**, during the **Policy Period** or the **Discovery Period** (if applicable) and reported in the manner as may be required by the **Followed Policy**.

**Claims** first made against an **Insured Person** and **Pre-Claim Inquiries** first received by an **Insured Person** prior to the inception date of this policy, and **Claims** deemed as first made against an **Insured Person** and **Pre-Claim Inquiries** deemed as first received by an **Insured Person** under any directors and officers liability insurance policy in force prior to the inception date of this policy, are not covered under this policy.

All **Claims** made against an **Insured Person**, and all **Pre-Claim Inquiries** received by an **Insured Person**, alleging, arising out of, based upon or attributable to the same or related facts, **Wrongful Acts**, circumstances or situations, or the same or related series of facts, **Wrongful Acts**, circumstances or situations, shall be deemed to be a single **Claim** or **Pre-Claim Inquiry** made or received at the time the earliest such **Claim** was first made against, or **Pre-Claim Inquiry** was first received by, an **Insured Person**.

*Other Insurance & Indemnification*

This policy shall follow the terms, conditions and limitations of the **Followed Policy**'s Other Insurance Section or Clause. The coverage provided by this policy:

(a) for **Outside Entity Executives** is specifically excess over any directors and officers liability policy issued to an **Outside Entity**;

(b) for **Loss** in connection with any **Claim** made against an **Insured Person** that is for bodily injury, sickness, disease, or death of any person, or damage to or destruction of any tangible property, shall apply specifically as excess over any property, casualty or commercial general liability insurance issued to or available to an **Organization** or **Outside Entity**, either directly or as an additional insured, and any personal liability insurance issued to such **Insured Person**; and

(c) for **Loss** in connection with any **Claim** made against an **Insured Person** as a fiduciary of any employee benefit plan sponsored by an **Organization** or any matter claimed against such **Insured Person** by reason of his or her status as such, shall apply specifically as excess over any fiduciary liability insurance policy that names any **Organization** as a sponsor of a covered plan.

5.  GENERAL TERMS AND CONDITIONS  (Continued)

© All rights reserved.

## SIDE-A EDGE

*Notices &*
*Authority*

Where the **Followed Policy** requires or permits notice to its insurer, the **Named Entity** and the **Insured Persons** have the same obligations and rights to notify the **Insurer** under this policy, except that with respect to this policy, any notice to the **Insurer** must be directed as follows: (a) for claims-related matters, by mail or e-mail to the **Claims Address**; and (b) for all other notices, by mail to the **Insurer Address**. The **Named Entity** shall act on behalf of each and every **Insured Person** with respect to the giving and receiving of notice of cancellation or nonrenewal, the payment of premiums and the receiving of any return premiums that may become due under this policy, the receipt and acceptance of any endorsements issued to form a part of this policy and in the exercising of any right to a **Discovery Period**.

*Rights*

The **Insurer** shall have the same rights, privileges and protections afforded to the **Underlying Insurer** of the **Followed Policy** in accordance with the terms, conditions and limitations of the **Followed Policy**. The **Insurer** shall also have the right, in its sole discretion, but not the obligation, to effectively associate with the **Insured Persons** in the defense and settlement of any **Claim** or **Pre-Claim Inquiry** that appears to be reasonably likely to involve the **Insurer**. The **Named Entity**, each **Organization** and the **Insured Persons** shall provide the **Insurer** with such information, assistance and cooperation as the **Insurer** may reasonably request and shall not do anything that prejudices the **Insurer's** position or potential rights of recovery of payments made in connection with this Policy.

Notwithstanding the foregoing paragraph, the failure of the **Named Entity**, each **Organization** or any **Insured Person** to give the **Insurer** such information, assistance or cooperation shall not impair the rights of any other **Insured Person** under this policy.

The **Organizations** agree to indemnify the **Insured Persons** and/or advance **Defense Costs** to the fullest extent permitted by law. If the **Insurer** pays under this policy any indemnification or advancement owed to any **Insured Person** by any **Organization**, then that **Organization** shall reimburse the **Insurer** for such amounts and such amounts shall become immediately due and payable as a direct obligation of the **Organization** to the **Insurer**. The failure of an **Organization** to perform any of its obligations to indemnify the **Insured Persons** and/or advance **Defense Costs** under this policy shall not impair the rights of any **Insured Person** under this policy. In no event shall any such advancement by the **Insurer** relieve any **Organization**, **Outside Entity** or **Underlying Insurer** of any duty it may have to provide advancement, make any payment or provide indemnification to any **Insured Person**.

5.  GENERAL TERMS AND CONDITIONS  (Continued)

            ◇ All rights reserved.

## SIDE-A EDGE

Changes *If, subsequent to the issuance of the Followed Policy, the terms, conditions or limitations of an Underlying Policy are modified, the Named Entity and the Insured Persons must notify the Insurer in writing, as soon as practicable, of such modification. If any changes to the Followed Policy: (a) expand coverage, (b) change the Named Entity's name or address, or (c) modify premium, this policy shall not follow those changes unless the Named Entity or the Insured Persons have secured the Insurer's written consent to do so.*

Conformance To Law *Coverage under this policy shall not be provided to the extent prohibited by any law.*

6. DEFINITIONS

"**Asset Protection Cost**" means reasonable and necessary fees, costs and expenses consented to by the **Insurer** and incurred by an **Executive** of an **Organization** to oppose any efforts by an **Enforcement Body** to seize or otherwise enjoin the personal assets or real property of such **Executive** or to obtain the discharge or revocation of a court order entered during the **Policy Period** in any way impairing the use thereof.

"**Clawback Costs**" means the reasonable and necessary fees, costs and expenses consented to by the **Insurer** (including the premium or origination fee for a loan or bond) and incurred by an **Executive** to facilitate the return of amounts required to be repaid by such **Executive** pursuant to Section 304(a) of the Sarbanes-Oxley Act of 2002 ("SOX 304") or Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank 954"). " **Clawback Costs**" do not include the payment, return, reimbursement, disgorgement or restitution of any such amounts requested or required to be repaid by such **Executive** pursuant to either SOX 304 or Dodd-Frank 954.

"**Derivative Demand**" means a written demand by any shareholder of an **Organization** upon the board of directors (or equivalent management body) of such **Organization** to commence a civil action on behalf of the **Organization** against any **Executive** of the **Organization** for any actual or alleged wrongdoing on the part of such **Executive**.

"**Derivative Investigation**" means, after receipt by any **Insured** of a **Claim** that is either a **Derivative Suit** or a **Derivative Demand**, any investigation conducted by the **Organization**, or on behalf of the **Organization** by its board of directors (or the equivalent management body) or any committee of the board of directors (or equivalent management body), as to how the **Organization** should respond.

"**Enforcement Body**" means: (a) any federal, state, local or foreign law enforcement authority or other governmental investigative authority (including, but not limited to, the U.S. Department of Justice, the U.S.

 © All rights reserved.

## SIDE-A EDGE

6.  DEFINITIONS (Continued)

Securities and Exchange Commission and any attorney general); or (b) the enforcement unit of any securities or commodities exchange or other self-regulatory organization.

"**Executive ReputationGuard Expenses**"

means reasonable and necessary fees, costs and expenses of a **Panel PR Firm** retained within 30 days of a **Personal Reputation Crisis** solely and exclusively by an **Executive** to mitigate the damage to the **Executive's** reputation from a **Personal Reputation Crisis**. "**Executive ReputationGuard Expenses**" shall not include any fees, costs or expenses of any **Panel PR Firm** incurred by an **Executive** if such **Panel PR Firm** is also retained by or on behalf of an **Organization**.

"**Extradition**"

means any formal process by which an **Insured Person** located in any country is surrendered to any other country for trial or otherwise to answer any criminal accusation.

"**Extradition Costs**"

means **Defense Costs** incurred by an **Insured** in lawfully opposing any effort to obtain the **Extradition** of an **Insured Person**.

"**Foreign Jurisdiction**"

means any jurisdiction, other than the United States of America or any of its territories or possessions.

"**Foreign Policy**"

means the standard policy form, including all mandatory endorsements, if any, typically offered for sale in a **Foreign Jurisdiction** for comparable risks by the **Insurer** or any of its affiliates that provides excess "Side-A" (non-indemnifiable loss) executive management liability coverage substantially similar to the coverage provided by this form. If no such policy exists, then "**Foreign Policy**" means the portions of the standard directors and officers liability policy form addressing coverage for "Side-A" (non-indemnifiable loss) for **Insured Persons**.

The term "**Foreign Policy**" shall not include any partnership managerial, pension trust or professional liability coverage.

"**Liberty Protection Costs**"

means:
(a) reasonable and necessary fees, costs and expenses consented to by the **Insurer** and incurred by an **Insured Person** in order for an **Insured Person** to lawfully seek the release of the **Insured Person** from any pre-**Claim** arrest or confinement to a: (i) specified residence; or (ii) secure custodial premises operated by or on behalf of any law enforcement authority; or

(b) reasonable and necessary premiums (but not collateral) consented to by the **Insurer** and incurred by an **Insured Person** for a bond or other financial instrument to guarantee the contingent obligation of the **Insured Person** for a specified

## SIDE-A EDGE

6. DEFINITIONS (Continued)

amount required by a court during the **Policy Period**, if such premiums: (i) arise out of an actual or alleged **Wrongful Act**; or (ii) are incurred solely by reason of such **Insured Person's** status as an **Executive** or **Employee** of an **Organization**.

**"Panel PR Firm"**    means any public relations, crisis management or brand management firm specifically retained by an **Executive** in connection with a **Personal Reputation Crisis** but only if such firm is listed under the "ReputationGuard®" link at http://www.aig.com/us/panelcounseldirectory as an approved ReputationGuard® **Panel PR Firm** at the time the firm is retained.

**"Personal Reputation Crisis"**    means any negative statement that is included in any press release or published by any print or electronic media outlet regarding an **Executive** of an **Organization** made during the **Policy Period** regarding any **Wrongful Acts** that form the basis of any **Claim** or **Pre-Claim Inquiry** covered under this policy.

**"Pre-Claim Inquiry"**    means any pre-**Claim**:

(a) verifiable request for an **Insured Person** of any **Organization**: (i) to appear at a meeting or interview; or (ii) produce documents that, in either case, concerns the business of that **Organization** or that **Insured Person's** insured capacities, but only if the request came from any:

     (1) **Enforcement Body**; or

     (2) **Organization**, or, on behalf of an **Organization**, by its board of directors (or the equivalent management body) or any committee of the board of directors (or the equivalent management body):

         (A) arising out of an inquiry or investigation by an **Enforcement Body** concerning the business of that **Organization** or that **Insured Person's** insured capacities; or

         (B) as part of its **Derivative Investigation**; and

(b) arrest or confinement of an **Executive** of an **Organization** to a: (i) specified residence; or (ii) secure custodial premises operated by or on behalf of an **Enforcement Body**, in connection with the business of any **Organization** or an **Insured Person's** capacity as an **Executive** or **Employee** of an **Organization**.

"**Pre-Claim Inquiry**" shall not include any routine or regularly scheduled regulatory or internal supervision, inspection, compliance, review, examination, production or audit, including any request for mandatory information from a regulated entity, conducted in an **Organization's** and/or **Enforcement Body's** normal review or compliance process.

117121 (12/13)      Page 11 of 12      © All rights reserved.

## SIDE-A EDGE

6. DEFINITIONS (Continued)

"Pre-Claim
Inquiry Costs"

means:

(a) as respects a **Pre-Claim Inquiry** under subparagraph (a) of the definition of such term, the reasonable and necessary pre-**Claim** fees, costs and expenses consented to by the **Insurer** and incurred by an **Insured Person** solely in connection with his/her preparation for and response to a **Pre-Claim Inquiry** directed to such **Insured Person**, including attendance at an interview or meeting requested by an **Enforcement Body**, but excluding: (i) any compensation of any **Insured Person**; and (ii) the costs of complying with any formal or informal discovery or other request seeking documents, records or electronic information in the possession or control of an **Organization**, the requestor or any other third party; and

(b) as respects a **Pre-Claim Inquiry** under subparagraph (b) of the definition of such term, **Liberty Protection Costs**.

"Transaction"

unless defined in the **Followed Form**, means:

(1) owning interests representing more than 50% of the voting, appointment or designation power for the selection of a majority of: the Board of Directors of a corporation; the management committee members of a joint venture; or the members of the management board of a limited liability company; or

(2) having the right, pursuant to written contract or the by-laws, charter, operating agreement or similar documents of an **Organization**, to elect, appoint or designate a majority of: the Board of Directors of a corporation; the management committee of a joint venture; or the management board of a limited liability company.

"UK Corporate
Manslaughter
Act Defense
Costs"

means **Defense Costs** incurred by an **Insured Person** that result solely from the investigation, adjustment, defense and/or appeal of a **Claim** against an **Organization** for violation of the United Kingdom Corporate Manslaughter and Corporate Homicide Act of 2007 or any similar statute in any jurisdiction.

"Wrongful Act"

in addition to the definition provided in the **Followed Policy**, also means any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act by any **Insured Person** as a fiduciary of any employee benefit plan sponsored solely by any **Organization** or any matter claimed against such **Insured Person** solely by reason of his or her status as such.

                 Ⓓ All rights reserved.

## ENDORSEMENT# 1

This endorsement, effective *12:01 am*   *February 24, 2017*   forms a part of
policy number   *01-232-99-82*
issued to *COLLECTOR'S COFFEE, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

### NEVADA AMENDATORY ENDORSEMENT

Wherever used in this endorsement: 1) "we", "us", "our", and "Insurer" mean the insurance company which issued this policy; and 2) "you", "your", "named Insured", "First Named Insured", and "Insured" mean the Named Corporation, Named Organization, Named Sponsor, Named Insured, or Insured stated in the declarations page; and 3) "Other Insured(s)" means all other persons or entities afforded coverage under the policy.

### CANCELLATION/NONRENEWAL

A. The cancellation provision of the policy is replaced by the following:

    1.    The First Named Insured may cancel this policy by mailing or delivering to the Insurer advance written notice of cancellation.

    2.    MIDTERM CANCELLATION

        If this policy has been in effect for seventy (70) days or more, or if this policy is a renewal of a policy the Insurer issued, the Insurer may cancel only for one or more of the following reasons:

        a.    Nonpayment of premium;

        b.    Conviction of the Insured or Other Insured(s) of a crime arising out of acts increasing the hazard insured against;

        c.    Discovery of fraud or material misrepresentation in obtaining the policy or in presenting a claim thereunder;

        d.    Discovery of an act or omission or a violation of any condition of the policy which occurred after the first effective date of the current policy, and substantially and materially increases the hazard insured against;

        e.    A material change in the nature or extent of the risk, occurring after the first effective date of the current policy, which causes the risk of loss to be substantially and materially increased beyond that contemplated at the time the policy was issued or last renewed;

© All rights reserved.

### *END 001*

ENDORSEMENT# *1*   (continued)

    f.    A determination by the commissioner that continuation of the Insurer's present volume of premiums would jeopardize the Insurer's solvency or be hazardous to the interests of the Insurer's policyholders, creditors or the public; or

    g.    A determination by the commissioner that the continuation of the policy would violate, or place the Insurer in violation of, any provision of the code.

If this policy is cancelled by the Insurer based on 2. b. through g. above, the Insurer shall mail or deliver a written notice to the First Named Insured thirty (30) days before the effective date of cancellation. If this policy is cancelled for nonpayment of premium, the Insurer will mail or deliver a written notice to the First Named Insured ten (10) days before the effective date of cancellation.

    3.    ANNIVERSARY CANCELLATION

    If this policy is written for a term longer than one year, the Insurer may cancel for any reason at an anniversary, by mailing or delivering written notice of cancellation to the First Named Insured at the last mailing address known to the Insurer at least sixty (60) days before the anniversary date.

    4.    The following is added as an additional condition and supersedes any other provision to the contrary:

    NONRENEWAL

    a.    If the Insurer elects not to renew this policy, the Insurer will mail or deliver to the First Named Insured a notice of intention not to renew at least sixty (60) days before the agreed expiration date.

    b.    The Insurer need not provide this notice if:

        1.    The First Named Insured has accepted replacement coverage;

        2.    The First Named Insured has requested or agreed to nonrenewal; or

        3.    This policy is expressly designated as nonrenewable.

    5.    NOTICES

    a.    Notice of cancellation or nonrenewal in accordance with the above, will be mailed, first class or certified, or delivered to the First Named Insured at the last mailing address known to the Insurer and will state the reason for cancellation or nonrenewal.

    b.    The First Named Insured may request an explanation upon which the

© All rights reserved.

**END 001**

ENDORSEMENT# *1*    (continued)

Insurer's decision to cancel or nonrenew was based.  The Insurer will provide the explanation within six days of the written request by the First Named Insured.

c.    The Insurer will also provide a copy of the notice of cancellation, for both policies in effect less than seventy (70) days and policies in effect seventy (70) days or more, to the agent who wrote the policy.

All other terms, conditions and exclusions shall remain unchanged.

AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 001*

## ENDORSEMENT# *2*

This endorsement, effective *12:01 am*     *February 24, 2017*     forms a part of
policy number    *01-232-99-82*
issued to *COLLECTOR'S COFFEE, INC.*

by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

### NOTICE OF CLAIM
### (REPORTING BY E-MAIL)

In consideration of the premium charged, it is hereby understood and agreed as follows:

1.  *Email Reporting of Claims*: In addition to the postal address set forth for any Notice of
    Claim Reporting under this policy, such notice may also be given in writing pursuant
    to the policy's other terms and conditions to the Insurer by email at the following
    email address:

    c-claim@AIG.com

    Your email must reference the policy number for this policy. The date of the
    Insurer's receipt of the emailed notice shall constitute the date of notice.

    In addition to Notice of Claim Reporting via email, notice may also be given to the
    Insurer by mailing such notice to: AIG, Financial Lines Claims, P.O. Box 25947,
    Shawnee Mission, KS 66225 or faxing such notice to (866) 227-1750.

2.  *Definitions*: For this endorsement only, the following definitions shall apply:

    (a)   "Insurer" means the "Insurer," "Underwriter" or "Company" or other name
          specifically ascribed in this policy as the insurance company or underwriter for
          this policy.

    (b)   "Notice of Claim Reporting" means "notice of claim/circumstance," "notice of
          loss" or other reference in the policy designated for reporting of claims, loss
          or occurrences or situations that may give rise or result in loss under this
          policy.

    (c)   "Policy" means the policy, bond or other insurance product to which this
          endorsement is attached.

3.  This endorsement does not apply to any Kidnap & Ransom/Extortion Coverage
    Section, if any, provided by this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 002*

## ENDORSEMENT# 3

This endorsement, effective 12:01 am    February 24, 2017    forms a part of
policy number  01-232-99-82
issued to   COLLECTOR'S COFFEE, INC.

by    National Union Fire Insurance Company of Pittsburgh, Pa.

### PENDING AND PRIOR LITIGATION EXCLUSION FOR ADDITIONAL EXCESS LIMITS

In consideration of the premium charged, it is hereby understood and agreed that with
respect to the **Limit of Liability** of this policy $20,000,000 excess of the first $5,000,000
of this policy, the **Insurer** shall not be liable for any **Loss** in connection with any **Claim**
made against or any **Pre-Claim Inquiry** received by any **Insured Person** alleging, arising out
of, based upon or attributable to, as of 02/24/2017, any pending or prior: (1) litigation; or
(2) administrative or regulatory proceeding or investigation of which an **Insured Person** had
notice, or alleging or derived from the same or essentially the same facts as alleged in such
pending or prior litigation or administrative or regulatory proceeding or investigation.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED

AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 3*

ENDORSEMENT# 4

This endorsement, effective  12:01 am        February 24, 2017        forms a part of
policy number   01-232-99-82
issued to   COLLECTOR'S COFFEE, INC.

by      National Union Fire Insurance Company of Pittsburgh, Pa.

### PRIVATE COMPANY COVERAGE

In consideration of the premium charged, it is hereby understood and agreed that, notwithstanding any other provision of this policy or of the **Followed Policy** (including any endorsement attached thereto whether such endorsement precedes or follows this endorsement in time or sequence), the policy is amended as follows:

1.   Sections 11, 12 and 15 of the Securities Act of 1933: Clause 4. EXCLUSION is amended to delete the exception (ii) to the Conduct Exclusion for "a **Claim** alleging violations of Section 11, 12 or 15 of the Securities Act of 1933, as amended, to the portion of any **Loss** attributable to such violations."

2.   Definitions: Clause 6. DEFINITIONS is amended to include the following:

> " **Affiliate**" means: (i) any person or entity that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is in common control with, the **Organization** or any of its **Insureds**; or (ii) any person or entity that directly, or indirectly through one or more intermediaries, is a successor in interest to the **Organization** or any of its **Insureds**.

> " **Executive**" means:

> (1) any past, present or future duly elected or appointed directors, officers, management committee members or members of the Board of Managers of the **Organization,** but only in their capacities as such. Coverage will automatically apply to all new directors, officers, management committee members or members of the Board of Managers of the **Organization** after the inception date of this policy;

> (2) any past, present or future duly elected or appointed directors, officers, management committee members or members of the Board of Managers of the **Organization** serving in the capacity as director, officer, trustee or governor of an **Outside Entity,** but only if such service is at the specific written request or direction of the **Organization**; or

> (3) in the event the **Organization** operates outside the United States, then the terms director, officer, management committee member or member of the Board of Managers shall also mean those titles, positions or capacities in such foreign **Organization** which are equivalent to such positions in an organization incorporated or formed within the United States.

ENDORSEMENT# *4*     (Continued)

This endorsement, effective *12:01 am*     *February 24, 2017*     forms a part of
policy number   *01-232-99-82*
issued to   *COLLECTOR'S COFFEE, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

3.   Public Securities Claim Exclusion: Clause 4. EXCLUSION is amended to include the
following paragraph at the end thereof:

The **Insurer** shall not be liable to make any payment for that portion of **Loss** in
connection with any **Claim** made against any **Insured Person** alleging, arising out of,
based upon or attributable to any public offering of securities by the **Organization**,
an **Outside Entity** or an **Affiliate** or alleging a purchase or sale of such securities
subsequent to such public offering; provided, however, that this exclusion will not
apply to:

(a)   any purchase or sale of securities exempted pursuant to Section 3(b) of the
Securities Act of 1933; and coverage for such purchase or sale transaction
shall not be conditioned upon payment of any additional premium; as long as
the **Named Entity** provides the **Insurer** with written notice of any public
offering exempted pursuant to Section 3(b), together with full particulars and
as soon as practicable, but not later than thirty (30) days after the effective
date of the public offering; or

(b)   any public offering of securities (other than a public offering described in
subpart (a) above), as well as any purchase or sale of such securities
subsequent to such public offering, in the event that within thirty (30) days
prior to the effective time of such public offering: (i) the **Named Entity** shall
give the **Insurer** written notice of such public offering together with full
particulars and underwriting information required thereto; and (ii) the **Named
Entity** accepts such terms, conditions and additional premium required by the
**Insurer** for such coverage. Such coverage is also subject to the **Named Entity**
paying when due any such additional premium.     In the event the
**Organization** gives written notice with full particulars and underwriting
information pursuant to (i) above, then the **Insurer** must offer a quote for
coverage under this paragraph.

4.   Other Insurance: Clause 5. GENERAL TERMS AND CONDITIONS, subparagraph (c)
of the section entitled Other Insurance and Indemnification is hereby deleted in its
entirety and replaced as follows:

(c)   pursuant to any fiduciary liability insurance policy or fiduciary coverage
section that names any **Organization** as a sponsor of a covered plan.

ALL OTHER TERMS, CONDITIONS AND EXCLUSION REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 4*

117122 (12/13)

### ENDORSEMENT# 5

This endorsement, effective at *12:01 am*    *February 24, 2017*    forms a part of
Policy number  *01-232-99-82*
Issued to: *COLLECTOR'S COFFEE, INC.*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*

Product Name: *zManually Issued Policy*

### ECONOMIC SANCTIONS ENDORSEMENT

*This endorsement modifies insurance provided under the following:*

Coverage shall only be provided and payment of loss under this policy shall only be made
in full compliance with enforceable United Nations economic and trade sanctions and the
trade and economic sanction laws or regulations of the European Union and the United
States of America, including, but not limited to, sanctions, laws and regulations
administered and enforced by the U.S. Treasury Department's Office of Foreign Assets
Control ("OFAC").

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 005*

119679 (9/15)                          Page 1 of 1

ENDORSEMENT# *6*

This endorsement, effective  *12:01 am*      *February 24, 2017*      forms a part of
policy number   *01-232-99-82*
issued to   *COLLECTOR'S COFFEE, INC.*

by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

### AMENDED SIDE A EDGE AMENDATORY ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that the policy
is amended as follows:

I.

The Declarations are amended to add the following at the end thereof:

---

*SAME*

> *The **Followed Policy** [does; does not] include a Side-A Match Edge endorsement providing Side-A coverage that follows the terms and conditions of this policy.*

---

II.

Clause 1. INSURING AGREEMENTS is deleted in its entirety and replaced with the
following:

### 1. INSURING AGREEMENTS

This policy provides coverage to **Insured Persons** solely for **Loss** that arises from **Claims**
first made against **Insured Persons,** and **Pre-Claim Inquiry Costs** that arise from any
**Pre-Claim Inquiry** first reported to the **Insurer,** during the **Policy Period** or the applicable
**Discovery Period.** This policy is an excess follow form and difference in conditions
insurance policy. It only protects and benefits **Insured Persons.** No entity is covered in any
respect under this policy.

A term in bold typeface not defined in this policy or stated in the Declarations shall have
the same meaning as the same term defined in the **Followed Policy.**

ENDORSEMENT# 6    (Continued)

This endorsement, effective  12:01 am    February 24, 2017    forms a part of
policy number    01-232-99-82
issued to    COLLECTOR'S COFFEE, INC.

by    National Union Fire Insurance Company of Pittsburgh, Pa.

*Excess and Difference in Conditions ("DIC") Insured Person Side-A Coverage*

This policy shall pay:

(i) the **Loss** of any **Insured Person**, where such **Loss** arises from any **Claim** for any **Wrongful Act** of such **Insured Person**; and

(ii) the **Pre-Claim Inquiry Costs** of any **Insured Person**;

in either case: (a) excess of amounts paid under any **Underlying Policy** (including payments by any **Insured Person** or others of **Loss** or **Pre-Claim Inquiry Costs** insured under that **Underlying Policy** and payments under any other policy with a limit of liability tied in with the limit of liability of that **Underlying Policy**) and of amounts indemnified or advanced from an **Organization** or **Outside Entity**; or (b) on a drop-down basis solely as provided in the Difference in Conditions ("DIC") Event Coverage below.

*DIC Events*

The policy will drop down and pay the **Loss** or **Pre-Claim Inquiry Costs** of an **Insured Person** if, for any reason, an **Organization** or **Outside Entity** fails or refuses to advance, pay or indemnify **Loss** or **Pre-Claim Inquiry Costs** within an applicable retention; or an **Underlying Insurer** fails or refuses to advance, pay or indemnify **Loss** or **Pre-Claim Inquiry Costs** under an **Underlying Policy**; including but not limited to the occurrence of any one or more of the following events:

(i) this policy affords broader coverage than the **Underlying Policy**;
(ii) the **Organization** fails or refuses for any reason to advance, pay or indemnify **Loss** or **Pre-Claim Inquiry Costs** of an **Insured Person** within any applicable retention of an **Underlying Policy**;
(iii) an **Outside Entity** and the **Organization** fails or refuses for any reason to advance, pay or indemnify **Loss** or **Pre-Claim Inquiry Costs** of an **Insured Person** serving as an **Outside Entity Executive** within any applicable retention of any **Underlying Policy** or management liability policy issued to the **Outside Entity**;
(iv) the refusal in writing of an **Underlying Insurer** for any reason to pay any **Loss** or **Pre-Claim Inquiry Costs** of any **Insured Person** pursuant to the terms and conditions of its **Underlying Policy**;
(v) the failure of an **Underlying Insurer** for any reason to pay or advance any **Loss** or **Pre-Claim Inquiry Costs** of any **Insured Person** within sixty (60) days of a written request from the **Named Entity** or an **Insured Person**;

ENDORSEMENT# 6    (Continued)

This endorsement, effective  *12:01 am*     February 24, 2017     forms a part of
policy number   *01-232-99-82*
issued to    *COLLECTOR'S COFFEE, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

*DIC Events*

    (vi) the actual or intended avoidance, rescission or cancellation of an **Underlying Policy** by an **Underlying Insurer**;

    (vii) the **Organization** fails or refuses to advance, pay or indemnify **Loss** or **Pre-Claim Inquiry Costs** of an **Insured Person** by reason of bankruptcy, receivership or any similar proceeding in any jurisdiction worldwide;

    (viii) an **Outside Entity** and the **Organization** fails or refuses to advance, pay or indemnify **Loss** or **Pre-Claim Inquiry Costs** of an **Insured Person** serving as an **Outside Entity Executive** by reason of bankruptcy, receivership or any similar proceeding in any jurisdiction worldwide;

    (ix) the financial inability by reason of bankruptcy, receivership, liquidation or any similar proceeding in any jurisdiction worldwide of an **Underlying Insurer** to provide coverage to any **Insured Person**; or

    (x) an **Underlying Insurer** is unable to or precluded from paying **Loss** or **Pre-Claim Inquiry Costs** of an **Insured Person** by reason of bankruptcy, receivership or any similar proceeding in any jurisdiction worldwide by or against an **Organization**.

Advancement, payment or indemnification of an **Insured Person** by an **Organization**, **Outside Entity** or **Underlying Insurer** is deemed:

    (a) "failed" if it has been requested by or on behalf of an **Insured Person** and has not been provided by, agreed to be provided by or acknowledged as an obligation by, or is not collectible from, an **Organization**, **Outside Entity** or **Underlying Insurer**, respectively, within sixty (60) days of such request.

    (b) "refused" if an **Organization**, **Outside Entity** or **Underlying Insurer** gives notice of the refusal to the **Insured Person**.

*Follow Form*    This policy shall provide coverage for **Insured Persons** in accordance with the terms, conditions and limitations of the **Followed Policy**, as modified by and subject to the terms, conditions and limitations of this policy, including but not limited to the *Changes* Clause of this policy regarding midterm modifications to an **Underlying Policy** (including but not limited to the **Followed Policy**).

M122379 (09/16)                    *END 6*

**ENDORSEMENT# 6** (Continued)

This endorsement, effective *12:01 am* *February 24, 2017* forms a part of
policy number *01-232-99-82*
issued to *COLLECTOR'S COFFEE, INC.*

by *National Union Fire Insurance Company of Pittsburgh, Pa.*

*Followed*
*Sublimits*
If any **Loss** or **Pre-Claim Inquiry Costs** are subject to a sublimit of liability under the **Followed Policy**, this policy shall pay such **Loss** or **Pre-Claim Inquiry Costs** of any **Insured Person** excess of amounts actually paid under any **Underlying Policy**, regardless of whether the full limit of liability of any **Underlying Policy** has been exhausted. This policy shall provide coverage for such **Loss** or **Pre-Claim Inquiry Costs** subject to a sublimit of liability equal to that set forth in the **Followed Policy**, which shall be part of and not in addition to this policy's **Limit of Liability**.

*Underlying*
*Match*
*Assurance*
For any **Claim** against or **Pre-Claim Inquiry** received by any **Insured Person**, this policy shall be extended to include coverage for **Loss** or **Pre-Claim Inquiry Costs** of **Insured Persons** provided by any **Underlying Policy** (including but not limited to the **Followed Policy**) that is not already encompassed in this policy, excess of amounts actually paid under any **Underlying Policy** and amounts actually indemnified or advanced from an **Organization** or **Outside Entity**. In no event shall this provision increase any limit of liability of this policy.

### III.

In Clause 2. EXTENSIONS AND ADDITIONAL PROTECTION, the section entitled " *Civil Fines & Penalties*" is deleted in its entirety and replaced with the following:

*Civil Fines &*
*Penalties*
**Loss**, as defined in Clause 6, Definitions, of this policy (as amended), includes civil fines and civil penalties assessed by any **Enforcement Body** against any **Insured Person** in connection with a **Claim** if such assessment does not relate to any willful or deliberate violation of law by such **Insured Person** and is not otherwise prohibited by the assessment itself. Such fines and penalties include but are not limited to Section 2(g)(2)(B) of the U.S. Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2(g)(2)(B) and § 78ff(c)(2)(B), or Section 11(1)(a) of the United Kingdom Bribery Act of 2010, Chapter 23, or the equivalent subsection of any comparable anti-corruption or anti-bribery statute.

### IV.

In Clause 2. EXTENSIONS AND ADDITIONAL PROTECTION, the section entitled " *Enhanced Discovery*" is amended by deleting the second paragraph in its entirety and replacing it with the following:

ENDORSEMENT# 6    (Continued)

This endorsement, effective *12:01 am*    *February 24, 2017*    forms a part of
policy number   *01-232-99-82*
issued to   *COLLECTOR'S COFFEE, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

Additionally, in the event the **Named Entity** first becomes the subject of
a bankruptcy proceeding (or the equivalent in a **Foreign Jurisdiction**)
during the **Policy Period**, if the **Insurer** or **Insured Persons** subsequently
elect not to renew this policy, then the **Insured Persons** shall have the
right to a discovery period of unlimited duration commencing at the end
of the **Policy Period**, in which to give the **Insurer** written notice of:

(a) **Claims** first made against an **Insured Person** after the end of the
**Policy Period** and solely with respect to **Wrongful Acts** that occur
prior to the end of the **Policy Period**;

(b) **Pre-Claim Inquiries** first reported by an **Insured Person** after the
end of the **Policy Period** and solely with respect to acts or
omissions that occur prior to the end of the **Policy Period**; and

(c) circumstances that occur prior to the end of the **Policy Period** of
which an **Insured Person** shall become aware after the end of the
**Policy Period**;

Such discovery period shall be provided for no additional premium.

### V.

In Clause 2. EXTENSIONS AND ADDITIONAL PROTECTION, the section entitled "
*Enhanced Discovery*" is further amended by deleting the third paragraph in its entirety and
replacing it with the following:

Any **Executive** that ceases to serve as an **Executive** of an **Organization**
during the **Policy Period** shall be provided, for no additional premium,
with a discovery period of unlimited duration in which to give the
**Insurer** written notice of:

(i)    **Claims** first made against such former **Executive** after the
effective date of such former **Executive's** ceasing to serve in
their capacity as **Executive** of an **Organization** and solely with
respect to **Wrongful Acts** that occur prior to such date; and

(ii)   **Pre-Claim Inquiries** first reported by such former **Executive** after
the effective date of such former **Executive's** ceasing to serve in
their capacity as **Executive** of an **Organization** and solely with
respect to acts or omissions that occur prior to such date.

This discovery period for former **Executives** shall be specifically excess
of any valid and collectible insurance otherwise in place for such
former **Executives**.   The **Limit of Liability** for any discovery period
provided under this policy shall be part of, and not in addition to, the
corresponding **Limit of Liability** for the **Policy Period**.

M122379 (09/16)    *END 6*

ENDORSEMENT# 6    (Continued)

This endorsement, effective  12:01 am    February 24, 2017    forms a part of
policy number  01-232-99-82
issued to   COLLECTOR'S COFFEE, INC.

by    National Union Fire Insurance Company of Pittsburgh, Pa.


## VI.

In Clause 2. EXTENSIONS AND ADDITIONAL PROTECTION, the section entitled "
*Non-rescindable*" is deleted in its entirety and replaced with the following:

*Non-rescindable*

The **Insurer** shall not be entitled, under any circumstances, to rescind or
void any coverage under this policy in whole or in part.


## VII.

In Clause 2. EXTENSIONS AND ADDITIONAL PROTECTION, the section entitled "
*Recognition of Erosion*" is deleted in its entirety and replaced with the following:

*Recognition Of Erosion*

This policy shall recognize erosion of an **Underlying Limit** or any followed
sublimit of liability of an **Underlying Policy** through payments by others of
**Loss** and **Pre-Claim Inquiry Costs** insured under that **Underlying Policy**.


## VIII.

In Clause 2. EXTENSIONS AND ADDITIONAL PROTECTION, the section entitled " *Blanket,
For Profit Outside Director*" is deleted in its entirety and replaced with the following:

*Blanket, For
Profit Outside
Director Liability*

In addition to the definition of " **Outside Entity Executive**" set forth in the
**Followed Policy, Outside Entity Executive under** this policy shall also
mean any **Executive** of an **Organization who is or** was acting at the
specific request or direction of an **Organization** as an **Executive** of any
for-profit entity, but only when such **specific request** or direction occurs
prior to the **Wrongful Act** giving rise to a **Claim**.

In addition to the definition of " **Outside Entity**" set forth in the **Followed
Policy, Outside Entity** under this policy shall also mean any for-profit
entity.


M122379 (09/16)    *END 6*

ENDORSEMENT# 6    (Continued)

This endorsement, effective *12:01 am*    *February 24, 2017*    forms a part of
policy number    *01-232-99-82*
issued to    *COLLECTOR'S COFFEE, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## IX.

Clause 2. EXTENSIONS AND ADDITIONAL PROTECTION of the policy is amended by adding the following paragraphs at the end thereof:

*Spousal and Legal*
*Representative*
*Extension*

If a **Claim** against an **Insured Person** includes a **Claim** against: (i) the lawful spouse or **Domestic Partner** of such **Insured Person**; or (ii) a property interest of such spouse or **Domestic Partner**, and such **Claim** arises from any actual or alleged **Wrongful Act** of such **Insured Person**, this policy shall cover **Loss** arising from the **Claim** made against that spouse or **Domestic Partner** or the property of that spouse or **Domestic Partner** to the extent that such **Loss** does not arise from a **Claim** for any actual or alleged act, error or omission of such spouse or **Domestic Partner**. This policy shall cover **Loss** arising from a **Claim** made against the estates, heirs, or legal representatives of any deceased **Insured Person**, and the legal representatives of any **Insured Person**, in the event of incompetency, insolvency or bankruptcy, who was an **Insured Person** at the time the **Wrongful Acts** upon which such **Claim** is based were committed.

" **Domestic Partner**" means any individual person legally recognized as a domestic or civil union partner under: (1) the provisions of any applicable federal, state, or local law; or (2) the provisions of any formal program established by the **Named Entity** or any **Subsidiary**.

*Policy Access Fund*

The **Insurer** shall pay the reasonable fees, costs and expenses incurred by an **Insured Person** to:

    (a) gain access to the limit of liability provided by an **Underlying Policy**; or

    (b) defend against efforts by third parties to seize or attach this policy or any **Underlying Policy**;

provided the **Organization**, **Outside Entity** and/or **Underlying Insurer** fails, refuses or is financially unable to indemnify, advance or pay such fees, costs and expenses. The **Policy Access Fund** coverage shall be subject to a maximum amount per **Policy Period** of $XXXXXX, which limit shall be in addition to the **Limit of Liability** provided by this policy.

M122379 (09/16)    *END 6*

ENDORSEMENT# 6    (Continued)

This endorsement, effective  12:01 am        February 24, 2017      forms a part of
policy number   01-232-99-82
issued to    COLLECTOR'S COFFEE, INC.


by      National Union Fire Insurance Company of Pittsburgh, Pa.


Bankruptcy Clause        Bankruptcy or insolvency of any **Organization** or any **Insured Person**
                         shall not relieve the **Insurer** of any of its obligations hereunder.

                         It is further understood and agreed that the coverage provided under
                         this policy is intended to protect and benefit the **Insured Persons**.
                         Further, if a liquidation or reorganization proceeding is commenced by
                         the **Named Entity** and/or any other **Organization** (whether voluntarily
                         or involuntarily) under Title 11 of the United States Code (as
                         amended), or any similar state, local or foreign law (collectively
                         "Bankruptcy Law") then, in regard to a covered **Claim** under this
                         policy, the **Insureds** hereby:

                         (a) waive and release any automatic stay or injunction to the
                             extent it may apply in such proceeding to the proceeds of this
                             policy under such Bankruptcy Law; and

                         (b) agree not to oppose or object to any efforts by the **Insurer** or
                             any **Insured** to obtain relief from any stay or injunction
                             applicable to the proceeds of this policy as a result of the
                             commencement of such liquidation or reorganization
                             proceeding.

                                        X.

In Clause 4. EXCLUSION, the section entitled " *Conduct Exclusion*" is deleted in its
entirety and replaced with the following:

Conduct Exclusion    The **Insurer** shall not be liable to make any payment for that portion
                     of **Loss** or **Pre-Claim Inquiry Costs** in connection with any **Claim**
                     made against any **Insured Person** for: (a) any remuneration, personal
                     profit or other financial advantage to which a final, non-appealable
                     adjudication against such **Insured Person** in the underlying action
                     establishes that the **Insured Person** was not legally entitled; or (b)
                     any deliberate criminal or deliberate fraudulent act by the **Insured
                     Person**, if a final, non-appealable adjudication against such **Insured
                     Person** in the underlying action establishes that such deliberate
                     criminal or deliberate fraudulent act was committed;

M122379 (09/16)                    *END 6*

ENDORSEMENT# *6*    (Continued)

This endorsement, effective *12:01 am*    *February 24, 2017*    forms a part of
policy number    *01-232-99-82*
issued to    *COLLECTOR'S COFFEE, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

provided, however:

(i)     this exclusion shall not apply to **Defense Costs**;

(ii)    part (a) of this exclusion shall not apply in an **Employment Practices Claim** or in a **Claim** alleging violations of Section 11, 12 or 15 of the Securities Act of 1933, as amended, to the portion of any **Loss** attributable to such violations;

(iii)   with respect to part (b) of this exclusion, for acts or omissions which are treated as a criminal violation in a **Foreign Jurisdiction** that are not treated as a criminal violation in the United States of America, the imposition of a criminal fine or other criminal sanction in such **Foreign Jurisdiction** will not, by itself, be conclusive proof that a deliberate criminal or deliberate fraudulent act occurred; and

(iv)    with respect to part (b) of this exclusion, this exclusion shall not apply to **Independent Directors**;

Solely for purposes of this exclusion, " **Independent Director**" means with respect to the **Organization**, a "Non-Employee Director" as that term is defined in Rule 16b-3 promulgated under the Securities Exchange Act of 1934 provided that the term "issuer" as used in that Rule shall be deemed to refer to such **Organization**.

## XI.

In Clause 5. GENERAL TERMS AND CONDITIONS, the section entitled " *Claims Made & Pre-Claim Inquiries Received*" is amended by deleting the second and third paragraphs in their entirety and replacing them with the following:

**Claims** first made against an **Insured Person** and **Pre-Claim Inquiries** first reported by an **Insured Person** prior to the inception date of this policy, and **Claims** deemed as first made against an **Insured Person** and **Pre-Claim Inquiries** deemed as first reported by an **Insured Person** under any directors and officers liability insurance policy in force prior to the inception date of this policy, are not covered under this policy.

M122379 (09/16)    *END 6*

ENDORSEMENT# 6     (Continued)

This endorsement, effective  12:01 am     February 24, 2017     forms a part of
policy number   01-232-99-82
issued to    COLLECTOR'S COFFEE, INC.

by     National Union Fire Insurance Company of Pittsburgh, Pa.

> All **Claims** made against  an **Insured Person**,  and all **Pre-Claim  Inquiries**
> reported by an  **Insured Person**, alleging,  arising out of,  based upon  or
> attributable to  the same  or related **Wrongful  Acts**,  circumstances or
> situations,  or  the  same  or  related  series  of **Wrongful  Acts**,
> circumstances or situations,  shall be  deemed to  be a  single **Claim**  or
> **Pre-Claim Inquiry** made or  reported at the time  the earliest such **Claim**
> was first made  against, or **Pre-Claim  Inquiry** was first  reported by, an
> **Insured Person.**

### XII.

In Clause 5. GENERAL TERMS AND CONDITIONS, the section entitled  " *Other Insurance &
Indemnification*" is amended by adding the following at the end thereof:

> Such insurance as is provided by  this policy shall apply only  as excess
> over  any  other  valid  and  collectible  insurance,  unless  such  other
> insurance is specifically  written as excess  insurance over the  **Limit of
> Liability** provided by this policy.   Such insurance as is  provided by this
> policy shall apply  as primary  to any  personal umbrella  excess liability
> insurance purchased by any **Insured Persons.**

> Notwithstanding  the  foregoing  or  the  terms  and  conditions  of  the
> **Followed Policy**, if for any reason any **Underlying Insurer** fails or refuses
> to pay  **Loss** or  **Pre-Claim Inquiry  Costs** covered  under the  terms and
> conditions of this  policy, this  policy shall  pay such  **Loss** or  **Pre-Claim
> Inquiry Costs.**

<u>ENDORSEMENT# *6*</u>     (Continued)

This endorsement, effective  *12:01 am*     *February 24, 2017*     forms a part of
policy number   *01-232-99-82*
issued to   *COLLECTOR'S COFFEE, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

## XIII.

In Clause 5. GENERAL TERMS AND CONDITIONS, the section entitled " *Notices &
Authority*" is deleted in its entirety and replaced with the following:

Notices &
Authority

Where the **Followed Policy** requires or  permits notice to its insurer,  the
**Named Entity** and  the **Insured Persons**  have the  same obligations and
rights to notify  the **Insurer** under  this policy, except that with respect
to this policy, any notice to the **Insurer** must be directed as follows:  (a)
for **Claim**-related and **Pre-Claim Inquiry**-related matters, by mail  or
e-mail to the  **Claims Address**; and  (b) for all  other notices,  by mail to
the **Insurer Address**. The **Named Entity** shall act on  behalf of each and
every **Insured Person** with respect to  the giving and receiving of notice
of cancellation or nonrenewal, the payment of premiums  and the
receiving of any  return premiums  that may become  due under this
policy, the receipt and acceptance of any endorsements issued  to form
a part of  this policy and  in the  exercising of any  right to  a **Discovery
Period**.

Notwithstanding the foregoing,  a failure  to provide  notice as soon as
practicable shall  not  preclude  coverage  under  the policy  unless  the
**Insurer** has been prejudiced by such failure.

## XIV.

In Clause 5. GENERAL TERMS  AND CONDITIONS, the section  entitled " *Rights*" is
amended by adding the following at the end thereof:

In the event the **Insurer** recovers amounts  it paid under this policy, the
**Insurer** will reinstate the  **Limits of Liability**  of this policy  to the extent
of such recovery, less its  costs incurred in administering and  obtaining
such recovery.  The **Insurer** assumes no duty to seek  a recovery of any
amounts paid  under this  policy. The  **Insurer**, in  its sole  and absolute
discretion, shall determine the amounts to be credited, if any, toward a
reinstatement of the **Limits of Liability**.

In no event shall the **Insurer** exercise its right of subrogation against  an
**Insured Person** under this policy.

M122379 (09/16)                    *END 6*

ENDORSEMENT# 6     (Continued)

This endorsement, effective  12:01 am      February 24, 2017      forms a part of
policy number   01-232-99-82
issued to   COLLECTOR'S COFFEE, INC.

by      National Union Fire Insurance Company of Pittsburgh, Pa.

XV.

In Clause 6. DEFINITIONS, the definitions of " **Asset Protection Cost**," " **Clawback Costs**,"
" **Executive ReputationGuard Expenses**" " **Extradition**," " **Liberty Protection Costs**," "
**Pre-Claim Inquiry**," " **Transaction**" and " **Wrongful Act**" are deleted in their entirety and
replaced with the following:

" **Asset Protection** means reasonable fees, costs and expenses consented to by the
Cost"        **Insurer**, such consent not to be unreasonably withheld, and incurred by
            an **Executive** of an **Organization** to oppose any efforts by an
            **Enforcement Body** to seize or otherwise enjoin the personal assets or
            real property of such **Executive** or to obtain the discharge or revocation
            of a court order entered during the **Policy Period** in any way impairing
            the use thereof.

" **Clawback Costs**"means the reasonable fees, costs and expenses consented to by the
            **Insurer** (including the premium or origination fee for a loan or bond),
            such consent not to be unreasonably withheld, and incurred by an
            **Executive** to facilitate the return of amounts required to be repaid by
            such **Executive** pursuant to Section 304(a) of the Sarbanes-Oxley Act
            of 2002 ("SOX 304") or Section 954 of the Dodd-Frank Wall Street
            Reform and Consumer Protection Act ("Dodd-Frank 954"), or any
            similar local, state or foreign statute under the securities laws providing
            for the recovery, return or reimbursement of incentive-based
            compensation from an **Executive** due to an accounting restatement by
            an **Organization**. " **Clawback Costs**" do not include the payment, return,
            reimbursement, disgorgement or restitution of any such amounts
            requested or required to be repaid by such **Executive** pursuant to SOX
            304, Dodd-Frank 954 or any similar local, state or foreign statute.

" **Executive**        means reasonable fees, costs and expenses of a **Panel PR Firm** retained
**ReputationGuard**  within 30 days of a **Personal Reputation Crisis** solely and exclusively by
**Expenses**"        an **Executive** to mitigate the damage to the **Executive**'s reputation from
            a **Personal Reputation Crisis**.

" **Extradition**"     means any formal process by which an **Insured Person** located in any
            country is surrendered or sought to be surrendered to any other country
            for trial or otherwise to answer any criminal accusation.

ENDORSEMENT# *6*    (Continued)

This endorsement, effective *12:01 am*    *February 24, 2017*    forms a part of
policy number  *01-232-99-82*
issued to  *COLLECTOR'S COFFEE, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

" **Liberty Protection** means:
Costs"

> (a) reasonable fees, costs and expenses consented to by the **Insurer**, such consent not to be unreasonably withheld, and incurred by an **Insured Person** in order for an **Insured Person** to lawfully seek the release of the **Insured Person** from any pre- **Claim** arrest or confinement to a: (i) specified residence; or (ii) secure custodial premises operated by or on behalf of any law enforcement authority; or

> (b) reasonable and necessary premiums (but not collateral) consented to by the **Insurer**, such consent not be unreasonably withheld, and incurred by an **Insured Person** for a bond or other financial instrument to guarantee the contingent obligation of the **Insured Person** for a specified amount required by a court during the **Policy Period**, if such premiums: (i) arise out of an actual or alleged **Wrongful Act**; or (ii) are incurred solely by reason of such **Insured Person's** status as an **Executive** or **Employee** of an **Organization**.

" **Pre-Claim Inquiry**" means any pre- **Claim**:

> (a) request for an **Insured Person** of any **Organization**: (i) to appear at a meeting or interview; (ii) to provide testimony or a sworn statement; or (iii) produce documents, that, in any such case, concerns the business of that **Organization** or that **Insured Person's** insured capacities, but only if the request came from any:

>> (1) **Enforcement Body**; or
>> (2) **Organization**, or, on behalf of an **Organization**, by its board of directors (or the equivalent management body) or any committee of the board of directors (or the equivalent management body); and

> (b) arrest or confinement of an **Executive** of an **Organization** to a: (i) specified residence; or (ii) secure custodial premises operated by or on behalf of an **Enforcement Body**, in connection with the business of any **Organization** or an **Insured Person's** capacity as an **Executive** or **Employee** of an **Organization**.

" **Pre-Claim Inquiry**" shall not include any routine or regularly scheduled regulatory or internal supervision, inspection, compliance, review, examination, production or audit, including any request for mandatory information from a regulated entity, conducted in an **Organization's** and/or **Enforcement Body's** normal review or compliance process.

*END 6*

ENDORSEMENT# *6*      (Continued)

This endorsement, effective *12:01 am*      *February 24, 2017*      forms a part of
policy number   *01-232-99-82*
issued to   *COLLECTOR'S COFFEE, INC.*

by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

" **Transaction**"      unless defined in the **Followed Form**, means:

(1) the **Named Entity** consolidating with or merging into another entity
such that the **Named Entity** is not the surviving entity, or selling all
or substantially all of its assets to any other person or entity or
group of persons or entities acting in concert;

(2) any person or entity or group of persons or entities acting in concert
acquiring **Management Control** of the **Named Entity**; or

(3) the appointment by any **Enforcement Body** of, or where any
**Enforcement Body** assumes the role of, a trustee, receiver,
conservator, rehabilitator, liquidator or similar official to take control
of, supervise or oversee the **Named Entity**, or to liquidate or sell all
or substantially all of the assets of the **Named Entity**.

" **Wrongful Act**"   in addition to the definition provided in the **Followed Policy**, also means
any actual or alleged breach of duty, neglect, error, misstatement,
misleading statement, omission or act by any **Insured Person** as a
fiduciary of any employee benefit plan sponsored solely by any
**Organization** or any matter claimed against such **Insured Person** by
reason of his or her status as such.

## XVI.

In Clause 6. DEFINITIONS, the following definitions are added to the end thereof:

" **Insured Person**" in addition to the definition provided in the **Followed Policy**, **Insured
Person** also means any **Shadow Director** or de facto director.

<u>ENDORSEMENT#</u> *6*    (Continued)

This endorsement, effective *12:01 am*    *February 24, 2017*    forms a part of
policy number   *01-232-99-82*
issued to   *COLLECTOR'S COFFEE, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

"Loss"    **Loss** means the amounts that the **Insured Persons** are legally obligated to
pay as a result of a **Claim**, including but not limited to:

(a) **Defense Costs;**

(b) damages, judgments (including pre/post-judgment interest on a covered judgment), and settlements;

(c) the listed items set out in Clause 2, Extensions, Executive Protection Suite of this policy;

(d) punitive or exemplary damages or the multiple portion of a multiplied damages award;

(e) the premium (but not collateral) for any bail or similar bond incurred by an **Insured Person** in connection with a **Claim**;

(f) taxes imposed upon the **Organization** for which an **Insured Person** is legally liable by reason of the **Organization's** bankruptcy or insolvency; and

(g) taxes imposed upon an **Insured Person** due to any payment of **Loss** by the **Insurer** under this policy.

**Loss** (other than **Defense Costs**) shall not include:

(i) matters that may be deemed uninsurable under the law pursuant to which this policy shall be construed;

(ii) taxes, except as covered under Clauses (f) and (g) above;

(iii)fines or penalties, except to the extent covered under Clause 2, EXTENSIONS AND ADDITIONAL PROTECTION, *Civil Fines & Penalties* of this policy; and

(iv)any statutory liability imposed upon an **Insured Person** as a result of the failure of the **Organization** to have paid any taxes owed to a federal or state government.

**Loss** shall specifically include plaintiff attorneys' fees awarded or approved by a court in connection with a **Non-Monetary Settlement.**

The insurability of fines, penalties, taxes, and punitive, exemplary and multiplied damages shall be governed by such applicable law that most favors coverage for such fines, penalties, taxes, and punitive, exemplary and multiple damages.

ENDORSEMENT# *6*    (Continued)

This endorsement, effective  *12:01 am*    *February 24, 2017*    forms a part of
policy number    *01-232-99-82*
issued to    *COLLECTOR'S COFFEE, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

 

Notwithstanding the above, the  **Insurer** shall not  assert that, in  a **Claim**
alleging violations of Section 11,  12 or 15 of  the U.S. Securities Act of
1933, as amended, or similar statutory provisions of any state  or foreign
securities law, the  portion of any amounts incurred  by **Insured  Persons**
which is attributable  to such violations  constitutes uninsurable loss  and
shall treat that  portion of  all such settlements,  judgments and  **Defense
Costs** as constituting **Loss** under this policy.

" **Non-Monetary
Settlement**"
means a settlement of  a **Claim** brought  by one or  more shareholders of
an **Organization**, either  directly or  derivatively on  behalf of  an
**Organization**, wherein no  monetary consideration  would be  received by
such shareholder(s) or **Organization**, including but not limited to any such
**Claim** alleging that the price or consideration paid or proposed  to be paid
for the acquisition or completion  of the acquisition of  all or substantially
all the ownership interest in or assets of an entity is inadequate.

" **Shadow
Director**"
means any natural person who, as  a consequence of being an **Executive**
or **Employee** of any **Organization** is deemed a  shadow director, as
defined in Section  251 of  the U.K. Companies  Act 2006,  of any other
**Organization** or any **Outside Entity**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

® All rights reserved.
*END 6*

M122379 (09/16)

ENDORSEMENT# *7*

This endorsement, effective *12:01 am*   *February 24, 2017*   forms a part of
policy number   *01-232-99-82*
issued to *COLLECTOR'S COFFEE, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| 117121 | 12/13 | SIDE A EGDE DEC |
| 96555 | 01/15 | TRIA DEC DISCLOSURE FORM |
| 117121 | 12/13 | SIDE - A EDGE POLICY |
| 52160 | 07/12 | NEVADA CANCELLATION-NONRENEWAL AMENDATORY ENDORSEMENT |
| 99758 | 08/08 | NOTICE OF CLAIM (REPORTING BY E-MAIL) |
| 117133 | 12/13 | PENDING AND PRIOR LITIGATION EXCLUSION FOR ADDITIONAL EXCESS LIMITS |
| 117122 | 12/13 | PRIVATE COMPANY COVERAGE |
| 119679 | 09/15 | ECONOMIC SANCTIONS ENDORSEMENT |
| M122379 | 09/16 | AMENDED SIDE A EDGE AMENDATORY ENDORSEMENT |
| 78859 | 10/01 | FORMS INDEX ENDORSEMENT |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

◊ All rights reserved.

*END 007*



## CLAIM REPORTING FORM

Issuing Company: *National Union Fire Insurance Company of Pittsburgh, Pa.*

Reported under Policy/Bond Number: _01-232-99-82_          Date: _____

Type of Coverage: D&O _____  E&O _____  Fidelity _____ (complete the Fidelity Supplemental on the next page)

Insured's Name, as given on Policy Declarations (Face Page):

*COLLECTOR'S COFFEE, INC.* _____

_____

_____

Contact Person: _____

Title: _____

Phone: (_____)_____-_____Ext_____

eMail: _____ @ _____

Case or Claimant Name: _____

_____

If the party involved is different from "Insured" Name (as given on Policy Declarations) state relationship:

_____

Insurance Broker/Agent: _ARC EXCESS & SURPLUS LLC_

Address: _113 SOUTH SERVICE ROAD, POB 9012_

Address: _JERICHO, NY 11753_

Contact: _KATHY PLANT-LEY_                         Phone: _____

eMail: _CCAVALLARO@ARCXS.COM_

Send Notice of Claims to:   AIG                          Phone: (888) 602-5246
                            Financial Lines Claims       Fax:   (866) 227-1750
                            P.O. Box 25947               Email: c-Claim@AIG.com
                            Shawnee Mission, KS 66225



## CLAIM REPORTING FORM
## FIDELITY SUPPLEMENTAL

(Only complete this supplemental if the Claim is being reported under Fidelity Coverage)

Issuing Company: *National Union Fire Insurance Company of Pittsburgh. Pa.*

Reported under Policy/Bond Number:  *01-232-99-82*

Date of Discovery: ————————————— Estimated Amount of loss: ———————————

Cause of Loss:  Employee Dishonesty _____         Computer Fraud _____

Funds Transfer _____         Robbery/Burglary _____

ID Theft _____         Forgery _____

Client Property _____         In Transit _____

ERISA _____         Credit Card Forgery _____

Other _____    if Other, describe: _____

Send Notice Of Claims To:  AIG
Financial Lines Claims
P.O. Box 25947
Shawnee Mission, KS 66225

Phone: (888) 602-5246
Fax:    (866) 227-1750
Email:  c-Claim@AIG.com

*centralized Customer Link and Information Management*